IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| **SH 130 CONCESSION COMPANY, LLC** | § | **CASE NO. 16-10262** |
| **ZACHRY TOLL ROAD – 56 LP** | § | **CASE NO. 16-10263** |
| **CINTRA TX 56 LLC** | § | **CASE NO. 16-10264** |
| | § | |
| **DEBTORS.** | § | **CHAPTER 11** |
| | § | |
| EIN: 20-8490258; 20-8596022; 20-8059105 | § | |
| | § | |
| **10800 N US 183 HWY** | § | *JOINT ADMINISTRATION* |
| **BUDA, TEXAS 78610-9460** | § | *REQUESTED* |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (A) AUTHORIZING THE USE OF CASH COLLATERAL, (B) GRANTING
ADEQUATE PROTECTION, (C) MODIFYING THE AUTOMATIC STAY
AND (D) SCHEDULING A FINAL HEARING**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

SH 130 Concession Company, LLC ("Concessionaire") and certain of its affiliates, as

debtors and debtors in possession (collectively, the "Debtors" and each, a "Debtor"), submit this

motion (the "Motion") for the entry of an interim order (the "Interim Order"),[1] substantially in

the form attached hereto as Exhibit A, and a final order (the "Final Order," and together with the

Interim Order, the "Cash Collateral Orders"), pursuant to sections 105, 361, 362, 363, 507, and

552 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq*., the "Bankruptcy Code"),

Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

and the "Comments to Cash Collateral and DIP Financing Checklist" incorporated into the Local

Rules of Bankruptcy Practice and Procedure (the "Local Rules") of the United States Bankruptcy

Court for the Western District of Texas (the "Court"), (i) authorizing the Debtors to use the cash

---

[1]  Capitalized terms not defined herein shall have the meanings ascribed to them in the proposed Interim Order.

collateral of existing secured lenders, (ii) granting adequate protection to existing secured lenders for such use, (iii) modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors and the Prepetition Secured Parties (as defined below) to implement the terms of the Cash Collateral Orders; (iv) scheduling a final hearing for approval of the relief requested herein on a final basis (the "Final Hearing"); and (v) granting related relief.  In support of this Motion, the Debtors rely upon and incorporate by reference (a) the *Declaration of Paul Harris in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "Harris Declaration") which was filed with the Court concurrently herewith.  In further support of this Motion, the Debtors respectfully represent:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## CONCISE SUMMARY OF MATERIAL TERMS OF INTERIM ORDER[2]

2.      In accordance with Bankruptcy Rule 4001(b)(1)(B), the following is a concise statement and summary of the proposed material terms for the use of Cash Collateral (as defined below):

---

[2] This concise statement is qualified in its entirety by reference to the applicable provisions of the Interim Order. To the extent there exists any inconsistency between the concise statement and the Interim Order, the Interim Order shall control. Any capitalized terms used but not defined in the concise statement shall have the meaning ascribed to such terms in the Interim Order.

| Material Term | Summary Of Material Terms | Provision |
|---|---|---|
| **Parties with Interest in Cash Collateral:**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(i)] | The Pre-Petition Secured Parties, which means the Pre-Petition Lenders and the Agents. | ¶ E |
| **Use:**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(ii)] | Subject to the Carve-Out (as defined below), Cash Collateral will be used only prior to the Termination Date (as defined below) and only in accordance with the terms of this Interim Order and the budget attached hereto as **Exhibit A** (the "Approved Budget"), subject to the following limitations and permitted variances (collectively, the "Budgetary Provisions"): (i) except as otherwise provided in this Interim Order, Cash Collateral shall only be used for the payment of (a) post-petition expenses incurred by the Debtors in the ordinary course of business, (b) such other expenses for working capital and other general corporate purposes that are or may be outside of the ordinary course of business that are agreed to by the Instructing Agent and approved by the Court on notice and opportunity for a hearing, (c) costs of administration of the Chapter 11 Cases, including approved fees and expenses of persons or firms retained by the Debtors pursuant to sections 327, 330 or 363 of the Bankruptcy Code and of any official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee") pursuant to section 1103 of the Bankruptcy Code (collectively, the "Case Professionals"), and (d) such prepetition claims and expenses as agreed to by the Instructing Agent and approved by this Court; and (ii) the Debtors shall be entitled to exceed the amounts set forth in each of the categories of expenses detailed in the Approved Budget (*i.e.*, Concession Payments, Right of Way Payments, Operating Expenses, Sponsor Affiliate Payments, and Capital Expenditures) by up to 10% of the cumulative amount set forth in each such category.  In addition to the amounts set forth in the Approved Budget, during the interim period the Debtors shall be entitled to make payments up to an aggregate amount of $200,000 in connection with funding repairs and/or maintenance costs arising from emergency and/or catastrophic events as required under the Concession Agreement (as defined in the Senior Bank Facility Agreement); to the extent such payments exceed $200,000, the Debtors may make such payments subject to the Prepetition Secured Parties' consent, which consent shall not unreasonably be withheld. | ¶¶ H, 4 |

| | | |
|---|---|---|
| **Term:**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] | Subject only to the Carve-Out, the Debtors' right to use Cash Collateral under the terms of the Interim Order shall terminate immediately upon the earlier of the following (such earlier date referred to as the "Termination Date"): (i) 45 days after the Petition Date (unless extended under the terms of an entered Final Order approved in form and substance by the Instructing Agent); or (ii) a Default; *provided* that, during the Default Notice Period (if applicable), the Debtors shall be entitled to continue to use Cash Collateral in accordance with the terms of the Interim Order and the Approved Budget, subject to the Budgetary Provisions, and during the Default Notice Period, the Debtors may request that the Court order the continued use of Cash Collateral, including on shortened notice.  The Termination Date may be extended with the written consent of the Debtors and the Instructing Agent. | ¶ 7 |
| **Adequate Protection:**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] | In the event this Interim Order ceases to be in effect, the Pre-Petition Secured Parties shall receive and retain all rights and entitlements that a secured creditor would otherwise receive and/or retain if it had not consented to the use of its cash collateral, or sought relief from the automatic stay and had such request overruled.  In addition, the Collateral Agent, for the benefit of the Pre-Petition Secured Parties, is hereby granted the following adequate protection, in each case in an amount equal to the extent of any diminution in value of the Pre-Petition Secured Parties' Collateral from and after the Petition Date for, among other things, any post-petition diminution in the value of the Pre-Petition Secured Parties' Collateral resulting from the use, sale, or lease of such Collateral and/or the imposition of the automatic stay under section 362 of the Bankruptcy Code or otherwise: | ¶ 9 |
| | • <u>Replacement Liens</u>.  Valid, enforceable, non-avoidable, and fully perfected, first-priority post-petition security interests in and liens on (effective and perfected upon the date of entry of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments) each and every Estate Asset (as defined in the Interim Order) that is not subject to (i) valid, perfected, non-avoidable, and enforceable liens in existence on or as of the Petition Date or (ii) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property"); provided that, for purposes of this provision, Unencumbered Property shall not include causes of action under sections 544, 545, 547, 548 or 550 of the Bankruptcy Code (collectively, the "Avoidance Actions"), but upon entry of a Final Order, the Unencumbered Property shall include proceeds of Avoidance Actions (the "Avoidance Action Proceeds"); provided further, however, that the security interests and liens granted in the Avoidance Action Proceeds shall be subject and subordinate to the payment of unsecured claims allowed in these Chapter 11 Cases held by creditors other than affiliates (as defined in section 101(2) of the Bankruptcy Code) and insiders (as defined in section 101(31) of the Bankruptcy Code), unless and to the extent agreed otherwise in writing by the Instructing Agent. | ¶ 9(a) |

