## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| **SH 130 CONCESSION COMPANY, LLC** | § | **CASE NO. 16-10262** |
| **ZACHRY TOLL ROAD – 56 LP** | § | **CASE NO. 16-10263** |
| **CINTRA TX 56 LLC** | § | **CASE NO. 16-10264** |
| | § | |
| **DEBTORS.** | § | **CHAPTER 11** |
| | § | |
| EIN: 20-8490258; 20-8596022; 20-8059105 | § | |
| | § | |
| **10800 N US 183 HWY** | § | *JOINT ADMINISTRATION* |
| **BUDA, TEXAS 78610-9460** | § | *REQUESTED* |

## DECLARATION OF PAUL HARRIS IN SUPPORT OF THE
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Paul Harris, hereby declare under penalty of perjury:

1.     "I am the Chief Financial Officer of SH 130 Concession Company, LLC (the "Concessionaire"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors").   In this capacity, I am generally familiar with the Debtors' operations, businesses, financial affairs, and books and records.

2.     "On the date hereof (the "Petition Date"), the Concessionaire and its debtor affiliates, CINTRA TX 56, LLC ("TX 56") and Zachry Toll Road – 56 LP ("Toll Road – 56"), voluntarily commenced cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors are operating their businesses and managing their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or creditors committee has been appointed in the Chapter 11 Cases. Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.       "I submit this declaration (the "First Day Declaration") to provide an overview of the Debtors and the Chapter 11 Cases and to supplement the Debtors' chapter 11 petitions and "first day" motions and applications (each, a "First Day Motion," and collectively, the "First Day Motions").  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management teams or the Debtors' advisors, and/or my opinion based upon my knowledge and experience and information I have reviewed concerning the Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

4.       "The purpose of this First Day Declaration is to familiarize the Court with the Debtors and the relief they seek in the First Day Motions.  To that end, this First Day Declaration is organized as follows:   Part I describes the Debtors' businesses, operations and capital structure.  Part II describes the events leading to the commencement of the Chapter 11 Cases. Part III describes the relief sought by the Debtors in each of their First Day Motions.

## I.    THE DEBTORS' BUSINESSES, OPERATIONS, AND CAPITAL STRUCTURE

### A.    The Debtors' Businesses and Operations

5.       "The Concessionaire, a Delaware limited liability company, was formed in 2007 by affiliates of Cintra Infraestructuras, S.A. (f/k/a Cintra Concesiones de Infraestructuras de Transporte, S.A.) ("Cintra") and Zachry American Infrastructure – 56 LLC ("ZAI").   The Concessionaire was formed to finance, develop, design, construct, operate, and maintain segments five and six of Texas State Highway 130 in partnership with the Texas Department of

Transportation ("TxDOT"). The Concessionaire's headquarters are located in Buda, Texas. Toll Road – 56 and TX 56, the Concessionaire's affiliate debtors, are holding companies that collectively hold the equity interests in the Concessionaire. Pursuant to that certain Members Pledge Agreement, dated as of March 7, 2008, among the Concessionaire, as borrower, TX 56 and Toll Road – 56, as members, and Wells Fargo Bank, National Association, as collateral agent (subsequently assigned to Deutsche Bank Trust Company Americas) (the "Pledge Agreement"), TX 56 and Toll Road – 56 pledged a continuing first priority lien and security interest in their equity of the Concessionaire. TX 56 and Toll Road – 56 have no operations and, other than their obligations under the Pledge Agreement, have no creditors.

### i.    Construction and Development History of SH 130

6.      "State Highway 130 ("SH 130") consists of six segments and is a component of the Central Texas Turnpike System. SH 130 runs in a 91-mile corridor commencing north and east of Austin and ending north and east of San Antonio. TxDOT planned and developed SH 130 in response to the tremendous surge in truck traffic on the Interstate 35 between San Antonio and Austin created by the implementation of the North American Free Trade Agreement and, concomitantly, continued urban growth and cross-border trade in the area. SH 130's route alleviates heavy traffic volume by providing a bypass of Austin and an alternate route between Austin and San Antonio.[1]

7.      "In June 2002, TxDOT awarded Lone Star Infrastructure ("LSI"), a consortium of major highway construction contractors and civil engineering firms, rights to design and build segments one through four of SH 130, totaling 50 miles, which run from Interstate 35 in

---

[1]  Additional information about SH 130 and various maps of its route, including an interactive planning map, are available on the Tollway's website, www.mysh130.com.

Georgetown, Texas to Mustang Ridge, Texas.  Groundbreaking for these segments of SH 130 took place on October 3, 2003, and LSI completed segments one through four between November 2006 and April 2008.

8.      "Segments five and six of SH 130 (the "Tollway") are a continuation of the northern segments of the highway, forming a 41-mile link from Mustang Ridge through Travis, Caldwell and Guadalupe counties to Interstate 10 near Seguin, Texas.  Initially, construction of the Tollway was delayed due to lack of public funds.  Ultimately, however, the State of Texas determined that toll financing was the appropriate way to complete the Tollway.  Accordingly, on June 28, 2006, the Concessionaire, through its investors, reached a $1.3 billion agreement with the State of Texas to finance, design, build, operate and maintain the Tollway.

9.      "Construction of the Tollway began in April 2009 and created more than 3,600 jobs and engaged more than 150 Texas-based companies.  The Tollway opened to traffic on October 24, 2012, and currently provides a fast and convenient highway for commuters and long-distance travelers.  The posted speed limit on the Tollway's main lanes is 85 miles per hour – the highest posted speed limit in the United States.  Throughout the Tollway, drivers enjoy the benefits of "open road tolling," whereby tolls are assessed electronically at certain points along the Tollway without the use of toll-booths, enabling motorists to drive the entire 41-mile Tollway at highway speeds without having to slow down or stop for payment.

### ii.      *Ownership and Operation of the Tollway*

10.     "The Concessionaire and TxDOT are parties to that certain Facility Concession Agreement, SH 130 Segments 5 and 6 Facility, dated March 22, 2007 (the "FCA").  The FCA sets forth the terms and conditions by which, in exchange for TxDOT's grant to the Concessionaire of the exclusive right to impose tolls, the Concessionaire paid to TxDOT

concession payments in the aggregate amount of $142.6 million (including (i) $25.8 million for a concession payment, (ii) $15.3 million for a sales tax related payment, (iii) $100 million in connection with increasing the speed limit on the Tollway to 85 miles per hour, and (iv) $1.5 million in connection with hazardous material remediation charges) and developed and constructed, and now operates and maintains, the Tollway, as well as the terms and conditions relating to toll revenue sharing between the Concessionaire and TxDOT.  Under the terms of the FCA, TxDOT has no obligation to commit any funds to the development, construction, operation and maintenance of the Tollway.

11.     "Among other things, the Concessionaire is responsible for operating and maintaining the Tollway, including quality assurance and control, safety, technology enhancements, and renewal and improvement projects.  The Concessionaire is also responsible for maintaining personnel, including certain key personnel specified by TxDOT, job training, and maintaining various specified insurance policies.  TxDOT, among other things, maintains certain oversight rights and has various related obligations.

12.     "The State of Texas is the record titleholder to all of the right of way and roadway that comprises the Tollway as well as all improvements thereon.  Pursuant to a facility lease between the Concessionaire and TxDOT entered into in connection with the FCA, the Concessionaire leases the Tollway from TxDOT for the duration of the FCA.  At the end of the FCA's 50-year term since start of operations, the Concessionaire will transfer the Tollway back to TxDOT.

13.     "Pursuant to the FCA, the Concessionaire has the exclusive right to (a) impose tolls upon the Tollway, (b) establish, modify, and adjust toll rates subject to a maximum amount as set forth in the FCA, (c) receive toll amounts, and (d) subject to TxDOT's right to perform toll

5

handling, collection, and enforcement services, enforce and collect tolls.  To facilitate the toll collection process, TxDOT provides certain back office functions including call center operations, account management and maintenance, driver invoicing, toll collection, violation processing and enforcement, revenue handling and accounting, and customer service and support as well as certain clearinghouse services.[2]

14.    "As mentioned above, tolls are assessed electronically at various points along the Tollway without the use of toll-booths.  Drivers pay their tolls using a "TxTag," "Dallas Toll Tag" or "Houston EZ TAG" (collectively, "Tags" and such trips "Tag Trips"), or they are captured on video (a "Video Trip") and invoiced by mail using vehicle registration records and information maintained by the Vehicle Titles and Registration Division of TxDOT.  The amount of the toll charged varies based on the vehicle classification, although Video Trip users are charged at a higher rate.  Drivers are assessed a toll when they pass through an established tolling zone, regardless of the distance travelled on the Tollway.