| | | |
|---|---|---|
| | • <u>Adequate Protection Liens</u>. Valid, enforceable, non-avoidable, and fully perfected junior priority security interests in and post-petition liens on each and every Estate Asset (other than property excluded pursuant to paragraph 9(a) of the Interim Order) that is subject to (i) valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date or (ii) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, which valid, perfected, and unavoidable liens are senior in priority to the Pre-Petition Liens of the Pre-Petition Secured Parties. | ¶ 9(b) |
| | • <u>Superpriority Claim</u>. An allowed, first-priority, superpriority administrative expense claim under section 507(b) of the Bankruptcy Code (the "Superpriority Claim," and together with the Adequate Protection Liens, the "Adequate Protection Obligations") with priority in payment over any and all administrative expenses of the kinds specified in or ordered pursuant to sections 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims arise in the Chapter 11 Cases or in any subsequent cases or proceedings under the Bankruptcy Code that may result therefrom. | ¶ 9(c) |
| | • The Adequate Protection Liens and Superpriority Claim shall be subject and subordinate only to payment of the Carve-Out in accordance with the terms and conditions of the Interim Order. | ¶ 9(e) |
| **Payment of Professional Fees:**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] | Subject to the provisions of this subparagraph, the Debtors shall pay in cash all reasonable and documented prepetition and post-petition fees and expenses of certain professionals representing the Pre-Petition Secured Parties. | ¶ 10 |
| **Carve Out:**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] | "Carve-Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $30,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed by the Court at any time, subject to the Approved Budget, all unpaid fees and expenses (the "Case Professional Fees") incurred by Case Professionals at any time before the first business day following a Default and delivery of written notice by the Instructing Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and the Committee (if any) and any other official committee appointed in the Chapter 11 Cases of the Instructing Agent's termination of consent to the Debtors' continued use of Cash Collateral (such notice, a "Carve-Out Trigger Notice"), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) to the extent allowed by the Court at any time, Case Professional Fees incurred by Case Professionals on or after the first business day following the delivery of a Carve-Out Trigger Notice in an aggregate amount not to exceed $750,000 (the "Residual Carve-Out"). | ¶ 11 |
| **Events of Default:**<br><br>[Fed. R. Bankr. P. | The occurrence of any of the following shall constitute an Event of Default:<br><br>• The Debtors' failure to comply with any of the terms or conditions of the Interim Order, including, without limitation, the Approved Budget, subject | ¶ 5 |

| 4001(b)(1)(B)(iii)] | to the Budgetary Provisions. | |
| --- | --- | --- |
| | • The Debtors' filing of an application, motion, or other pleading seeking to amend, modify, supplement, or extend the Interim Order or the Approved Budget without the prior written consent of the Instructing Agent. | |
| | • The entry of any order reversing, amending, supplementing, staying, vacating, or otherwise modifying the Interim Order without the prior written consent of the Instructing Agent. | |
| | • The Debtors' assertion in any pleading filed in any court that any material provision of the Interim Order is not valid and binding (unless such pleading is filed in response to the Pre-Petition Secured Parties' failure to comply with the terms and conditions of the Interim Order). | |
| | • Any material provision of this Interim Order shall for any reason cease to be valid and binding (for the avoidance of doubt, the occurrence of the Termination Date described in clause (i) of Paragraph 7 shall not cause this Interim Order to cease to be valid and binding). | |
| | • The Debtors' filing of an application for the approval of any superpriority claim or for the grant of any lien or security interest in the Collateral, the Cash Collateral, or the Replacement Lien Collateral (other than with respect to any lien or security interest permitted under the Loan Documents)) without the prior written consent of the Instructing Agent. | |
| | • The entry of an order approving a superpriority claim or granting a lien or security interest in the Collateral, the Cash Collateral, or the Replacement Lien Collateral (other than with respect to any lien or security interest permitted under the Loan Documents)) without the prior written consent of the Instructing Agent. | |
| | • The Debtors' filing of a motion or other pleading seeking the dismissal or conversion of any or all of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code or otherwise, in each case, without the prior written consent of the Pre-Petition Secured Parties. | |
| | • The dismissal of any or all of the Chapter 11 Cases or the conversion of any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code. | |
| | • The Debtors' application for, consent to, or acquiesce in, the appointment of a trustee or an examiner having powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in any or all of the Chapter 11 Cases, without the prior written consent of the Pre-Petition Secured Parties. | |
| | • The appointment or election of a trustee or an examiner having powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in any or all of the Chapter 11 Cases. | |
| | • The Debtors' filing of any motion, action, application, or adversary proceeding seeking relief against any of the Pre-Petition Secured Parties with respect to the validity, enforceability, perfection, or priority of the Pre-Petition Liens, the Pre-Petition Obligations, or otherwise, other than a | |

| | | |
|---|---|---|
| | Reserved Rights Action. | |
| | • The Concession Agreement or the Facility Lease (as those terms are defined in the Senior Bank Facility Agreements) is terminated. | |
| | • The Debtors' failure to maintain all such insurance and comply with all such insurance requirements as provided for under the terms of section 6.1.7(a) and 6.1.7(b) of the Senior Bank Facility Agreement. | |
| | • The entry of an order modifying the automatic stay of section 362(a) of the Bankruptcy Code for the benefit of any party other than the Instructing Agent or the Collateral Agent in relation to any Collateral, Cash Collateral, or Replacement Lien Collateral. | |
| **Stipulations:**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] | The Debtors acknowledge, admit, represent, stipulate, and agree that:<br><br>• As of the Petition Date, the Debtors were indebted and liable to the First Lien Lenders in the principal amount of at least $720,749,970, plus interest accrued, and costs and any fees and expenses due and owing under, and any additional amounts which may be owing pursuant to or in connection with letter of credit commitments made pursuant to, the Senior Bank Facility Agreement.<br><br>• The Hedge Counterparties have not exercised early termination rights under their respective Swap Agreements. But, as of the Petition Date, if such rights were so exercised, the Hedge Counterparties would have claims against the Debtors arising from the Swap Agreement Obligations in the amount of at least $312 million.<br><br>• As of the Petition Date, the Debtors were indebted and liable to TIFIA in the principal amount of at least $550,875,000, plus interest accrued (but not yet capitalized into the aggregate outstanding principal amount), and costs and any fees and expenses due and owing under the TIFIA Agreement (collectively, the "Pre-Petition TIFIA Facility Obligations" and collectively with the Pre-Petition Senior Bank Facility Obligations and Swap Agreement Obligations, the "Pre-Petition Obligations").<br><br>• As of the Petition Date, the Senior Bank Facility Agreement, each of the Swap Agreements, the TIFIA Agreement, the Collateral Agency Agreement, the Security Agreement, the Pledge Agreement, the Waiver Agreements, each other "Financing Document" (as defined in the Senior Bank Facility Agreement), and all other documentation associated with the foregoing, including any exhibits, schedules and attachments thereto, amendments thereof, and any other related transactional documents (collectively the "Loan Documents"): (a) constitute the legal, valid, binding, and unavoidable obligations of the Debtors, secured by the Pre-Petition Liens; and (b) subject to the Reserved Rights, are not, and shall not be, subject to any avoidance, disallowance, disgorgement, reduction, setoff, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, or any other challenges of any kind or nature under the Bankruptcy Code or any other applicable law or regulation.<br><br>• As of the Petition Date, the Pre-Petition Liens: (a) constitute legal, valid, binding, properly perfected and unavoidable first priority liens and security interests in the Collateral, subject, however, to the terms of the | ¶ F |