15.    "The Concessionaire has the exclusive right, title, entitlement, and interest in and to all Toll Revenues (as defined in the FCA), subject to TxDOT's right to share in a percentage thereof and to receive all Video Trip Toll Premiums (as defined in the FCA).[3]  Pursuant to the FCA, TxDOT is currently entitled to receive between 4.65% and 50% of all Toll Revenues assessed, depending upon revenue collection thresholds in the applicable year of operation.[4]

---

[2]  The back office services provided by TxDOT are paid by the Concessionaire.

[3]  Pursuant to the FCA, TxDOT is also entitled to receive reimbursement of any incidental charges, including amounts for the purchase or rental of Tags, administrative fees, and certain other fees and charges.

[4]  Pursuant to the FCA, if the posted speed limit on the Tollway is 85 miles per hour, the applicable percentage would normally range from 11.05% to 50%.  However, in accordance with the FCA, in exchange for a $100 million concession payment, TxDOT agreed to receive a reduced toll-sharing percentage of 4.65% to 50%, which is the percentage that would apply if the posted speed limit were 70 miles per hour.

16.     "Daily, the Concessionaire submits invoices to TxDOT for all tolls processed along the Tollway.  The FCA requires that TxDOT transfer the funds on account of all tolls assessed from Tag Trip users and Video Trip users into master lockbox accounts (the "Master Lockbox Accounts"), to be held in trust for the benefit of the Concessionaire and TxDOT.  Amounts invoiced for Tag Trips are transferred within seven days of invoice submission, and amounts invoiced for Video Trips are transferred within 60 days.  Daily, the custodian of the Master Lockbox Accounts processes the receipts and sweeps the cash into toll revenue accounts (the "Toll Revenue Accounts") maintained by the Concessionaire.  Amounts in the Toll Revenue Accounts are thereafter distributed in accordance with the Concessionaire's cash management system into various accounts including, among others, a revenue sharing account for the benefit of TxDOT.

**B.     Capital Structure**

17.     "The Concessionaire's capital structure consists of (a) senior secured debt in the form of (i) private loans, (ii) certain obligations arising from interest rate hedging arrangements, and (iii) loans made by the United States Department of Transportation ("USDOT") under the Transportation Infrastructure Financing and Innovation Act of 1998 ("TIFIA"), and (b) other miscellaneous unsecured debt.  As of the Petition Date, the Concessionaire's total consolidated lender debt (excluding trade debt but including amounts owing to USDOT under TIFIA) consisted of an aggregate principal amount of approximately $1.272 billion, plus accrued interest, fees, expenses, charges, and other obligations (including swap obligations) incurred in connection therewith.  The Concessionaire is indebted under the following prepetition credit arrangements:

### i. *Senior Bank Facility*

18. "Pursuant to that certain Initial Senior Loan Agreement, dated as of March 7, 2008 (as amended, the "Senior Bank Facility Agreement"), among the Concessionaire, as borrower, lenders from time-to-time party thereto (collectively, the "First Lien Lenders"), BNP Paribas (f/k/a Fortis Bank S.A./N.V., UK Branch)("BNP Paribas"), as Administrative Agent (in such capacity, the "Administrative Agent") for the First Lien Lenders, Banco Santander, S.A., New York Branch as Fronting Bank, and the mandated lead arrangers party thereto, the First Lien Lenders provided to the Concessionaire a first lien secured credit facility of up to $720,750,000 in aggregate principal amount of term loan commitments (the "Senior Bank Facility").  The Senior Bank Facility consists of three tranches, each with a different availability period:  (i) Facility A, totaling $685,750,000 in aggregate commitments, was available to the Concessionaire through the Tollway construction period; (ii) Facility B, totaling $35,000,000 in aggregate commitments, is available from the service commencement date to the 10th anniversary of the effective date of the Senior Bank Facility Agreement; and (iii) Facility C, totaling $29,100,000 in aggregate commitments, is available based on certain events relating to the letter of credit issued in favor of TxDOT in connection with the project until the 10th anniversary of the effective date of the Senior Bank Facility Agreement.  The Senior Bank Facility matures on the last business day of February, 2038 and interest thereunder is paid semi-annually, currently at a rate of LIBOR plus 1.65% per annum.

19. "Pursuant to Section 3.5.3 of the Senior Bank Facility Agreement, an interest payment (the "Interest Payment") was due to be made by the Concessionaire to BNP Paribas as Administrative Agent for the benefit of the First Lien Lenders on the payment date under the Senior Bank Facility Agreement scheduled for June 30, 2014.  Additionally, pursuant to Section

3.10.2 of the Senior Bank Facility Agreement, (i) a non-fronting LC fee (the "Non-Fronting LC Fee") was due to be made by the Concessionaire to BNP Paribas as Administrative Agent for the benefit of each Facility C Lender, and (ii) a fronting LC fee (the "Fronting LC Fee") was due to be made by the Concessionaire to a fronting bank (the "Fronting Bank"), on the payment date under the Senior Bank Facility Agreement scheduled for June 30, 2014.

20.     "On June 30, 2014, the Concessionaire, the First Lien Lenders, the Hedge Counterparties (as defined below), and the Fronting Bank executed a waiver agreement (the "Waiver Agreement"), in which (i) the First Lien Lenders agreed to waive the Interest Payment and the Non-Fronting LC Fee and (ii) the Fronting Bank agreed to waive the Fronting LC Fee, in each case until December 15, 2014 (without giving effect to applicable grace periods).

21.     "On December 15, 2014, the Concessionaire, the First Lien Lenders, the Hedge Counterparties, and the Fronting Bank executed a modification and waiver agreement (the "Modification and Waiver Agreement"), in which (i) the First Lien Lenders agreed to waive the Interest Payment and the Non-Fronting LC Fee and (ii) the Fronting Bank agreed to waive the Fronting LC Fee, in each case until January 29, 2016 (without giving effect to applicable grace periods).

22.     "On January 29, 2016, the Concessionaire, the First Lien Lenders, the Hedge Counterparties and the Fronting Bank executed a second modification and waiver agreement (the "Second Modification Agreement"), pursuant to which (i) the First Lien Lenders agreed to waive the Interest Payment and the Non-Fronting LC Fee and (ii) the Fronting Bank agreed to waive the Fronting LC Fee, in each case until February 28, 2016 (without giving effect to applicable grace periods).

23.     "Pursuant to the terms of the Modification and Waiver Agreement, the Interest Payment, the Non-Fronting LC Fee, and the Fronting LC Fee were due to be made by the Concessionaire on February 28, 2016 (without giving effect to applicable grace periods).

24.     "As of the Petition Date, the Concessionaire was indebted and liable to the Administrative Agent and First Lien Lenders in the aggregate principal amount of approximately $720.75 million, plus accrued interest, fees, expenses, charges, and all other obligations incurred in connection therewith to the extent provided in the Senior Bank Facility Agreement (the "Prepetition Senior Bank Facility Obligations").