| | | |
|---|---|---|
| | ICA; and (b) are not, and shall not be, subject to any avoidance, recharacterization, subordination (whether equitable, contractual, or otherwise), or any other challenges of any kind or nature under the Bankruptcy Code or any other applicable law or regulation.<br><br>• None of the Pre-Petition Secured Parties is or shall be deemed to be a control person or insider of any of the Debtors by virtue of any of the actions taken by such party in respect of or in connection with the Loan Documents prior to or during the Chapter 11 Cases.<br><br>• Subject to the Reserved Rights, as of the Petition Date, the Debtors have not asserted, are not aware of, and, subject to the entry of the Final Order, have no, claims, objections, challenges, causes of action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against any of the Pre-Petition Secured Parties arising out of or related to the Loans Documents or otherwise.<br><br>• As of the Petition Date, other than the Pre-Petition Liens and as otherwise permitted under the Loan Documents, there were no liens on or security interests in the Collateral. | |
| **Waivers:**<br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] | The Pre-Petition Secured Parties, subject to entry of the Final Order, shall be entitled to (i) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (ii) a waiver of the provisions of section 506(c) of the Bankruptcy Code. Extraordinary circumstances exist for the granting of such relief in light of the public and regulatory interests involved in these Chapter 11 Cases, the immediate and irreparable harm to the estates that would result during the interim period covered by this Interim Order in the absence of the Debtors' ability to use Cash Collateral. | ¶ J |

## **BACKGROUND**

### A.   **General Background**

3.    On the date hereof (the "Petition Date"), each of the Debtors commenced cases (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.

4.    On June 28, 2006, the Debtors' investors reached a $1.3 billion agreement with the State of Texas to finance, develop, design, construct, operate, and maintain segments five and six (the "Tollway") of Texas State Highway 130 ("SH 130"). In 2007, the Debtors were formed

to implement these plans with respect to the Tollway in partnership with the Texas Department of Transportation ("TxDOT").  SH 130 is a component of the Central Texas Turnpike System, and runs in a 91-mile corridor commencing north and east of Austin and ending east of San Antonio.  The Tollway portion of SH 130 forms a 41-mile link from Mustang Ridge, Texas through Travis, Caldwell, and Guadalupe counties to Interstate 10 near Seguin, Texas.

5.      Construction of the Tollway began in April 2009, and created more than 3,600 jobs and engaged more than 150 Texas-based companies.  The Tollway opened to traffic on October 24, 2012, and provides a fast and convenient highway for commuters and long distance travelers.  The posted speed limit on the Tollway's main lanes is 85 miles per hour – the highest posted speed limit in the United States.  Throughout the Tollway, drivers enjoy the benefits of "open road tolling," whereby tolls are assessed electronically at certain points along the Tollway without the use of toll-booths, enabling motorists to drive the entire 41-mile Tollway at highway speeds without having to slow down or stop for payment.

6.      The key driver of the Debtors' profitability is traffic volume on the Tollway, as the Tollway generates revenue by the assessment of tolls in exchange for the use of the road. Concessionaire and TxDOT are parties to that certain Facility Concession Agreement, SH 130 Segments 5 and 6 Facility, dated March 22, 2007 (the "FCA").  The FCA sets forth the terms and conditions of TxDOT's grant to the Concessionaire of the exclusive right to impose tolls. Pursuant to the FCA, the Concessionaire developed and constructed, and now operates and maintains, the Tollway.  The FCA also governs the terms and conditions of the toll revenue sharing arrangement between the Concessionaire and TxDOT.  Under the terms of the FCA, TxDOT has no obligation to commit any funds to the development, construction, operation, and maintenance of the Tollway.  Since it began operating the Tollway, the Concessionaire has made

payments to TxDOT under the FCA in the amount of $142.6 million.[3] No TxDOT funds were utilized in the construction of the Tollway.

7.      Pursuant to the FCA, the Concessionaire has the exclusive right to (a) impose tolls upon the Tollway, (b) establish, modify and adjust toll rates subject to a maximum amount as set forth in the FCA, (c) receive toll amounts, and (d) subject to TxDOT's right to perform toll handling, collection, and enforcement services, to enforce and collect tolls.  The Concessionaire also has exclusive rights to all Toll Revenues (as defined in the FCA but excluding Video Trip Toll Premiums (as defined in the FCA)), subject to TxDOT's right to share in a percentage thereof.

8.      As of the Petition Date, the Debtors employ approximately 30 employees.  As discussed below, the Debtors' prepetition capital structure consists of (a) senior secured debt consisting of (i) private loans, (ii) certain obligations arising from interest rate hedging arrangements, and (iii) loans made by the United States Department of Transportation ("USDOT") under the Transportation Infrastructure Financing and Innovation Act of 1998 ("TIFIA"), and (b) certain other miscellaneous unsecured debt.  As of the Petition Date, the Debtors' total consolidated lender debt (excluding trade debt but including amounts owing to USDOT under TIFIA) consisted of an aggregate principal amount of approximately $1.272 billion, plus accrued interest, fees, expenses, charges, and other obligations (including swap obligations) incurred in connection therewith.  The Debtors estimate their unsecured liabilities to be approximately $2.0 million as of the Petition Date.  The Debtors' shareholders have invested approximately $345.5 million of equity in the Concessionaire.

---

[3] The breakdown of these payments is as follows: (i) $25.8 million for a concession payment, (ii) $15.3 million for payment sales tax related payment, (iii) $100 million in connection with increasing the speed limit on the Tollway to 85 miles per hour, and (iv) $1.5 million in connection with hazardous material remediation charges.

9.     Since its inception, a number of factors have coalesced that significantly strained the Concessionaire's ability to continue to service its outstanding indebtedness and, ultimately, led to the Debtors' filing of the Chapter 11 Cases.  Those events include the worldwide economic crisis that commenced in 2007—which affected nearly every segment of the United States' economy—and the concomitant negative impact on projected traffic volumes has led to revenues being significantly below levels projected when construction of the Tollway was financed.  Because of less-than-projected revenues generated by the Tollway, the Debtors do not have the liquidity necessary to service their prepetition senior debt, thus precipitating the filing of the Chapter 11 Cases.  These circumstances, coupled with the Concessionaire's unsuccessful attempts to implement an out-of-court restructuring and the Concessionaire's potential defaults under the Senior Credit Facility and Swap Agreements, resulted in the commencement of these Chapter 11 Cases to maximize the value of the Tollway for all stakeholders

10.    The Debtors commenced these Chapter 11 Cases with the goal of developing and implementing a comprehensive proposal designed to enable the Debtors to restructure their debts and realize the full value of the Tollway over time for the benefit of the Debtors' creditors and other stakeholders.