### ii.     *Swap Agreements*

25.     "To hedge interest rate risk, the Concessionaire is party to the following swap agreements: (i) that certain ISDA Master Agreement between Caixa – Banco de Investimento, S.A. (in such capacity, the "Caixa Hedging Bank") and the Concessionaire dated as of March 7, 2008 (together with its Schedule and Confirmation thereto (as each such term is defined therein), the "Caixa Swap Agreement"), (ii) that certain ISDA Master Agreement between Espírito Santo, plc, as successor to Banco Espírito Santo, S.A., New York Branch (in such capacity, the "Banco Espírito Hedging Bank")  and the Concessionaire dated as of March 7, 2008 (together with its Schedule and Confirmation thereto (as each such term is defined therein), the "Banco Espírito Swap Agreement"), (iii) that certain ISDA Master Agreement between Bankia S.A., as successor to Caja de Ahorros y Monte de Piedad de Madrid Miami Agency (in such capacity, the "Bankia Hedging Bank") and the Concessionaire dated as of March 7, 2008 (together with its Schedule and Confirmation thereto (as each such term is defined therein), the "Bankia Swap Agreement"), (iv) that certain ISDA Master Agreement between Fortis Bank SA Sucursal en España (in such capacity, the "Fortis Hedging Bank") and the Concessionaire dated as of March 7, 2008 (together

with its Schedule and Confirmation thereto (as each such term is defined therein), the "Fortis Swap Agreement"), and (v) that certain ISDA Master Agreement between Banco Santander, S.A. (in such capacity, the "Santander Hedging Bank," and together with the Caixa Hedging Bank, the Banco Espirito Hedging Bank, the Bankia Hedging Bank, and the Fortis Hedging Bank, the "Hedge Counterparties," and collectively with the First Lien Lenders, the "Senior Lenders") and the Concessionaire dated as of March 7, 2008 (together with its Schedule and Confirmation thereto (as each such term is defined therein), the "Santander Swap Agreement," and together with the Caixa Swap Agreement, the Banco Espirito Swap Agreement, the Bankia Swap Agreement and the Fortis Swap Agreement, the "Swap Agreements," and collectively with the Senior Bank Facility Agreement, the "Senior Loan Agreements").

26.     "Pursuant to Section 2(a)(i) of each of the Swap Agreements and the attached respective Confirmations (as defined in the Swap Agreements), a net payment in each Hedge Counterparty's favor (the "Swap Obligation") was due to be made by the Concessionaire to each such Hedge Counterparty on the payment date under the respective Swap Agreements scheduled for June 30, 2014.

27.     "In connection with the Waiver Agreement, the Hedge Counterparties agreed to waive the Swap Obligation until December 15, 2014 (without giving effect to applicable grace periods).  In connection with the Modification and Waiver Agreement, Hedge Counterparties agreed to waive the Swap Obligation until January 29, 2016 (without giving effect to applicable grace periods).  Accordingly, pursuant to the Modification and Waiver Agreement, the Swap Obligation was due to be made by the Concessionaire on January 29, 2016 (without giving effect to applicable grace periods).

28.     "The Hedge Counterparties have not exercised early termination rights under their respective Swap Agreements.  However, as of the Petition Date, if such rights were so exercised, the Concessionaire would be indebted and liable to the Hedge Counterparties in the aggregate estimated amount of $312 million (the "Swap Agreement Obligations").

### iii.     TIFIA Facility

29.     "The Transportation Infrastructure Finance and Innovation Act (TIFIA) program provides Federal credit assistance in the form of direct loans, loan guarantees, and standby lines of credit to finance surface transportation projects of national and regional significance. TIFIA credit assistance provides improved access to capital markets, flexible repayment terms, and potentially more favorable interest rates than can be found in private capital markets for similar instruments. TIFIA can help advance qualified, large-scale projects that otherwise might be delayed or deferred because of size, complexity, or uncertainty over the timing of revenues. Pursuant to that certain TIFIA Loan Agreement, dated as of March 7, 2008 (the "TIFIA Loan Agreement," and together with the Senior Loan Agreements, the "Prepetition Loan Agreements"), between the Concessionaire and the USDOT, acting by and through the Federal Highway Administrator (the "TIFIA Lender," and together with the Senior Lenders, the "Prepetition Lenders"), the TIFIA Lender provided a subordinated term loan credit facility of up to $430,000,000 (the "TIFIA Facility").  The TIFIA Facility matures on June 30, 2047, and interest is payable semi-annually at a rate of 4.46% per annum.  Under the TIFIA Agreement, the first interest payment is scheduled for June 2017 and principal repayments are scheduled to begin in June 2018.  To date, interest has been capitalized.

30.     "As of the Petition Date, the Concessionaire was indebted and liable to the TIFIA Lender in the principal amount, including interest capitalized through December 31, 2015, of

approximately $550,875,000, plus accrued interest, fees, expenses, charges, and all other obligations incurred in connection therewith to the extent provided in the TIFIA Loan Agreement (the "Prepetition TIFIA Facility Obligations," and together with the Prepetition Senior Bank Facility Obligations and the Swap Agreement Obligations, the "Prepetition Obligations").

### iv.     *Security Agreement, Pledge Agreement and Collateral Agency Agreement*

31.     "To secure the obligations under the Prepetition Loan Agreements, the Concessionaire granted Deutsche Bank Trust Company Americas (as successor to Wells Fargo Bank, National Association), as collateral agent (in such capacity, the "Collateral Agent"), first-priority liens (the "Prepetition Liens") upon and in the "Collateral" (the "Security Agreement Collateral") as defined in that certain Security Agreement between Concessionaire, as borrower, and the Collateral Agent, dated as of March 7, 2008 (the "Security Agreement").

32.     "As stated above, pursuant to the Pledge Agreement, TX 56 and Toll Road–56 pledged, in support of the Concessionaire's secured obligations under the Prepetition Loan Agreements, all Member Collateral (as defined therein) to the Collateral Agent (the "Pledge Agreement Collateral," and together with the Security Agreement Collateral, the "Prepetition Collateral").

33.     "Pursuant to that certain Collateral Agency and Account Agreement by and among the Collateral Agent, Concessionaire, the Administrative Agent, the Hedge Counterparties, and the TIFIA Lender (the "Collateral Agency Agreement"), the Collateral Agent acts as the secured party under the Secured Financing Documents (as defined in the Collateral Agency Agreement) for the benefit of the Administrative Agent and the Prepetition Lenders (collectively with the Collateral Agent, the "Prepetition Secured Parties").

### v.      Intercreditor Agreement

34.      "Prior to the Petition Date, BNP Paribas, as instructing agent, the TIFIA Lender, and the Collateral Agent entered into that certain Subordination and Intercreditor Agreement, dated as of March 7, 2008 (the "ICA"), which addresses the respective rights, interests, obligations, priority, and positions of the Senior Lenders and the TIFIA Lender with respect to the Prepetition Collateral.  Pursuant to the ICA, the liens securing the TIFIA Loan Agreement were originally subordinated to the liens securing the Senior Loan Agreements.  However, as a result of the commencement of the Chapter 11 Cases, by operation of applicable non-bankruptcy law and the ICA, the lien and payment priority of the obligations arising under the TIFIA Loan Agreement were *pari passu* with the obligations arising under the Senior Loan Agreements as of the Petition Date.

### iv.      Trade Debt and Other Unsecured Claims

35.      "The Concessionaire owes approximately $1.9 million in unsecured trade debt as of the Petition Date.  This debt arises from the provision of goods and services necessary for the operation of the Concessionaire's business.  The Concessionaire owes approximately $125,000 in other general unsecured claims as of the Petition Date, which is mostly comprised of accrued but unpaid wages, salaries and other employee compensation.

## II.      EVENTS LEADING TO THE CHAPTER 11 CASES

36.      "Since its inception, a number of factors have coalesced that significantly strained the Concessionaire's ability to continue to service its outstanding indebtedness and, ultimately, led to the Debtors' filing of the Chapter 11 Cases.  Those events include the worldwide economic crisis that commenced in 2007—which affected nearly every segment of the United States' economy—and the concomitant negative impact on projected traffic volumes has led to

revenues being significantly below levels projected when construction of the Tollway was financed. These circumstances, coupled with the Concessionaire's unsuccessful attempts to implement an out-of-court restructuring and the Concessionaire's potential defaults under the Senior Credit Facility and Swap Agreements, resulted in the commencement of these Chapter 11 Cases to maximize the value of the Tollway for all stakeholders.

37.    "The key driver of profitability of the Tollway is traffic volume, as the Tollway generates revenue for the Concessionaire by the collection of tolls in exchange for the use of the road.  The general slowdown of the global economy resulted in, among other things, substantially reduced amounts of traffic through the Tollway than the Concessionaire had initially projected. The Tollway was designed to alleviate traffic congestion on the Interstate 35 corridor between San Antonio and Austin. A sharp decrease in economic activity—and corresponding decrease in commercial traffic resulting therefrom—reduced traffic congestion on Interstate 35 (which does not charge tolls), thereby reducing the need for motorists to pay for using the Tollway as a traffic by-pass.