**B.     Debtors' Prepetition Indebtedness**

11.    The Debtors' capital structure consists of senior secured debt in the form of (a) private loans, (b) loans made by the USDOT under the TIFIA and (c) other miscellaneous unsecured debt.  As of the Petition Date, the Debtors' total consolidated lender debt (excluding trade debt but including amounts owing to USDOT under TIFIA) was approximately $1.272 billion.  The Debtors are indebted under the following prepetition credit arrangements:

###### i.      *Senior Bank Facility*

12.     Pursuant to that certain Initial Senior Loan Agreement, dated as of March 7, 2008 (as amended, the "Senior Bank Facility Agreement"), among the Concessionaire, as borrower, lenders from time-to-time party thereto (collectively, the "First Lien Lenders"), BNP Paribas (as successor to Fortis Bank S.A./N.V., UK Branch), as administrative agent (in such capacity, the "Administrative Agent") for the First Lien Lenders, Banco Santander, S.A., New York Branch as fronting bank (the "Fronting Bank"), and the mandated lead arrangers party thereto, the First Lien Lenders provided to the Concessionaire a first lien secured credit facility of up to $720,750,000 in aggregate principal amount of term loan commitments (the "Senior Bank Facility").  The Senior Bank Facility consists of three tranches, each with a different availability period:  (i) Facility A, totaling $685,750,000 in aggregate commitments, which was available to the Concessionaire through the period of the construction of the Tollway; (ii) Facility B, totaling $35,000,000 in aggregate commitments, which was available from the service commencement date to the tenth anniversary of the effective date of the Senior Bank Facility Agreement; and (iii) Facility C, totaling $29,100,000 in aggregate commitments, which was available based on certain events relating to the letter of credit issued in favor of TxDOT in connection with the project until the tenth anniversary of the effective date of the Senior Bank Facility Agreement. The Senior Bank Facility matures on the last business day of February, 2038, and interest thereunder is paid semi-annually, currently at a rate of LIBOR plus 1.65% per annum.

13.     Pursuant to Section 3.5.3 of the Senior Bank Facility Agreement, an interest payment (the "Interest Payment") was due to be made by the Debtors to BNP Paribas as Administrative Agent for the benefit of the First lien Lenders on the payment date under the Senior Bank Facility Agreement scheduled for June 30, 2014.  Additionally, pursuant to Section

3.10.2 of the Senior Bank Facility Agreement, (i) a non-fronting LC fee (the "Non-Fronting LC Fee") was due to be made by the Debtors to BNP Paribas as Administrative Agent for the benefit of each Facility C Lender, and (ii) a fronting LC fee (the "Fronting LC Fee") was due to be made by the Debtors the Fronting Bank, on the payment date under the Senior Bank Facility Agreement scheduled for June 30, 2014.

14.     On June 30, 2014, the Concessionaire, the First Lien Lenders, the Hedge Counterparties (as defined below) and the Fronting Bank executed a waiver agreement (the "Waiver Agreement"), in which (i) the First Lien Lenders agreed to waive the Interest Payment and the Non-Fronting LC Fee and (ii) the Fronting Bank agreed to waive the Fronting LC Fee, in each case until December 15, 2014 (without giving effect to applicable grace periods).

15.     On December 15, 2014, the Concessionaire, the First Lien Lenders, the Hedge Counterparties and the Fronting Bank executed a modification and waiver agreement (the "Modification and Waiver Agreement"), pursuant to which (i) the First Lien Lenders agreed to waive the Interest Payment and the Non-Fronting LC Fee and (ii) the Fronting Bank agreed to waive the Fronting LC Fee, in each case until January 29, 2016 (without giving effect to applicable grace periods).

16.     On January 29, 2016, the Concessionaire, the First Lien Lenders, the Hedge Counterparties and the Fronting Bank executed a second modification and waiver agreement (the "Second Modification Agreement"), pursuant to which (i) the First Lien Lenders agreed to waive the Interest Payment and the Non-Fronting LC Fee and (ii) the Fronting Bank agreed to waive the Fronting LC Fee, in each case until February 28, 2016 (without giving effect to applicable grace periods).

17.     Prior to the filing, the Debtors continued to negotiate in good faith with the Prepetition Secured Parties regarding a global resolution to restructure the outstanding debt and concurrently to reach a resolution regarding a further extension of the waiver to allow time for the parties to negotiate the global restructuring.  While significant progress was made on both those fronts, ultimately the parties did not reach a global resolution prior to the expiration of the waiver period set forth in the Second Modification Agreement.

18.     As of the Petition Date, the Debtors were indebted and liable to the Administrative Agent and First Lien Lenders in the aggregate principal amount of approximately $720,750,000 plus accrued interest, fees, expenses, charges and all other obligations incurred in connection therewith to the extent provided in the Senior Bank Facility Agreement (the "Prepetition Senior Bank Facility Obligations").

### ii.     Swap Agreements

19.     To hedge interest rate risk, the Concessionaire is party to the following swap agreements: (i) that certain ISDA Master Agreement between Caixa – Banco de Investimento, S.A. (in such capacity, the "Caixa Hedging Bank") and the Concessionaire dated as of March 7, 2008 (together with its Schedule and Confirmation thereto (as each such term is defined therein), the "Caixa Swap Agreement"); (ii) that certain ISDA Master Agreement between Espírito Santo, plc, as successor to Banco Espírito Santo, S.A., New York Branch (in such capacity, the "Banco Espírito Hedging Bank") and the Concessionaire dated as of March 7, 2008 (together with its Schedule and Confirmation thereto (as each such term is defined therein), the "Banco Espírito Swap Agreement"); (iii) that certain ISDA Master Agreement between Bankia S.A., as successor to Caja de Ahorros y Monte de Piedad de Madrid Miami Agency (in such capacity, the "Bankia Hedging Bank") and the Concessionaire dated as of March 7, 2008 (together with its Schedule

and Confirmation thereto (as each such term is defined therein), the "Bankia Swap Agreement");
(iv) that certain ISDA Master Agreement between Fortis Bank SA Sucursal en Espana (in such
capacity, the "Fortis Hedging Bank") and the Concessionaire dated as of March 7, 2008 (together
with its Schedule and Confirmation thereto (as each such term is defined therein), the "Fortis
Swap Agreement"); and (v) that certain ISDA Master Agreement between Banco Santander,
S.A. (collectively with the Caixa Hedging Bank, the Banco Espírito Hedging Bank, the Bankia
Hedging Bank, and the Fortis Hedging Bank, the "Hedge Counterparties," and collectively with
the First Lien Lenders, the "Senior Lenders") and the Concessionaire dated as of March 7, 2008
(together with its Schedule and Confirmation thereto (as each such term is defined therein), and
collectively with the Caixa Swap Agreement, the Banco Espírito Swap Agreement, the Bankia
Swap Agreement and the Fortis Swap Agreement, the "Swap Agreements," and collectively with
the Senior Bank Facility Agreement, the "Senior Loan Agreements").

20.    Pursuant to Section 2(a)(i) of each of the Swap Agreements and the attached
respective Confirmations (as defined in the Swap Agreements), a net payment in each Hedge
Counterparty's favor (the "Swap Obligation") was due to be made by the Debtors to each such
Hedge Counterparty on the payment date under the respective Swap Agreements scheduled for
June 30, 2014.