38.    "As a result of the unexpectedly low traffic volumes, the Tollway's revenue projections are also significantly below the original levels projected when the Debtors financed the construction of the Tollway. The Concessionaire has spent significant time and resources in an effort to increase the number of users of the Tollway.  For example, in 2013, the Concessionaire and TxDOT agreed to the placement of nearly 400 signs along the Interstate 35 corridor promoting SH 130 as an alternative route, for which the Concessionaire and TxDOT shared the cost. Additionally, as an incentive for trucks to use SH 130 rather than Interstate 35, between April 1, 2013 and November 30, 2013, TxDOT provided a discount to trucks using the Tollway, reducing the truck toll rate to the same price as cars.  Finally, TxDOT exercised its

option under the FCA to raise the speed limit on the Tollway to a maximum speed of 85 miles per hour.  The higher maximum speed limit is an inducement for more drivers to use the Tollway.  This speed increase helped capture more traffic from the alternatives.

39.    "Efforts to make the Tollway more profitable have yielded some dividends. Indeed, during 2014 and 2015, the Concessionaire exceeded its revised revenue projections and the Tollway is experiencing incremental growth in traffic volumes.  While the Concessionaire is able to meet its day-to-day operational costs, nevertheless, absent a restructuring of the Concessionaire's obligations under the Senior Bank Facility and TIFIA Facility, the Concessionaire's revenue will not generate sufficient liquidity to satisfy its debt servicing obligations.

40.    "Prior to the filing, the Debtors negotiated in good faith with the Prepetition Secured Parties regarding a global resolution to restructure the outstanding debt or in the alternative to reach a resolution regarding an extension of the Modification and Waiver Agreement to allow the parties an opportunity to reach a global resolution.  Although significant progress was made, ultimately the parties could not reach a global resolution or an agreement to extend the waiver deadline.  The Debtors intend to use the bankruptcy process to continue to negotiate with the Prepetition Secured Parties to reach a consensual resolution and restructuring of the outstanding debt.

### III.    FIRST-DAY MOTIONS[5]

41.    "Contemporaneously herewith, the Debtors have filed a number of First Day Motions.  I believe that, among other things, the relief requested in the First Day Motions is

---

[5]  Capitalized terms used in this Part of this Declaration and not defined herein shall have the meanings ascribed to them in the relevant First Day Motion.  To the extent this Declaration is inconsistent with any provision of the First Day Motions, the applicable First Day Motion shall govern.

necessary to enable the Debtors to operate with minimal disruption during the pendency of these Chapter 11 Cases, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.  A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.  I have reviewed each of the First Day Motions, and the facts set forth therein are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.

(i)      **Debtors' Motion for Entry of an Order Directing Joint Administration of the Related Chapter 11 Cases (the "Joint Administration Motion")**

42.    "In the Joint Administration Motion, the Debtors request entry of an order directing the joint administration and procedural consolidation of their related chapter 11 cases. Specifically, the Debtors request that the Court maintain one file and one docket for all of the jointly administered cases under the case of SH 130 Concession Company, LLC and that the Court administer the cases under a consolidated caption.  Further, the Debtors request that entry be made on the docket of each of the Debtors' Chapter 11 Cases, other than SH 130 Concession Company, LLC, to reflect the joint administration of these Chapter 11 Cases.

43.    "Given the integrated nature of the Debtors' operations, joint administration of the Chapter 11 Cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will arise in the Chapter 11 Cases will jointly affect each and every Debtor.  The entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the Office of the U.S. Trustee and all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.

44.    "I have reviewed the Joint Administration Motion, and believe that the facts stated therein are accurate to the best of my knowledge, information and belief.  I further believe

that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will minimize disruptions to the Debtors' operations.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

      (ii)      **Debtors' Application For Appointment of Prime Clerk LLC as Claims, Noticing and Balloting Agent (the "Claims Agent Retention Application")**

45.      "In the Claims Agent Retention Application, the Debtors seek entry of order appointing Prime Clerk LLC ("Prime Clerk") as claims, noticing and balloting agent in the Chapter 11 Cases.  Prime Clerk's tasks would include, among others, (i) serving as the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in interest; (ii) providing computerized claims, objection, soliciting, and balloting database services; and (iii) providing expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Debtors' bankruptcy cases.

46.      "The Debtors had obtained and reviewed engagement proposals from two other claims and noticing agents.  I believe, based on my discussions with the Debtors' advisors, that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.

47.      "The Debtors seek retention of Prime Clerk solely in accordance with the terms and provisions as set forth in the retention application and the proposed order attached thereto. In view of the number of anticipated claimants and interest holders, I believe that the appointment of a claims and noticing agent is in the best interest of the Debtors' estates and their creditors and interest holders.

    **(iii)**    **Debtors' Motion For An Order (A) Waiving The Requirement That Each Debtor File And Upload A List Of Creditors, and (B) Authorizing The Filing Of A Consolidated List of Top 20 Unsecured Creditors (the "Creditor Matrix Motion")**

48.    "In the Creditor Matrix Motion, the Debtors request entry of an order (i) waiving the requirement that each Debtor file and upload a list of creditors on the Petition Date, pursuant to the Notice Rules, and (b) authorizing the Debtors to file a single consolidated list of the 20 largest unsecured creditors in these cases in lieu of filing three separate lists of the 20 largest unsecured creditors of each Debtor.

49.    "The Debtors estimate that they have several hundred creditors and notice parties on a consolidated basis. Contemporaneously with the filing of the motion, the Debtors have filed the Claims Agent Retention Application, an application to retain Prime Clerk LLC as their claims and noticing agent in these Chapter 11 Cases.  I believe that using the claims and noticing agent for this purpose will maximize administrative efficiency in these Chapter 11 Cases and reduce the administrative burdens that would otherwise fall upon this Court and the U.S. Trustee, and therefore, believe that filing and uploading the creditor Matrix is unnecessary.

50.    "Additionally, given the affiliated nature of the Debtors and considering that TX 56 and Toll Road 56 do not have any unsecured creditors, I believe filing the Consolidated Top 20 List will maximize efficiency, increase accuracy, and reduce costs to the benefit of these estates.

51.    "Accordingly, on behalf of the Debtors, I respectfully submit that the Creditor Matrix Motion should be approved.

**(iv)  Debtors' Motion for Entry of an Order Extending the Time to File Schedules and Statements of Financial Affairs (the "Schedules and Statements Motion")**

52.      "In the Schedules and Statements Motion, the Debtors request entry of an order granting an additional 60 days from the Petition Date (the "Extension Period") to file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements"), without prejudice to the Debtors' ability to request an additional extension of time if necessary.

53.      "An extension of time to file the Schedules and Statements is both beneficial to the Debtors' estates and necessary for the smooth progression of these Chapter 11 Cases.  The Debtors have numerous creditors and the breadth of the Debtors' business operations requires the Debtors to maintain voluminous books and records and complex accounting systems.  Given the complexity of their business operations and the number of creditors, I submit that the amount of information that must be assembled to prepare the Schedules and Statements and the hundreds of employee and advisor hours required to complete the same would be unnecessarily burdensome to the Debtors during the critical first weeks following the Petition Date.  I believe that the Debtors' limited resources would be better used towards stabilizing their business operations and focusing on working towards a plan of reorganization that provides for a swift exit from the bankruptcy process.

54.      "I believe that the relief requested in the Schedules and Statements Motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and Statements Motion should be approved.

**(v)    Debtors' Motion for Entry of an Order Limiting Notice and Establishing Notice Procedures (the "Notice Procedures Motion")**

55.    "In the Notice Procedures Motion, the Debtors request entry of an order authorizing procedures for the Debtors to provide notice to creditors and parties in interest.

56.    "The Debtors propose certain notice management procedures that would maximize the efficiency and orderliness of case administration and would reduce the costs associated with traditional noticing procedures, thereby preserving assets of the estates.  The costs and burdens that might arise absent adoption of notice procedures could impose significant economic and administrative burdens on the Debtors' estates, the Court and all other parties in interest.  I believe that the proposed procedures offer a streamlined approach to the management of these Chapter 11 Cases and constitute a critical element of achieving a successful and smooth transition into and out of chapter 11.

57.    "Accordingly, on behalf of the Debtors, I respectfully request that the Notice Procedures Motion be granted.