21.    In connection with the Waiver Agreement, the Hedge Counterparties agreed to
waive the Swap Obligation until December 15, 2014 (without giving effect to applicable grace
periods).  In connection with the Modification and Waiver Agreement, Hedge Counterparties
agreed to waive the Swap Obligation until January 29, 2016 (without giving effect to applicable
grace periods). Finally, in connection with the Second Modification Agreement, the Hedge

Counterparties agreed to waive the Swap Obligation until February 28, 2016 (without giving effect to applicable grace periods).

22.     The Hedge Counterparties have not exercised early termination rights under their respective Swap Agreements.  However, as of the Petition Date, if such rights were so exercised, the Concessionaire would be indebted and liable to the Hedge Counterparties in the aggregate estimated amount of approximately $312 million (the "Swap Agreement Obligations").

### iii.     TIFIA Facility

23.     The Transportation Infrastructure Finance and Innovation Act (TIFIA) program provides Federal credit assistance in the form of direct loans, loan guarantees, and standby lines of credit to finance surface transportation projects of national and regional significance. TIFIA credit assistance provides improved access to capital markets, flexible repayment terms, and potentially more favorable interest rates than can be found in private capital markets for similar instruments. TIFIA can help advance qualified, large-scale projects that otherwise might be delayed or deferred because of size, complexity, or uncertainty over the timing of revenues.  . Pursuant to that certain TIFIA Loan Agreement, dated as of March 7, 2008 (the "TIFIA Loan Agreement," and together with the Senior Loan Agreements, the "Prepetition Loan Agreements"), between the Concessionaire and USDOT, acting by and through the Federal Highway Administrator (the "TIFIA Lender," and together with the Senior Lenders, the "Prepetition Lenders"), the TIFIA Lender provided a subordinated term loan credit facility of up to $430,000,000 (the "TIFIA Facility").  The TIFIA Facility matures on June 30, 2047, and interest is payable semi-annually at a rate of 4.46% per annum. Under the TIFIA Agreement, the first interest payment is scheduled for June 2017 and principal repayments are scheduled to begin in June 2018. To date, interest has been capitalized.

24.     As of the Petition Date, the Debtors were indebted and liable to the TIFIA Lender in the principal amount, including interest capitalized through December 31, 2015, of approximately $550,875,000, plus accrued interest, fees, expenses, charges and all other obligations incurred in connection therewith to the extent provided in the TIFIA Loan Agreement (the "Prepetition TIFIA Facility Obligations," and together with the Prepetition Senior Bank Facility Obligations and the Swap Agreement Obligations, the "Prepetition Obligations").

> ### iv.     Security Agreement, Pledge Agreement and Collateral Agency Agreement

25.     To secure the obligations under the Prepetition Loan Agreements, the Concessionaire granted Wells Fargo Bank, National Association (as predecessor to Deutsche Bank Trust Company Americas), as collateral agent (in such capacity, the "Collateral Agent"), first-priority liens (the "Prepetition Liens") upon and in the "Collateral" (the "Security Agreement Collateral") as defined in that certain Security Agreement between Concessionaire, as borrower, and the Collateral Agent, dated as of March 7, 2008 (the "Security Agreement").

26.     In addition, pursuant to that certain Members Pledge Agreement, dated as of March 7, 2008 (the "Pledge Agreement"), CINTRA TX 56 LLC and Zachry Toll Road–56, LP pledged, in support of the Concessionaire's secured obligations under the Prepetition Loan Agreements, all Member Collateral (as defined therein) to the Collateral Agent (the "Pledge Agreement Collateral," and together with the Security Agreement Collateral, the "Prepetition Collateral").

27.     Pursuant to that certain Collateral Agency and Account Agreement by and among the Collateral Agent, Concessionaire, the Administrative Agent, the Hedge Counterparties, and the TIFIA Lender (the "Collateral Agency Agreement"), the Collateral Agent acts as the secured

party under the Secured Financing Documents (as defined in the Collateral Agency Agreement) for the benefit of the Administrative Agent and the Prepetition Lenders (collectively with the Collateral Agent, the "Prepetition Secured Parties").

### v.        Intercreditor Agreement

28.        Prior to the Petition Date, Fortis Bank S.A./N.V., UK Branch (as predecessor to BNP Paribas), as instructing agent (in such capacity, the "Instructing Agent"), the TIFIA Lender, and the Collateral Agent entered into that certain Subordination and Intercreditor Agreement, dated as of March 7, 2008 (the "ICA"), which addresses the respective rights, interests, obligations, priority and positions of the Senior Lenders and the TIFIA Lender with respect to the Prepetition Collateral.  Pursuant to the ICA, the liens securing the TIFIA Loan Agreement were originally subordinated to the liens securing the Senior Loan Agreements.  However, as a result of the commencement of the Chapter 11 Cases, by operation of applicable non-bankruptcy law and pursuant to the terms of the ICA, the lien and payment priority of the obligations arising under the TIFIA Loan Agreement became *pari passu* with the obligations arising under the Senior Loan Agreements as of the Petition Date.

### iv.        Trade Debt and Other Unsecured Claims

29.        The Debtors owe approximately $1.9 million in unsecured trade debt as of the Petition Date.  This debt arises from the provision of goods and services necessary for the operation of the Debtors' businesses.  The Debtors owe approximately $125,000 in other general unsecured claims as of the Petition Date, which is mostly comprised of accrued but unpaid wages, salaries and other employee compensation.

## C.        The Cash and Prepetition Collateral

30.        As described more fully in the Harris Declaration, the Debtors have the exclusive right, title, entitlement and interest in and to all Toll Revenue, subject to TxDOT's right to share in a percentage thereof.  Pursuant to the FCA, TxDOT collects and processes the Toll Revenue from drivers and then subsequently remits an agreed-upon amount per driver to the Concessionaire.

31.        After a careful analysis of applicable law and the Prepetition Secured Parties' Security Agreement and related documents, the Debtors' have determined that the postpetition Toll Revenues do not constitute Cash Collateral (as defined in the Interim Order).  Cash generated postpetition is not subject to the requirements of section 363 unless it satisfies section 552 of the Bankruptcy Code. S*ee Far E. Nat'l Bank v. U.S. Tr., San Diego (In re Premier Golf Props.)*, 477 B.R. 767, 772  (9th Cir. BAP 2012) (holding that secured lenders are "not entitled to the protections of § 363(c)(2) unless [their] security interest satisfies [section 552]" of the Bankruptcy Code).

32.        Section 552(a) codifies the general rule that "postpetition revenue is not cash collateral."  *Id*.  Section 552(b) of the Bankruptcy Code provides a "narrow exception" that allows a perfected prepetition security interest to extend to "proceeds, products, offspring, or profits" of prepetition collateral and "amounts paid as rents" of prepetition collateral if the prepetition interest expressly included such property.  *See id*.; 11 U.S.C. § 552(b).  Thus, cash generated postpetition by a debtor's business is unencumbered unless it falls in one of the five exceptions to section 552(a) and the prepetition security interest attached to the applicable exception.

33.     The Debtors' postpetition Toll Revenues do not fall within any of the exceptions to section 552(a).  As an initial matter, neither the "products" nor the "offspring" exception applies to postpetition toll revenue.  *See, e.g., In re Mintz*, 192 B.R. 313, 320 (Bankr. D. Mass. 1996) (applying Massachusetts law and holding "offspring" and "products" did not apply to income stream).