**(vi)    Debtors' Motion For Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Certain Prepetition Wages and Reimbursable Employees Expenses, (B) Authorizing the Debtors to Pay and Honor Medical and Similar Benefits, (C) Authorizing the Debtors to Continue Employee Compensation and Employee Benefits Programs, and (D) Scheduling a Final Hearing (the "Employee Wages Motion")**

58.    "In the Employee Wages Motion, the Debtors request entry of an order (a) authorizing the Debtors to pay certain prepetition wages and other compensation, (b) authorizing the Debtors to pay and honor employee medical and similar benefits, and (c) authorizing the Debtors to continue their employee benefits programs.

59.     "In furtherance thereof, the Debtors further request that the Court authorize and direct banks and financial institutions to honor related checks and electronic payment requests, and grant related relief.

60.     "The Debtors' Employees, Secondees and Independent Contractors (each as defined below) perform a variety of critical operational functions and I believe that their skills, knowledge and understanding with respect to the Debtors' businesses and infrastructure are essential to the effective reorganization of the Debtors' businesses.  As of the Petition Date, the Debtors employ 31 employees including (i) nine exempt-salaried employees (the "Exempt-Employees") and (ii) 22 nonexempt-hourly employees – consisting of 20 full-time hourly employees and two part-time, regular, hourly employees (the "Nonexempt-Employees" and, together with the Exempt-Employees, the "Employees").  In addition to their Employees, the Debtors utilize the services of three secondees—the Concessionaire's Chief Executive Officer, Chief Financial Officer, and Chief Operating Officer—who are on secondment from affiliates of the Concessionaire.  The Concessionaire's Chief Financial Officer and Chief Operating Officer are on secondment from Cintra US, LLC (together, the "U.S. Seconded Employees").  The Concessionaire's Chief Executive Officer is on secondment from Cintra Servicios de Infraestructuras, S.A. (the "Foreign Seconded Employee," and together with the U.S. Seconded Employees, the "Secondees").  To further supplement its workforce, in the ordinary course of business, the Debtors employ three independent contractors (the "Independent Contractors").

61.     "In the ordinary course of business, the Debtors pay Employees, among other things, salary, expenses reimbursement, and certain other forms of compensation described herein, depending on the services provided by the Employee to the Debtors  (collectively, the "Employee Compensation").  Although the Debtors have paid most of their wage, salary and

other Employee obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition Employee Compensation is nevertheless due and owing.

**(1)    Wage Obligations**

    A.    <u>Employees</u>

62.    "The Debtors pay their Nonexempt-Employees on a bi-weekly basis and pay their Exempt-Employees on a monthly basis.   On average, the Debtors' gross payroll totals approximately $31,500 per bi-weekly period for Nonexempt-Employees and approximately $67,000 per month for Exempt-Employees.[6]  The Debtors' most recent payroll was paid by direct deposit (i) to each Nonexempt-Employee on February 26, 2016, for the period through and including February 20, 2016, and (ii) to each Exempt-Employee on February 26, 2016, for the period through and including February 29, 2016.

63.    As of the Petition Date, I estimate that (i) approximately $32,000 remains outstanding for Nonexempt Employees compensation (the "Unpaid Hourly Compensation"), and (ii) $10,000 remains outstanding for the Exempt-Employees compensation ("Unpaid Monthly Compensation," and, together with the Unpaid Hourly Compensation, the "Unpaid Wages").

64.    "I do not believe that the Unpaid Wages, plus any accrued vacation and 401(k) contribution due to any individual Employee exceeds the priority cap of $12,475 under sections 507(a)(4) and (a)(5) of the Bankruptcy Code, and, thus, seek authority to pay any Unpaid Wages in the ordinary course of business and consistent with past practices.

---

[6]  The amounts listed herein in respect of the Debtors' gross payroll exclude payroll taxes, as payroll taxes are described below.

B.    Secondees

65.    "The U.S. Seconded Employees receive all of their wages and benefits (including payroll, healthcare coverage, 401(k), life insurance, and workers' compensation) through Cintra US Services, LLC, which costs are then billed to the Debtors on a monthly basis (the "U.S. Secondee Obligations").  The Foreign Seconded Employee's wages are paid by Cintra Servicios de Infraestructuras, S.A., which costs are then billed to the Debtors on a monthly basis (the "Foreign Secondee Obligations," and together with the U.S. Secondee Obligations, the "Secondee Obligations").  The Debtors also provide certain of the Secondees with certain allowances including, among other things, cost-of-living-allowance, medical and dental coverage, and payment of certain travel expenses (the "Secondment Allowances").  As of the Petition Date, approximately $2,000 in the aggregate is owed on account of Secondment Allowances.  By the Employee Wage Motion, the Debtors request authority to pay the unpaid Secondment Allowances and seek authority to continue to incur and pay ongoing Secondment Allowances and Secondee Obligations in the ordinary course. The Secondees are critical to the overall business and the success of the Debtors' reorganization.

C.    Independent Contractors

66.    "One of the Independent Contractors is a government and community relations consultant (the "Consultant").  The other two Independent Contractors are non-executive directors (the "Non-Executive Directors").  On average, the Debtors incur expenses of approximately $23,000 per month in the aggregate on account of Independent Contractors' compensation (the "Independent Contractor Obligations").  As of the Petition Date, there is approximately $1,000 outstanding on account of Independent Contractor Obligations. The Debtors seek authority to pay any unpaid amounts arising in connection with the

Independent Contractor Obligations in the ordinary course of business and consistent with past practices and to continue to incur Independent Contractor Obligations in the ordinary course of business.

**(2)    Reimbursable Expenses**

67.    "Prior to the Petition Date and in the ordinary course of business, the Debtors reimbursed Employees and Secondees, subject to manager approval, for certain allowed expenses incurred on behalf of the Debtors while traveling on business (the "Reimbursable Expenses").  More specifically, Reimbursable Expenses include, among other things, business travel (e.g., airfare/rail, gas mileage, taxis, hotel and telephone/internet) and meals (e.g., business travel-related and onsite).  In some cases, Employees/Secondees pay for such expenses directly from their own funds and are  reimbursed upon the submission of an expense reimbursement form itemizing the applicable  business expenses.  In other cases, Employees and Secondees incur expenses on corporate-authorized credit cards issued to the individual and likewise submit itemized expense reimbursement requests.  In both cases, reimbursement is contingent on the Debtors' determination that the charges are for legitimate and reimbursable expenses.

68.    "The Debtors' incurrence of Reimbursable Expenses varies from month to month. As a result, the Debtors cannot accurately estimate prepetition, unpaid Reimbursable Expenses. However, Reimbursable Expenses approximate to $1,000 per month.

69.    "Employees and Secondees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed.  To avoid harming Employees and Secondees who incurred the Reimbursable Expenses, the Debtors request authority to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices, including payment to and in adherence with the Debtors' policy for reimbursing Employees and Secondees such expenses, and honor any prepetition obligations

related thereto to the extent Employees and Secondees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses; (b) modify their prepetition policy relating thereto as they deem appropriate without the need for further court approval; and (c) pay all Reimbursable Expenses to Employees that (i) accrued prepetition and (ii) accrue postpetition but relate to the prepetition period; *provided that*, the Debtors request to directly reimburse Employees/Secondees, to the extent Employees/Secondees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses, in an amount of only up to $1,000 in Reimbursable Expenses.  The Debtors also seek authority to continue their reimbursement policy in the ordinary course during the administration of the Chapter 11 Cases.

**(3)    Company Vehicles**

70.    "The Debtors provide all of the Secondees and one Employee with full time access to cars that are fully expensed by the Debtors.  In addition, other Employees have communal access to one company car when required for business-related travel.  The average monthly lease cost in connection with these cars is approximately $2,100 per month.  Further, certain roadway maintenance employees that are regularly on call have access to company trucks.  The Debtors also have a number of other vehicles and equipment that are integral to its operation and maintenance of the Tollway.  Fuel costs in respect of all company vehicles are paid by company gas card.  The average monthly cost in connection with the company gas cards with respect to use of the Debtors' company vehicles is approximately $8,200.  The Debtors request authority to continue to incur and pay ongoing expenses relating to company vehicles in the ordinary course.