34.     Since tolls are paid in exchange for the right to access the Tollway, the Debtors' postpetition Toll Revenue also does not qualify as "proceeds" of any Prepetition Collateral.  *See In re Wright Grp., Inc.*, 443 B.R. 795, 800 (Bankr. N.D. Ind. 2011); *In re Premier Golf*, 477 B.R. at 776 (holding that value of a license to use the debtor's golf course was "largely the result of the [debtor's] labor and own operational resources" and, "[c]onsequently, although the green fees and driving range fees may be 'collected on' the [debtor's] licenses, they are not proceeds generated from the [lender's] collateral").  Similarly, because postpetition tolls are not derived from the disposition of the Debtors' real property, postpetition tolls do not constitute "rents" or "profits" of Prepetition Collateral. *See, e.g., In re Wabash Valley Power Ass'n*, 114 B.R. 613, 619–20 (S.D. Ind. 1989).

35.     Nevertheless, the Debtors are proposing to provide the Prepetition Secured Parties with replacement liens on all of the Concessionaire's unencumbered property, including Toll Revenue generated postpetition, in exchange for the Prepetition Secured Parties' consent to the Debtors' continued use of the Cash Collateral.

## RELIEF REQUESTED

36.     By this Motion, pursuant to sections 105, 361 and 363 of the Bankruptcy Code and Bankruptcy Rules 4001 and 9014, and "Comments to Cash Collateral and DIP Financing Checklist" incorporated into the Local Rules of the Court, the Debtors request that the Court grant the following relief as provided in the Cash Collateral Orders:

(a)    authorize the Debtors on an interim basis, pursuant to section 363(c) of the Bankruptcy Code, to use Cash Collateral (as defined in the Interim Order) in accordance with the budget (as amended from time to time, the "Budget") attached to the Interim Order as <u>Exhibit 1</u>;

(b)    authorize the Debtors on an interim basis, pursuant to sections 361 and 363 of the Bankruptcy Code, to provide the adequate protection described herein to the Prepetition Secured Parties with respect to any diminution in value of the Prepetition Secured Parties' interests in the Prepetition Collateral whether from the use of Cash Collateral or the use, sale, lease, depreciation, decline in market price, or otherwise, of the Prepetition Collateral;

(c)    modify the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors and the Prepetition Secured Parties to implement the terms of the Cash Collateral Orders;

(d)    schedule the Final Hearing, pursuant to Bankruptcy Rule 4001, to consider entry of a Final Order authorizing the use of Cash Collateral and approving the notice procedures in respect of the Final Hearing;

(e)    authorize the Debtors on a final basis, pursuant to section 363(c) of the Bankruptcy Code, to use Cash Collateral in accordance with the Budget and any supplemental Budgets as approved by the Court after further notice and hearing;

(f)    authorize the Debtors on a final basis, pursuant to sections 361 and 363 of the Bankruptcy Code, to provide the adequate protection described herein to the Prepetition Secured Parties with respect to any diminution in value of the Prepetition Secured Parties' interests in the Prepetition Collateral whether from the use of Cash Collateral or the use, sale, lease, depreciation, decline in market price, or otherwise of the Prepetition Collateral; and

(g)    grant related relief.

37.    The Debtors and the Senior Lenders intend to seek authority in the Final Order to pay pre-petition, unsecured claims in the ordinary course of business. The conditions for such payments to be made are still subject to negotiations among the Debtors and the Senior Lenders.

## THE CASH COLLATERAL USE

38.    The Debtors use the Toll Revenues to fund their day-to-day operations, and to service other business obligations, including without limitation those obligations discussed

herein and in more detail in the Harris Declaration.  The proposed immediate use of Cash Collateral is intended to provide working capital while the Debtors operate in chapter 11 pending the Final Hearing.

39.     The Debtors have, with the assistance of their proposed financial advisor and legal counsel, analyzed their cash needs in an effort to determine what is necessary to maintain their operations in chapter 11 and work towards a successful reorganization. In undertaking this analysis, the Debtors and their advisors have conferred with individuals in the Debtors' operational and management teams to understand key business metrics in both the near and long term.

**DEBTORS' URGENT NEED FOR USE OF CASH COLLATERAL**

40.     The Debtors have an immediate and urgent need for the use of Cash Collateral during the Chapter 11 Cases to continue to operate their businesses, pay employees, perform critical maintenance and upkeep on the Tollway, satisfy other working capital and operational needs and sufficiently fund their reorganization.  As of the Petition Date, the Debtors do not have sufficient unencumbered cash to fund their business operations and pay present operating expenses.  The Debtors' access to Cash Collateral is necessary to preserve and maximize value for the Debtors' stakeholders.

41.     The Debtors use Cash Collateral in the ordinary course of business to pay their employees, maintain the Tollway, and satisfy other working capital needs.  Absent approval of the Interim Order, the Debtors will be unable to operate their businesses, generate revenue, provide critical maintenance to the Tollway, satisfy working capital obligations and pay basic expenses, including payroll and trade obligations, or satisfy other ongoing obligations related to the Tollway, including maintenance required by TxDOT under the FCA. Failure to fund these

expenses would prove seriously disruptive to the Debtors' relationship with TxDOT, vendors, and employees and could cause severe and irreparable harm to the Debtors' operations to the material detriment of the estates. Indeed, with respect to the Debtors' relationship with TxDOT, which is governed by the FCA, failure to provide critical maintenance to the Tollway could result in termination rights in favor of TxDOT, which would jeopardize the Debtors' most substantial asset: the FCA itself. Also, any cessation of operation would result in an inability to retain their employees, many of whom have specialized skills and training necessary for their positions.

42. Recognizing the need to access cash, the Debtors engaged in discussions with the Senior Lenders regarding the Debtors' consensual continued use of Cash Collateral. The parties reached an agreement, the terms of which are described herein and set forth in the proposed Interim Order.

## THE PROPOSED ADEQUATE PROTECTION

43. The Debtors propose to provide to the Prepetition Secured Parties the following adequate protection (collectively, the "Adequate Protection Obligations"):

- <u>Replacement Liens</u>. In an amount equal to the extent of any diminution in value of the Pre-Petition Secured Parties' Collateral from and after the Petition Date, valid, enforceable, non-avoidable, and fully perfected, first-priority post-petition security interests in and liens on (effective and perfected upon the date of entry of this Interim Order and without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements, and other agreements or instruments) each and every Estate Asset (as defined in the Interim Order) that is not subject to (i) valid, perfected, non-avoidable, and enforceable liens in existence on or as of the Petition Date or (ii) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property"); provided that, for purposes of this provision, Unencumbered Property shall not include causes of action under sections 544, 545, 547, 548 or 550 of the Bankruptcy Code (collectively, the "Avoidance Actions"), but upon entry of a Final Order, the

Unencumbered Property shall include proceeds of Avoidance Actions (the "Avoidance Action Proceeds"); provided further, however, that the security interests and liens granted in the Avoidance Action Proceeds shall be subject and subordinate to the payment of unsecured claims allowed in these Chapter 11 Cases held by creditors other than affiliates (as defined in section 101(2) of the Bankruptcy Code) and insiders (as defined in section 101(31) of the Bankruptcy Code), unless and to the extent agreed otherwise in writing by the Instructing Agent.