**(4)     Holidays, Paid Time-Off and Leaves of Absence**

71.     "The Debtors offer full-time Employees pay for up to fourteen predetermined holidays and two floating holidays per year ("Paid Holidays").  Nonexempt-Employees who work on a paid holiday will receive time and a half pay for hours worked.  Additionally, full-time Employees of the Debtors are eligible for paid time away from work based on the employee's length of service.  These absences include personal illness, family illness, personal days, and vacation (collectively, "Paid Time Off" or "PTO").  The Debtors anticipate that certain Employees will seek to use PTO accrued during the prepetition period after the Petition Date (the "Unused Paid Time Off").  At the Petition Date, the Debtors estimate that their accrued liability in connection with Unused Paid Time Off equaled approximately $72,500.  The Debtors respectfully request to honor all Unused Paid Time Off that accrued prior to the Petition Date, in accordance with their historical practices and in the ordinary course of business.  The Debtors also seek authority to continue to incur and pay eligible Employees for Paid Holidays consistent with their past practices.

**(5)     Deductions and Withholdings**

72.     "During each applicable payroll period, the Debtors routinely deduct certain amounts from their Employees' gross pay, including, without limitation, (a) pre-tax and after-tax deductions payable pursuant to the Employee benefit plans discussed herein (e.g., contributions relating to health care benefits, insurance premiums and flexible spending programs) and (b) other miscellaneous deductions (collectively, the "Deductions").  On a monthly basis, the Debtors deduct and remit to appropriate third-party recipients approximately $13,000 from the Employees' paychecks for the Deductions.  I believe that, other than the deductions related to the 401(k) Plan (as defined below), as of the Petition Date, all Deductions have been paid.  Accordingly, the Debtors request authority to remit any deductions relating to the 401(k) Plan

and, out of an abundance of caution, the Debtors request authority to remit any other unpaid prepetition Deductions (collectively, the "Unremitted Deductions") that may exist.  Additionally, the Debtors seek authority to continue deducting amounts from the applicable Employee's wages and salaries and forwarding Deductions to the appropriate third-party recipients on a postpetition basis, in the ordinary course of business, and consistent with past practices.  It is my understanding that the Deductions represent earnings that applicable authorities have designated for deduction from Employees' paychecks and thus, may not be property of the Debtors' estates.

73.    "In addition to the Deductions, I am advised that the Debtors are required by law to withhold amounts related to federal income taxes, as well as Social Security and Medicare taxes for remittance to the appropriate taxing authority (collectively, the "Withheld Amounts"). I am further advised that the Debtors are also required to pay additional amounts for federal and state unemployment insurance (together with the Withheld Amounts, the "Payroll Taxes").  On a monthly basis, the Debtors remit approximately $39,000 in Payroll Taxes, which amounts include employer taxes plus what is withheld and remitted on behalf of the employee.  As of the Petition Date, the Debtor is not aware of any outstanding Payroll Taxes (collectively, the "Unremitted Payroll Taxes").  In an abundance of caution, however, to the extent Unremitted Payroll Taxes exist, the Debtors request authority to remit such amounts.

**(6)    Employee Benefits**

74.    "The Debtors offer their Employees the opportunity to participate in a number of insurance and benefit programs, including medical insurance, life and disability insurance, supplemental insurance, workers' compensation, and other employee benefit plans as described in the Employee Wage Motion (collectively, the "Employee Benefits").  Specifically, the Debtors provide health care coverage, dental care and vision care (the "Medical, Dental and Vision Plans") to all of their Employees and their dependents under various self-funded benefit

plans.  The Debtors also provide approximately 30 Employees with life insurance, accidental death and dismemberment and short-term and long-term disability coverage (collectively, the "Insurance and Disability Benefits").  The Debtors also provide voluntary insurance coverage to certain eligible Employees (the "Supplemental Insurance Benefits"), the premiums for which are satisfied solely by participating Employees.

75.  "The Debtors request authority to (a) continue the Employee Benefits in the ordinary course, (b) continue making contributions to the Employee Benefits, and (c) pay any amounts related thereto, including premiums, claims amounts, and administration fees, to the extent that they remain unpaid as of the Petition Date in the ordinary course of business.  I believe that maintaining these benefits and honoring obligations thereunder is necessary to preserve employee morale and maintain the stability of the Debtors' workforce during the Chapter 11 Cases.

76.  "As of the Petition Date, the Debtors estimate that no amounts are owed on account of the Medical, Dental and Vision Plans (the "Unpaid Medical, Dental and Vision Expenses"), the Insurance and Disability Benefits (the "Unpaid Insurance and Disability Benefits"), or the Supplemental Insurance Benefits (the "Unremitted Supplemental Insurance Benefits").  To the extent any amounts are owed on account of Unpaid Medical, Dental and Vision Expenses, I believe that much, if not all, of such amounts would qualify for priority of payment pursuant to section 507(a)(5) of the Bankruptcy Code.  Additionally, I believe that amounts withheld from Employee paychecks on account of the Unpaid Insurance and Disability Benefits and Supplemental Insurance Benefits premiums are likely held in trust by the Debtors and therefore are not property of the Debtors' estate.  Out of an abundance of caution, however, the Debtors request authority to pay any Unpaid Medical,  Dental and Vision Expenses, Unpaid

29

Insurance and Disability Benefits and Unremitted Supplemental Insurance Benefits premiums should any such amount be outstanding as of the Petition Date, including costs associated therewith that are borne by the Debtors in the ordinary course of business.

**(7)    Workers' Compensation**

77.    "The Debtors provide workers' compensation insurance for their Employees (the "Workers' Compensation Program") at the statutorily-required level through Old Republic General Insurance Corp. ("Old Republic"). The annual premium for the Workers' Compensation Program for the year beginning April 1, 2015 is approximately $28,887, which amount was prepaid. The Debtors currently have one Employee claiming benefits under the Workers' Compensation Program and request authority to pay any unpaid amounts in connection with Workers' Compensation Programs should any such amount be outstanding as of the Petition Date. Additionally, the Debtors request authority to maintain the Workers' Compensation Program postpetition.

**(8)    Employee Savings Plans**

78.    "The Debtors maintain for the benefit of eligible Employees an employee savings plan, administered through Fidelity Investments Institutional Operations Company, Inc. ("Fidelity"), which is a tax-qualified plan within the meaning of, and administered in accordance with, the requirements of section 401(k) and other applicable sections of the Internal Revenue Code (the "401(k) Plan"). There are approximately 50 participants in the 401(k) Plan.[7] The Debtors withhold certain amounts from Employees' paychecks and contribute such amounts to the 401(k) Plan (the "Employee 401(k) Contributions"). The Debtors estimate that they withhold a total of approximately $7,000 in Employee 401(k) Contributions each month. The 401(k) Plan

---

[7] This includes 30 current Employees and 20 former Employees.

also includes an employer matching component, pursuant to which the Debtors match Employee 401(k) Contributions fifty cents ($.50) for each dollar up to six percent (6%) of each Employee's base salary per pay period (the "Employer 401(k) Contributions"). The Debtors estimate that they pay a total of approximately $41,000 annually in the aggregate on account of Employer 401(k) Contributions. Additionally, the Debtors pay approximately $3,900 annually in the aggregate in administrative costs associated with the 401(k) Plan. As of the Petition Date, I estimate there are no accrued but unpaid amounts relating to such administrative costs. Out of an abundance of caution, however, the Debtors request authority to pay any accrued but unpaid amounts relating to such administrative costs in connection with the Employer 401(k) Contributions should any such amount be outstanding as of the Petition Date

79. "The Employer 401(k) Contributions are paid within a week of the relevant payroll date. As such, prepetition Employer 401(k) Contributions for the most recent applicable payroll period were not paid prior to the Petition Date. The Debtors respectfully request authority to remit such outstanding Employer 401(k) Contributions. Additionally, certain amounts may come due in connection with the Unpaid Wages. To the extent any such outstanding Employer 401(k) Contributions exist, the Debtors respectfully request authority to remit such amounts. Finally, the Debtors request authority to continue the Employee 401(k) Contributions and the Employer 401(k) Contributions on a postpetition basis.