- Adequate Protection Liens.  In an amount equal to the extent of any diminution in value of the Pre-Petition Secured Parties' Collateral from and after the Petition Date, valid, enforceable, non-avoidable, and fully perfected junior priority security interests in and post-petition liens on each and every Estate Asset (other than property excluded pursuant to paragraph 9(a) of the Interim Order) that is subject to (i) valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date or (ii) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, which valid, perfected, and unavoidable liens are senior in priority to the Pre-Petition Liens of the Pre-Petition Secured Parties.

- Superpriority Claim. In an amount equal to the extent of any diminution in value of the Pre-Petition Secured Parties' Collateral from and after the Petition Date, an allowed, first-priority, superpriority administrative expense claim under section 507(b) of the Bankruptcy Code (the "Superpriority Claim," and together with the Adequate Protection Liens, the "Adequate Protection Obligations") with priority in payment over any and all administrative expenses of the kinds specified in or ordered pursuant to sections 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims arise in the Chapter 11 Cases or in any subsequent cases or proceedings under the Bankruptcy Code that may result therefrom.

- Adequate Protection Payments. Subject to the provisions of the Interim Order, the Debtors shall pay in cash all reasonable and documented prepetition and post-petition fees and expenses of certain professionals representing the Pre-Petition Secured Parties.

<u>**BASIS FOR RELIEF REQUESTED**</u>

**(A)      The Proposed Use of Cash Collateral Should Be Approved.**

> **1.      The Use of Cash Collateral is Warranted Based on the Lenders'
> Consent**

44.      The use of estate property by a debtor-in-possession is governed by section 363 of

the Bankruptcy Code.  Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may use

cash collateral as long as "(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the

provisions of this section."  11 U.S.C. § 363(c)(2).

45.      The Prepetition Secured Parties have consented to (or have agreed to not object

to) the Debtors' use of Cash Collateral pursuant to the terms of the Cash Collateral Orders.

Accordingly, the Debtors request that the Court authorize the Debtors to use Cash Collateral in

accordance with section 363(c)(2) of the Bankruptcy Code and the terms set forth in the Cash

Collateral Orders.[4]

> **2.      The Use of Cash Collateral Is Necessary and Should Be Approved**

46.      Courts have recognized that use of cash is required to preserve a debtor's business

as a going concern.  As noted by the Eleventh Circuit:  "A debtor, attempting to reorganize a

business under Chapter 11, clearly has a compelling need to use 'cash collateral' in its effort to

rebuild.  Without the availability of cash to meet daily operating expenses such as rent, payroll,

utilities, etc., the congressional policy favoring rehabilitation over economic failure would be

frustrated."  *Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.)*,

727 F.2d 1017, 1019 (11th Cir. 1984); *see also Northwest Airlines Corp. v. Ass'n of Flight*

---

[4]Even if the Prepetition Secured Parties had not consented to the Debtors' use of Cash Collateral, the adequate
protection proposed by the Debtors would be sufficient to adequately protect the Prepetition Secured Parties' against
a diminution in value of their collateral, as demonstrated below.

*Attendants-CWA (In re Northwest Airlines Corp.)*, 349 B.R. 338, 380 (S.D.N.Y. 2006) ("The Bankruptcy Code embodies a strong policy in favor of reorganization").

47. The Debtors' ability to continue to fund their business operations, maintain their existing assets and appropriately restructure their balance sheet is critical to the outcome of the Chapter 11 Cases. Absent the use of Cash Collateral, the Debtors' businesses would immediately cease, with disastrous consequences for their businesses. Absent the use of Cash Collateral, the Debtors would need to immediately cease operating the Tollway, which would be catastrophic economically to all parties in interest in the Chapter 11 Cases Use of Cash Collateral is, therefore, of the utmost importance to the preservation and maintenance of the value of the Debtors, essential to the continued operations of the Debtors and the restructuring, and maximizing the value of their estates for all parties in interest.

### 3. The Proposed Adequate Protection Should Be Approved

48. As discussed, Cash Collateral will be used to ensure that the Debtors have sufficient working capital and liquidity to operate their businesses and thus preserve and maintain the going concern value of the Debtors' estates during the Chapter 11 Cases. If Cash Collateral were not available for this purpose, the Debtors would not have the ability to maintain their operations. Accordingly, in exchange for the Debtors' use of Cash Collateral, the Debtors have agreed to provide, and request that the Court approve, as of the Petition Date, certain protections of the Prepetition Secured Parties' interests in their Cash Collateral from diminution in value resulting from the Debtors' use of Cash Collateral or the imposition of the automatic stay. As described above, the Debtors seek to provide the Prepetition Secured Parties with the following forms of adequate protection: (i) adequate protection liens; (ii) superpriority claims as provided in section 507(b) of the Bankruptcy Code; and (iii) payment of reasonable and

documented out-of-pocket fees and expenses of the Agent, the TIFIA Lender, and the Steering Committee.

49.     A court can authorize the debtor to use cash collateral only if the court determines that the debtor has provided "adequate protection" of the secured creditors' interest in the cash collateral.  11 U.S.C. § 363(e); *In re DeSardi,* 340 B.R. 790, 797-98 (Bankr. S.D. Tex. 2006) ("Adequate protection is . . . grounded in the belief that secured creditors should not be deprived of the benefit of their bargain.").

50.     The purpose of adequate protection under section 361 of the Bankruptcy Code is to protect a secured creditor from diminution in the value of its interest in the collateral at issue during the period of the use of such collateral.  *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1389 (5th Cir. 1986) (adequate protection is intended to protect secured creditors from a decrease in value of their collateral); *Thomas Jefferson Const. Co., Inc. v. Martinez*, 1997 WL 375880, *2 (E.D. La. 1997) (adequate protection provisions of the Bankruptcy Code were intended to protect a secured creditor against a decrease in value of its collateral); *In re Ledgemere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990) (creditor should receive adequate protection only where there is a decrease in value of the collateral).

51.     Although the term "adequate protection" is not precisely defined in the Bankruptcy Code, section 361 sets forth three non-exclusive examples of what may constitute adequate protection: (1) periodic cash payments equivalent to decrease in value; (2) an additional or replacement lien on other property; or (3) other relief that provides the indubitable equivalent of an entity's interest in the property.  *In re Timbers of Inwood Forest Associates, Ltd*., 793 F.2d 1380, 1388 (5th Cir. 1986); *In re Curtis*, 9 B.R. 110, 111-12 (Bankr. E.D. Pa. 1981). "[T]he

debtor-in-possession has the burden of proof on the issue of adequate protection." *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 406 (Bankr. N.D. Tex. 2003).

52.     Adequate protection can be provided in various forms, including the payment of fees and the granting of replacement liens and administrative claims. *See Bank of N.Y. Trust Co. NA v. Pac. Lumber Co. (In re Scopac)*, 624 F.3d 274, 278 n.1 (5th Cir. 2010) (noting that "adequate protection . . . in short, it is a payment, replacement lien, or other relief sufficient to protect the creditor against diminution in the value of his collateral during the bankruptcy" while approving use of cash collateral over objection of secured parties).