**(9)     Other Employee Programs**

80. "The Debtors also have in place miscellaneous practices, programs, and policies that provide benefits to Employees, including, but not limited to a tuition reimbursement program, and a flexible spending account (collectively, the "Other Employee Programs"). I believe that the Other Employee Programs play a vital role in maintaining Employee morale and performance. Indeed, I believe that a failure to honor the Other Employee Programs would have

adverse effects on morale and performance that far outweigh the monetary costs of maintaining them.  Accordingly, I support the Debtors' request for authority to pay any prepetition amounts relating to such programs and continue such programs postpetition consistent with past practices.

**(10)    The Payroll Processor**

81.    "The Debtors utilize the services of the Payroll Processor to administer payroll funds made available to Employees through direct deposit.  The Payroll Processor's responsibilities include processing payroll and transferring funds from the Debtors to their Employees.  For these services, the Debtors pay the Payroll Processor approximately $9,000 per year.  The Debtors do not believe that there are any unpaid prepetition amounts with respect to the Payroll Processor's fees.  I believe that the services provided by the Payroll Processor are crucial to the smooth functioning of the Debtors' payroll system, and therefore believe the Debtors' request for permission to pay any unpaid Payroll Processor fees and to continue to pay the Payroll Processor fees that accrue during the ordinary course of business is appropriate.

82.    "Just as the Debtors depend on their Employees to operate their businesses on a daily basis, these individuals also depend on the Debtors.  Indeed, I believe the majority of the Debtors' Employees rely exclusively on their compensation, benefits and reimbursement of expenses to satisfy their daily basic living necessities.  Consequently, they will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses.

83.    "In the absence of such payments, I believe that the Debtors' Employees may seek alternative employment opportunities, thereby hindering the Debtors' ability to meet their operational needs.  Additionally, the Debtors' relationships with their Employees could be adversely impacted and there could be irreparable harm to the Employees' morale, dedication, confidence and cooperation.  The Employees' support for the Debtors' reorganization efforts is

critical to the success of those efforts.  Moreover, it is my opinion that loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be distracting at a time when the Debtors should be focusing on maintaining their operations, and the Debtors' businesses would be substantially damaged.  I believe that the relief requested in the Employee Wage Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Employee Wage Motion should be approved.

> **(vii)  Debtors' Motion for Entry of an  Order (A) Authorizing Debtors to Continue Using Existing Cash Management System, Bank Accounts and Business Forms and (B) Authorizing Debtors' Banks to Honor all Related Payment Requests (the "Cash Management Motion")**

84.  "In the Cash Management Motion, the Debtors request entry of an order (i) authorizing the Debtors to continue using their cash management system, bank accounts, and business forms, (ii) authorizing the Debtors' banks to honor all related payment requests, and (iii) in the case of an interim order, scheduling a final hearing.

85.  "In the ordinary course of business, the Debtors utilize an efficient cash management system (the "Cash Management System") in the day-to-day operation of their businesses to collect, manage, and disburse funds generated in connection with the Tollway.  The Debtors have designed the Cash Management System to meet their operating needs, enable management to control and monitor corporate funds, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the movement of funds and enhance the development of accurate account balances.

86.  "In the ordinary course of business, the Debtors utilize their Cash Management System to collect cash generated from operations, manage funds received from borrowings under

various credit facilities, and maintain current and accurate accounting records of all cash transactions. If the Debtors were required to comply with the U.S. Trustee Guidelines, the burden of opening new accounts, revising cash management procedures, and instructing customers to redirect payments would disrupt the Debtors' businesses at this critical time. In addition, the FCA requires the Debtors to maintain certain accounts, so if the Debtors were forced to place funds in new accounts, they may be in violation of the FCA. I respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date. Similarly, I submit that the burden and expense of immediately replacing existing business forms to reflect the Debtors' statuses as debtors in possession would be unduly burdensome at this critical juncture.

87. "The relief requested in the Cash Management Motion is vital to ensuring the Debtors' smooth transition into bankruptcy. Authorizing the Debtors to maintain their Cash Management System will avoid many of the possible disruptions and distractions that could divert their attention from more critical matters during the initial days of the Chapter 11 Cases.

88. "I have reviewed the Cash Management Motion and believe that the relief requested therein is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

(viii)    **Debtors' Motion for Entry of Interim and Final Orders (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services to, or Discriminating Against, the Debtors on Account of Prepetition Invoices, (B) Determining that the Utilities Are Adequately Assured of Future Payment, (C) Establishing Procedures for Determining Requests for Additional Assurance, (D) Permitting Utility Companies to Object to Such Procedures and (E) Scheduling a Final Hearing (the "Utilities Motion")**

89.     "In the Utilities Motion, the Debtors request entry of interim and final orders (a) prohibiting the Utility Companies (defined below) from altering, refusing, or discontinuing services, (b) approving the Debtors' proposed adequate assurance, (c) approving the Debtors' proposed procedures for resolving requests for additional assurance, and (d) approving procedures for resolving objections by the Utility Companies.

90.     "In the ordinary course of their business, the Debtors obtain water, electricity, and telephone and internet services (the "Utility Services") from eight utility providers (each, a "Utility Company" and collectively, the "Utility Companies").  Over the past 12 months, the Debtors paid on average $29,100 per month for Utility Services.  These Utility Services are essential to the Debtors' ongoing operations and an interruption in the provision of services, even for a brief period, would significantly jeopardize the success of the Debtors' reorganization efforts.  Therefore, it is critical to the success of the Debtors' reorganization that the Utility Services continue uninterrupted during the Chapter 11 Cases.

91.     "The Debtors intend to pay their undisputed postpetition obligations to the Utility Companies on a timely basis in accordance with their prepetition practices.  The Debtors further propose to deposit $14,550 (the "Adequate Assurance Deposit") into one segregated bank account on behalf of all Utility Companies within 20 days of the Petition Date as adequate assurance of future payment.  This amount represents two weeks of Utility Services, calculated as a historical average over the past 12 months.

92.     "In the event that a Utility Company believes additional assurance is required, such Utility Company may request additional assurance pursuant to the specific procedures set forth in the Utilities Motion (the "Adequate Assurance Procedures").  Moreover, should any Utility Company object to the Adequate Assurance Procedures, such Utility Company may submit an objection ("Procedures Objection"), which will be resolved at the Final Hearing (as defined in the Utilities Motion).

93.     "I believe and am advised that the proposed procedures are necessary in these Chapter 11 Cases to ensure that the Debtors are not forced to address numerous requests by the Utility Companies in a disorganized manner in the critical first weeks of the Chapter 11 Cases. Moreover, the procedures will prevent a Utility Company from unilaterally deciding—on or after the thirtieth day following the Petition Date—that it is not adequately protected and thus, entitled to discontinue service or make exorbitant demands for payment to continue service.  Given that any discontinuation of Utility Services would effectively shut down the Debtors' operations and disrupt the Debtors' reorganization efforts, the proposed procedures are critical to ensuring the uninterrupted continuation of Utility Services.

94.     "I believe and am advised that the Adequate Assurance Deposit together with the Debtors' ability to pay for future Utility Services (the "Proposed Adequate Assurance") is sufficient adequate assurance of future payment to satisfy the requirements of section 366 of the Bankruptcy Code.  Moreover, I believe the Proposed Adequate Assurance is in the best interests of the Debtors' estates, their creditors, and all other parties of interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

> (ix)     **Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Continue Prepetition Insurance Programs and Insurance Policies, (B) Authorizing the Debtors to Pay any Prepetition Premiums and Related Obligations, and (C) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers (the "Insurance Motion")**

95.     "In the Insurance Motion, the Debtors request entry of an order (a) authorizing the Debtors to continue prepetition insurance programs and insurance policies, (b) authorizing the Debtors to pay any prepetition premiums and related obligations, and (c) authorizing banks and other financial institutions to receive, process, honor, and pay checks or electronic transfers used by the Debtors to pay the foregoing and to rely on the Debtors' representations as to which checks are issued and authorized to be paid in accordance with the Insurance Motion.

96.     "In the ordinary course of business, the Debtors maintain a number of insurance Policies (as defined in the Insurance Motion) that benefit, among others, the Debtors.  The Policies are essential to the preservation of the value of the Debtors' businesses, property, and assets.  In many cases, insurance coverage such as that provided by the Policies is required by the regulations, laws, and contracts that govern the Debtors' activities.