53.     Whether or not a creditor is adequately protected is determined on a case-by-case basis. *See In re Self*, 239 B.R. 877, 881 (Bankr. N.D. Tex. 1999) (determination of adequate protection is not an "exact science" but, rather, it requires a court to balance all relevant factors); *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987) (stating that the concept of adequate protection is a flexible one and that courts should determine whether it exists on a case-by-case basis; *In re JKJ Chevrolet, Inc.*, 190 B.R. 542, 545 (Bankr. E.D. Va. 1995) (stating that adequate protection is determined on a case-by-case basis).

54.     Even if the Prepetition Secured Parties had not consented to the Debtors' use of Cash Collateral, the adequate protection proposed by the Debtors would be sufficient to adequately protect the Prepetition Secured Parties' interests during the Chapter 11 Cases.  As explained herein and as set forth in detail in the Interim Order, the Debtors propose to provide the Prepetition Secured Parties with adequate protection in the following ways. First, the Debtors agree to use the Cash Collateral subject to the agreed-upon Budget.  Additionally, the Prepetition Secured Parties are adequately protected by (a) the granting of the Adequate Protection Liens,

(b) the granting of the Superpriority Claims, and (c) the payment of the Secured Party Professional Fees.

55.     Moreover, the continuation of the Debtors' operations represents the best opportunity for the Prepetition Secured Parties to receive the greatest recovery on account of their claims.  Accordingly, the Debtors submit that the use of Cash Collateral will allow the Debtors to continue their operations and thereby protect the Prepetition Secured Parties' interests.

56.     Courts have recognized that the preservation of the going concern value of a secured lender's collateral constitutes adequate protection of such creditor's interest in the collateral.  *See, e.g., In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (holding that if there is no actual diminution of value of collateral and the debtor can operate profitably post-petition, then the secured creditor is adequately protected); *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 56 (Bankr. N.D.N.Y. 1992) (finding a secured creditor's interest in collateral adequately protected when cash collateral was applied to normal operating and maintenance expenditures on the collateral property); *In re Willowood E. Apartments of Indianapolis II, Ltd.*, 114 B.R. 138, 143 (Bankr. S.D. Ohio 1990) (same); *In re Stein*, 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (creditor's secured position would be enhanced by the continued operation of the debtor's business); *In re Aqua Assocs.*, 124 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("The important question, in determining whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (citation omitted).  In addition, a significant portion of the Debtors' expenditures in the initial stage of the case will be allocated to required Tollway road repair and

maintenance.  All of such expenditures will directly benefit and enhance the value of the Tollway and the Prepetition Secured Parties' related security interests.

57.     In light of the foregoing, in addition to the fact that the Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral, the Debtors submit that (i) the forms of proposed adequate protection are necessary and appropriate under the circumstances of the Chapter 11 Cases to ensure that the Debtors are able to continue using Cash Collateral and (ii the adequate protection proposed herein and in the Cash Collateral Orders is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) of the Bankruptcy Code. Accordingly, the Debtors' proposed adequate protection should be approved, and the Court should authorize the Debtors' use of Cash Collateral in accordance with the terms and conditions of the Cash Collateral Orders.

## MODIFICATION OF THE AUTOMATIC STAY

58.     Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition.  The Interim Order contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to (i) grant the security interests, liens, and superpriority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens and (ii) implement the terms of the proposed Cash Collateral Orders.

59.     Stay modification provisions of this kind are ordinary and standard features of cash collateral orders and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Debtors respectfully request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the proposed Cash Collateral Orders.

## IMMEDIATE RELIEF IS NECESSARY TO AVOID
## IMMEDIATE AND IRREPARABLE HARM

60.     Pursuant to Bankruptcy Rule 4001(b), a final hearing on a motion to use Cash Collateral may not be commenced earlier than 14 days after service of such motion. The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such 14-day period and to authorize the use of Cash Collateral to the extent necessary to avoid immediate and irreparable harm to the Debtors' estates. Pursuant to Bankruptcy Rule 4001(b), the Debtors therefore request that the Court (i) schedule interim and final hearings to consider approval of the Debtors' use of Cash Collateral and (ii) authorize the Debtors, pursuant to the terms of the Interim Order, to use Cash Collateral.  Pending a final hearing, the Debtors request authority to use Cash Collateral as set forth in the attached Budget.

61.     Absent the use of Cash Collateral, the Debtors will have no ability to operate their businesses.  Moreover, if the Debtors do not have access to Cash Collateral, their entire restructuring may be jeopardized to the significant detriment of the Debtors' estates, their creditors and all of their constituents.  In light of the foregoing, the Debtors submit that they have satisfied the requirements of Bankruptcy Rule 4001(b) to support immediate Cash Collateral availability pending the entry of the Final Order.  Accordingly, to forestall the immediate and irreparable harm that will inure to the Debtors' estates, creditors and parties in interest absent Court approval of this Motion, the Debtors respectfully request that the Court grant the relief requested herein and authorize the immediate use of Cash Collateral pursuant to the terms and conditions set forth in the Interim Order and in accordance with the Budget.

62.     Based on the foregoing, the Debtors submit the relief requested is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted.

## REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(a) and (h)

63.     To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements under Bankruptcy Rule 6004(a).  Furthermore, to implement the foregoing immediately, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  The Debtors submit that the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

## REQUEST FOR FINAL HEARING

64.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 14 days following the entry of the Interim Order, and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

## NOTICE

65.     The Debtors have provided notice of filing of the Motion either by electronic mail, facsimile, or overnight mail to:  (i) the Office of the United States Trustee for the Western District of Texas; (ii) the Debtors' 20 largest unsecured creditors on a consolidated basis; (iii) counsel to the agent for the Debtors' prepetition senior credit facility; (iv) counsel to the steering committee of lenders under the Debtors' prepetition senior credit facility; (v) counsel to the TIFIA Lender; (vi) counsel to the Collateral Agent for the Debtors' prepetition loan agreements; (vii) counsel to TxDOT; and (viii) any parties required to be served under any applicable

Bankruptcy Rule or Local Bankruptcy Rule.  Due to the nature of the relief requested herein, the Debtor submits that no other or further notice is required.  A copy of the Motion is also available on the website of the Debtors' proposed Noticing and Claims Agent, Prime Clerk LLC, at https://cases.primeclerk.com/SH130.

## NO PRIOR REQUEST

66.    No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, PREMISES CONSIDERED, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: March 2, 2016

Respectfully submitted,

David M. Feldman (*pro hac vice* pending)
Matthew K. Kelsey (*pro hac vice* pending)
Alan Moskowitz (*pro hac vice* pending)
Matthew G. Bouslog (*pro hac vice* pending)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
Email address: DFeldman@gibsondunn.com
Email address: MKelsey@gibsondunn.com
Email address: AMoskowitz@gibsondunn.com
Email address: MBouslog@gibsondunn.com

JACKSON WALKER L.L.P.
100 Congress Ave., Suite 1100
Austin, Texas 78701
(512) 236-2000
(512) 236-2002 - FAX

By: */s/ Patricia B. Tomasco*
    Patricia B. Tomasco
    State Bar No. 01797600
    (512) 236-2076 – Direct Phone
    (512) 691-4438 – Direct Fax
    Email address: ptomasco@jw.com

    Jennifer F. Wertz
    State Bar No. 24072822
    (512) 236-2247 – Direct Phone
    (512) 391-2147 – Direct Fax
    Email address: jwertz@jw.com

**PROPOSED COUNSEL FOR THE DEBTORS**