97.     "The Debtors pay Insurance Obligations (as defined in the Insurance Motion) in the ordinary course of business and only pay those Insurance Obligations when they become due and owing.  I believe that the Debtors are current on all Insurance Obligations and do not have any prepetition amounts owing under the Policies.

98.     "I have reviewed the Insurance Motion and believe that the facts stated therein are accurate to the best of my knowledge, information, and belief.  I further believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their

businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

> **(x)** **Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Pay Materialmen & Mechanic Contractors in the Ordinary Course and (B) Granting Related Relief (the "M&M Motion")**

99.     "In the M&M Motion, the Debtors request entry of an order authorizing the Debtors to pay various materialmen and mechanic contractors (the "Contractors") consistent with the ordinary course of business and granting related relief.

100.    "I believe that the Contractors provide essential and necessary services to the Debtors via their provision of repair and maintenance services. The services provided by the Contractors are fundamentally essential to the continued operation of the Debtors.

101.    "Moreover, I believe and am advised that the Debtors' failure to pay the Contractors would result in immediate harmful effects on the Debtors' estates because (i) the Contractors could then file and exercise applicable lien rights under nonbankruptcy law, (ii) the filing of any such lien right would trigger a default by the Debtors under the FCA, (iii) the triggering of such default under the FCA would bestow upon TxDOT (the counterparty under the FCA) an immediate right to offset or recoup toll revenues, and (iv) the creation of such an offset right in favor of TxDOT under the FCA would work an economic harm on the Debtors' estates.

102.    "I have reviewed the M&M Motion and believe that the facts stated therein are accurate to the best of my knowledge, information, and belief. I further believe that the relief requested in the M&M Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the M&M Motion should be approved.

      **(xi)**    **Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Granting Adequate Protection, and (II) Prescribing Form and Manner of Notice and Setting the Time for the Final Hearing (the "Cash Collateral Motion")**

103.    "In the Cash Collateral Motion, the Debtors request entry of orders (the "Cash Collateral Orders") granting the following relief as provided in the proposed orders attached to the Cash Collateral Motion:

    (a)    authorize the Debtors on an interim basis, pursuant to section 363(c) of the Bankruptcy Code, to use cash collateral, as defined in section 363(a) of the Bankruptcy Code (the "Cash Collateral") in accordance with the budget (as amended from time to time, the "Budget") attached to the interim Cash Collateral Order as <u>Exhibit 1</u>;

    (b)    authorize the Debtors on an interim basis, pursuant to sections 361 and 363 of the Bankruptcy Code, to provide certain adequate protection described to the Prepetition Secured Parties with respect to any diminution in value of the Prepetition Secured Parties' interests in the Prepetition Collateral whether from the use of the Cash Collateral or the use, sale, lease, depreciation, decline in market price, or otherwise of the Prepetition Collateral;

    (c)    schedule the Final Hearing, pursuant to Bankruptcy Rule 4001 to consider entry of a Final Order authorizing the use of Cash Collateral and approving the notice procedures in respect of the Final Hearing;

    (d)    authorize the Debtor on a final basis, pursuant to section 363(c) of the Bankruptcy Code, to use Cash Collateral in accordance with the Budget and any supplemental Budgets as approved by the Court after further notice and hearing;

    (e)    authorize the Debtor on a final basis, pursuant to sections 361 and 363 of the Bankruptcy Code, to provide the adequate protection described herein to the Prepetition Secured Parties with respect to any diminution in value of the Prepetition Secured Parties' interests in the Prepetition Collateral whether from the use of the Cash Collateral or the use, sale, lease, depreciation, decline in market price, or otherwise of the Prepetition Collateral; and

    (f)    grant related relief.

104.    "The Debtors have an immediate and urgent need for the use of Cash Collateral during the Chapter 11 Cases to continue to operate their businesses, pay employees, perform

critical maintenance and upkeep on the Tollway, satisfy other working capital and operational needs and sufficiently fund their reorganization.  As of the Petition Date, the Debtors do not have sufficient unencumbered cash to fund their business operations and pay present operating expenses.  The Debtors' access to Cash Collateral is necessary to preserve and maximize value for the Debtors' stakeholders.

105.    "The Debtors use Cash Collateral in the ordinary course of business to pay their employees, maintain the Tollway, and satisfy other working capital needs. I believe that absent approval of the Interim Order, the Debtors will be unable to operate their businesses, generate revenue, provide critical maintenance to the Tollway, satisfy working capital obligations and pay basic expenses, including payroll and trade obligations, or satisfy other ongoing obligations related to the Tollway, including maintenance required by TxDOT under the FCA. I believe that failure to fund these expenses would prove seriously disruptive to the Debtors' relationship with TxDOT, vendors, and employees and could cause severe and irreparable harm to the Debtors' operations to the material detriment of the estates.   Indeed, with respect to the Debtors' relationship with TxDOT, which is governed by the FCA, failure to provide critical maintenance to the Tollway could result in termination rights in favor of TxDOT, which would jeopardize the Debtors' most substantial asset: the FCA itself. Also, I believe that any cessation of operation would result in an inability to retain their employees, many of whom have specialized skills and training necessary for their positions.

106.    "Therefore, I believe that the Debtors require immediate use of the Cash Collateral to fund their obligations, which is vital to the success of their going forward operations and restructuring efforts.

107.    "Pursuant to the Motion, the Debtors propose to provide the Prepetition Secured Parties with ample adequate protection with respect to any diminution in value of the Prepetition Secured Parties' interests in the Prepetition Collateral in the form of (a) replacement liens; (b) post-petition superpriority claims; and (c) payment of professional fees and expenses (as described in greater detail in the Motion, the "Adequate Protection Obligations"). The Debtors also agree to satisfy certain Budget-related reporting requirements.

108.    "The Debtors engaged in discussions with the Senior Lenders regarding the Debtors' consensual continued use of Cash Collateral.  The parties reached an agreement, the terms of which are described herein and set forth in the proposed Interim Order regarding cash collateral use.

109.    " I believe that the adequate protection that the Debtors have proposed to provide to the Prepetition Secured Parties (as described in the Cash Collateral Motion), with respect to any diminution in value of the Prepetition Secured Parties' interests in the Prepetition Collateral, in exchange for the Prepetition Secured Parties' consent to the Debtors' continued use of the Cash Collateral is sufficient, fair and reasonable and in the best interests of the Debtors and their estates, creditors and equity holders, and should be approved.

110.    "Even if the Prepetition Secured Parties had not consented to the Debtors' use of their Cash Collateral, for the following reasons, I believe that the Prepetition Secured Parties are adequately protected by the Adequate Protection Obligations.

111.    "First, because additional tangible value is being provided to the Prepetition Secured Parties in the form of the Adequate Protection Obligations in exchange for the Debtors' use of Cash Collateral, I believe the Prepetition Secured Parties are adequately protected.

112. "Second, the Debtors propose to use the Cash Collateral to preserve or enhance the value of the Prepetition Secured Parties' interest in the Prepetition Collateral. The Cash Collateral will be used in accordance with the Budget. The Budget has been closely analyzed by the Debtors, their management (including myself) and their professionals and advisors, and is narrowly tailored so that only expenditures which are necessary to ensure the continued operation of the business and the orderly and expeditious commencement and continuation of the Chapter 11 Cases are made. If the Debtors were precluded from making expenditures necessary to maintain their assets and sustain their operations, I believe that the Prepetition Secured Parties would be harmed. Therefore, I believe that the adequate protection that the Debtors have proposed to provide to the Prepetition Secured Parties should be approved

113. "Accordingly, I believe that the relief requested in the Cash Collateral Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and will enable the Debtors to continue to operate in the ordinary course without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be approved.

## CONCLUSION

114. "To minimize any loss of value to their businesses, the Debtors' immediate objective is to engage in business as usual following the commencement of these Chapter 11 Cases with as little interruption to the Debtors' operations as possible. If the Court grants the relief requested in the First Day Motions, the prospect of achieving these objectives–to the maximum benefit of the Debtors' estates, creditors and parties in interest–will be substantially enhanced. I respectfully request that all of the relief requested in the First Day Motions, and such other further relief as may be just and proper, be granted."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 2, 2016

/s/ Paul Harris
Paul Harris
Chief Financial Officer of SH 130 Concession
Company, LLC