NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, OR A LEGALLY BINDING OBLIGATION OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST. THIS PLAN IS SUBJECT TO APPROVAL OF THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE (INCLUDING IN CONNECTION WITH THE PURCHASE OR SALE OF THE DEBTORS' SECURITIES) BEFORE THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| **SH 130 CONCESSION COMPANY, LLC** | § | **CASE NO. 16-10262** |
| **ZACHRY TOLL ROAD – 56 LP** | § | **CASE NO. 16-10263** |
| **CINTRA TX 56 LLC** | § | **CASE NO. 16-10264** |
| | § | |
| **DEBTORS.** | § | **CHAPTER 11** |
| | § | |
| EIN: 20-8490258; 20-8596022; 20-8059105 | § | |
| | § | |
| **10800 N US 183 HWY** | § | **JOINTLY ADMINISTERED UNDER** |
| **BUDA, TEXAS 78610-9460** | § | **CASE NO. 16-10262** |

**JOINT PLAN OF REORGANIZATION**
**OF SH 130 CONCESSION COMPANY, LLC, *ET AL.*,**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**GIBSON, DUNN & CRUTCHER LLP**
David M. Feldman (admitted *pro hac vice*)
Matthew K. Kelsey (admitted *pro hac vice*)
Alan Moskowitz (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
Email address: DFeldman@gibsondunn.com
Email address: MKelsey@gibsondunn.com
Email address: AMoskowitz@gibsondunn.com

*Counsel to the Debtors and*
*Debtors in Possession*

Dated: August 12, 2016

**JACKSON WALKER L.L.P.**
Patricia B. Tomasco (State Bar No. 01797600)
Jennifer F. Wertz (State Bar No. 24072822)
100 Congress Ave., Suite 1100
Austin, Texas 78701
(512) 236-2000
(512) 236-2002 - FAX
Email address: ptomasco@jw.com
Email address: jwertz@jw.com

## TABLE OF CONTENTS

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW ..................................................................................................... 1

    A.    Defined Terms. ............................................................................................... 1
    B.    Rules of Interpretation. ................................................................................. 12
    C.    Computation of Time. ................................................................................... 12
    D.    Governing Law. ............................................................................................ 12
    E.    Reference to Monetary Figures. .................................................................... 12

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ......................................... 13

    A.    Administrative Claims. ................................................................................. 13
    B.    Professional Compensation. .......................................................................... 13
    C.    Priority Tax Claims. ...................................................................................... 13
    D.    Claims in Connection with Debtor-in-Possession Financing. ........................ 13
    E.    Secured Party Fees. ...................................................................................... 14

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..................................... 14

    A.    Classification of Claims and Interests. .......................................................... 14
    B.    Treatment of Claims and Interests. ............................................................... 14
    C.    Special Provision Governing Unimpaired Claims. ......................................... 17
    D.    Acceptance or Rejection of the Plan. ............................................................. 17
    E.    Elimination of Vacant Classes. ..................................................................... 17
    F.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. ................ 17
    G.    Controversy Concerning Impairment. ............................................................ 17
    H.    Subordinated Claims. .................................................................................... 17

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN .......................................................... 18

    A.    No Substantive Consolidation. ...................................................................... 18
    B.    Formation of New Holdco; Issuance of New Equity Interests ......................... 18
    C.    Continued Organizational Existence and Vesting of Assets in the Reorganized Debtors; Continued Operations ............................................................ 18
    D.    Restructuring Transactions. ........................................................................... 19
    E.    New Debt Documents. ................................................................................... 20
    F.    Sources of Cash for Plan Distributions. ......................................................... 20
    G.    Governance, Directors and Officers; Employment-Related Agreements and Compensation Programs; Other Agreements. ............................................ 20
    H.    Section 1145 Exemption. .............................................................................. 22
    I.    General Settlement of Claims and Interests. .................................................. 22
    J.    Cancellation of Existing Securities and Agreements. ...................................... 22
    K.    Corporate, Limited Liability Company and Partnership Action. ...................... 22
    L.    Effectuating Documents; Further Transactions. .............................................. 23
    M.    Section 1146 Exemption. .............................................................................. 23
    N.    Preservation of Causes of Action. ................................................................. 23
    O.    Payment of Certain Fees and Expenses .......................................................... 24

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................24

    A.     Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases. ...........................................................................................................24
    B.     Claims Based on Rejection of Executory Contracts and Unexpired Leases. ...................25
    C.     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases...................25
    D.     Insurance Policies. ...........................................................................................................26
    E.     Modifications, Amendments, Supplements, Restatements, or Other Agreements..........26
    F.     Reservation of Rights. ......................................................................................................26
    G.     Nonoccurrence of Effective Date. ...................................................................................26
    H.     Contracts and Leases Entered Into After the Petition Date. ............................................26

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...............................................................26

    A.     Disbursing Agent. .............................................................................................................26
    B.     Rights and Powers of Disbursing Agent. .........................................................................27
    C.     Delivery of Distributions and Undeliverable or Unclaimed Distributions......................27
    D.     Compliance with Tax Requirements. ...............................................................................27
    E.     Allocations. ......................................................................................................................27
    F.     No Post-Petition Interest on Claims. ................................................................................28
    G.     Setoffs and Recoupment. ..................................................................................................28
    H.     Applicability of Insurance Policies. .................................................................................28

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED CLAIMS ........................................................................................................................28

    A.     Disputed Claims. ..............................................................................................................28
    B.     Objections to Claims and Interests. ..................................................................................28
    C.     Compromises and Settlements. .........................................................................................28
    D.     No Distributions Pending Allowance. ..............................................................................28
    E.     Distributions After Allowance. ........................................................................................29

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS ...........................29

    A.     Discharge of Claims and Termination of Interests............................................................29
    B.     Releases.............................................................................................................................29
    C.     Exculpation. .....................................................................................................................30
    D.     Injunction. ........................................................................................................................31
    E.     Protections Against Discriminatory Treatment. ...............................................................31
    F.     Setoffs. .............................................................................................................................32
    G.     Recoupment. .....................................................................................................................32
    H.     Subordination Rights.........................................................................................................32
    I.     Document Retention. ........................................................................................................32

ARTICLE IX. EFFECT OF CONFIRMATION OF THE PLAN ...............................................................32

ARTICLE X. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ....................................32

    A.     Conditions Precedent to the Confirmation Date................................................................32
    B.     Conditions Precedent to the Effective Date. .....................................................................32
    C.     Waiver of Conditions........................................................................................................33
    D.     Effect of Failure of Conditions. .......................................................................................33

ARTICLE XI. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN......................................34

    A.     Modification and Amendments.............................................................................................34
    B.     Effect of Confirmation on Modifications.............................................................................34
    C.     Revocation or Withdrawal of Plan.......................................................................................34

ARTICLE XII. RETENTION OF JURISDICTION.............................................................................................34

ARTICLE XIII. MISCELLANEOUS PROVISIONS ..........................................................................................35

    A.     Immediate Binding Effect.....................................................................................................35
    B.     Additional Documents. .........................................................................................................36
    C.     Payment of Statutory Fees. ...................................................................................................36
    D.     Reservation of Rights............................................................................................................36
    E.     Successors and Assigns.........................................................................................................36
    F.     Disallowed Claims. ..............................................................................................................36
    G.     Notices. .................................................................................................................................36
    H.     Term of Injunctions or Stays................................................................................................38
    I.     Entire Agreement..................................................................................................................38
    J.     Exhibits. ...............................................................................................................................38
    K.     Nonseverability of Plan Provisions......................................................................................38
    L.     Votes Solicited in Good Faith...............................................................................................38
    M.     Closing of Chapter 11 Cases. ...............................................................................................39
    N.     Waiver or Estoppel...............................................................................................................39
    O.     Conflicts................................................................................................................................39

*[Remainder of page intentionally left blank.]*

SH 130 Concession Company, LLC, CINTRA TX 56 LLC, and Zachry Toll Road–56 LP, as debtors and debtors in possession (each, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") propose this joint plan of reorganization for the resolution of the outstanding claims against and interests in the Debtors pursuant to chapter 11 of title 11 of the United States Code.  Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A of the Plan.  Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, projections of future operations, and a summary and description of the Plan and certain related matters.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY, PARTICULARLY HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN**.

## ARTICLE I.

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

*A.  Defined Terms.*

As used in the Plan, capitalized terms have the meanings set forth below.

1.  "<u>Accrued Professional Compensation Claims</u>" means, at any given moment, all Claims for accrued fees and expenses for services rendered by a Professional through and including the Effective Date, to the extent such fees and expenses have not been paid pursuant to any order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Accrued Professional Compensation Claim.  For the avoidance of doubt, Accrued Professional Compensation Claims shall include the aggregate holdback (if any) of those Professional fees billed to the Debtors during the Chapter 11 Cases that are held back pursuant to any other order of the Bankruptcy Court.  For the avoidance of doubt, the Secured Party Fees shall not constitute Accrued Professional Compensation Claims.

2.  "<u>Administrative Agent</u>" means BNP Paribas (as successor to Fortis Bank S.A./N.V., UK Branch), in its capacity as administrative agent under the Senior Loan Agreement, and/or its successors in such capacity.  The term "Administrative Agent" shall also include BNP Paribas (as successor to Fortis Bank S.A./N.V., UK Branch), in its role as Instructing Agent (as such term is defined in the Collateral Agency Agreement).

3.  "<u>Administrative Claim</u>" means any Claim for costs and expenses of administration of the Estates pursuant to section 503(b) or 507(a)(2) of the Bankruptcy Code, including any Cure Claim and the Secured Party Fees, other than any Accrued Professional Compensation Claim.

4.  "<u>Affiliate</u>" has the meaning set forth in section 101(2) of the Bankruptcy Code.

5.  "<u>Allowed</u>" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that either is not a Disputed Claim or has been allowed by a Final Order; (b) a Claim that is allowed (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; (c) a Claim relating to a rejected Executory Contract or Unexpired Lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order; (d) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed by the deadline established in Article VII.B; or (e) in the case of an Administrative Claim, such Administrative Claim (i) to the extent that it is based on liabilities incurred by a Debtor in the ordinary course of its business after the Petition Date and is payable by such Debtor in the ordinary course of business without the necessity of Bankruptcy Court approval, or (ii) if it is for fees payable pursuant to section 1930(a) of the Judicial Code; *provided*

that the Pre-Petition Secured Claims and the Secured Party Fees shall be deemed Allowed in the absence of the filing of Proofs of Claim.

6.      "Assumed Executory Contract and Unexpired Lease List" means the list (as may be amended from time to time prior to the Effective Date with the consent of the Required Consenting Senior Lenders pursuant to Article XI of the Plan) of Executory Contracts and Unexpired Leases that will be assumed by the Debtors pursuant to Article V of the Plan, which shall be filed twenty (20) Business Days prior to the Confirmation Hearing.

7.      "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101−1532.

8.      "Bankruptcy Court" means the United States Bankruptcy Court for the Western District of Texas, or such other court exercising jurisdiction over all or any part of the Chapter 11 Cases, as applicable.

9.      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

10.     "Bar Date" means the deadline for filing Proofs of Claim, which unless established otherwise by Final Order of the Bankruptcy Court for a particular Claim, shall be (i) July 5, 2016 at 4:00 p.m. Central Standard Time for all Entities other than Governmental Units, or (ii) one hundred eighty (180) days after the Petition Date for Governmental Units.

11.     "Business Day" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

12.     "Cash" means cash and cash equivalents, including bank deposits, checks, and other similar items in legal tender of the United States of America.

13.     "Causes of Action" means any claims, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in contract or in tort, in law or in equity, or pursuant to any other theory of law. Causes of Action also include:  (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

14.     "Certificate" means any instrument evidencing a Claim or an Interest.

15.      "Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and (b) when used with reference to all the Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

16.     "Cintra" means Cintra Infraestructuras S.A. and its affiliates.

17.     "CINTRA TX" means CINTRA TX 56 LLC, a Delaware limited liability company and a Debtor in the Chapter 11 Cases.

18.     "Claim" means any "claim"(as defined in section 101(5) of the Bankruptcy Code) against a Debtor.

19.     "Claims and Balloting Agent" means Prime Clerk LLC, located at 830 3rd Avenue, 9th Floor, New York, New York 10022.

20.     "Class" means a class of Claims or Interests as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

21.     "Collateral Agency Agreement" means that certain Collateral Agency and Account Agreement, dated as of March 7, 2008 (as amended, supplemented or otherwise modified from time to time), among the Concessionaire, the Administrative Agent, the Hedging Banks, TIFIA, and the Collateral Agent.

22.     "Collateral Agent" means Deutsche Bank Trust Company Americas (as successor to Wells Fargo Bank, National Association), in its capacity as collateral agent and securities intermediary under the Collateral Agency Agreement.

23.     "Concession Agreement" means that certain Facility Concession Agreement, dated as of March 22, 2007, by and between TxDOT and the Concessionaire, as amended, modified, or supplemented from time to time.

24.     "Concessionaire" means SH 130 Concession Company, LLC, a Delaware limited liability company and a Debtor in the Chapter 11 Cases.

25.     "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

26.     "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

27.     "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan, pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

28.     "Confirmation Order" means the order of the Bankruptcy Court, which shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Senior Lenders, confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

29.     "Confirmation Order Findings of Fact and Conclusions of Law" means the proposed findings of fact and conclusions of law made by the Bankruptcy Court, each of which shall be: (a) reasonably acceptable to the Debtors and the Required Consenting Senior Lenders; (b) deemed to have been made and issued pursuant to Bankruptcy Rule 7052; and (c) made applicable to the Chapter 11 Cases pursuant to Bankruptcy Rule 9014. Upon entry of the Confirmation Order, the Confirmation Order Findings of Fact and Conclusions of Law shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

30.     "Consummation" means the occurrence of the Effective Date.

31.     "Contractor" means Central Texas Highway Constructors LLC and its predecessors, successors, and assigns.

32.     "Cure Claim" means a Claim based upon a Debtor's default under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

33.     "Debtors" has the meaning ascribed to it in the preamble to the Plan.

34.     "DIP Credit Agreement" means [_____].

35.     "DIP Facility" means [_____].

36.     "DIP Parties" means [_____].

37.     "Disallowed Claim" means any Claim which has (i) not been scheduled by the Debtors in a liquidated, non-contingent and undisputed amount in the Schedules filed by the Debtors in the Chapter 11 Cases

pursuant to Bankruptcy Rule 1007, (ii) not been evidenced by a Proof of Claim filed in the Chapter 11 Cases by the applicable Bar Date, or (iii) been disallowed by a Final Order of the Bankruptcy Court.

38. "<u>Disbursing Agent</u>" means, as the context requires, the Debtors, the Reorganized Debtors, or the Entity or Entities selected by the Debtors or Reorganized Debtors, as applicable, to make or facilitate distributions pursuant to the Plan.

39. "<u>Disclosure Statement</u>" means the *Disclosure Statement Relating to the Joint Plan of Reorganization of SH 130 Concession Company, LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code*, dated August 12, 2016, including all exhibits and schedules thereto and references therein that relate to the Plan (as amended, modified, or supplemented from time to time), that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

40. "<u>Disclosure Statement Order</u>" means an order entered by the Bankruptcy Court, approving, among other things, the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code, authorizing the transmittal of the Disclosure Statement and the Plan to Holders of Claims and Interests, authorizing the solicitation of votes on the Plan, and approving related solicitation materials.

41. "<u>Disputed</u>" means (a) in relation to Claims, such Claim if a Proof of Claim is required to be filed and (i) no Proof of Claim has been timely filed, (ii) an objection has been timely interposed, or (iii) the time for filing an objection to such Claim has not expired and no order of the Bankruptcy Court allowing such Claim has been entered, or (b) in relation to Claims and Interests, such Claim (other than a Pre-Petition Secured Claim) or Interest with respect to which the Debtors otherwise dispute its amount, enforceability or validity, or their liability.

42. "<u>Distribution Record Date</u>" means the record date for purposes of making distributions under the Plan on account of Allowed Claims and Allowed Interests, which date shall be the later of (a) five (5) Business Days prior to the Effective Date, or (b) with respect to Claims for which the applicable Bar Date has not expired as of such date, the earlier of (i) such applicable Bar Date, or (ii) the date on which a Proof of Claim evidencing such Claim is Filed.

43. "<u>Effective Date</u>" means, with respect to the Plan, the date that is a Business Day selected by the Debtors with the consent of the Required Consenting Senior Lenders on which: (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article X of the Plan have been satisfied or waived (in accordance with Article X.C of the Plan); (c) the Plan is declared effective by the Debtors; and (d) the Debtors shall have Filed notice of the Effective Date with the Bankruptcy Court.

44. "<u>Entity</u>" means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

45. "<u>Equity Security</u>" means any "equity security" (as defined in section 101(16) of the Bankruptcy Code) in a Debtor.

46. "<u>Estate</u>" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

47. "<u>Exculpated Claim</u>" means any claim or Cause of Action related to any act or omission in connection with, relating to, or arising out of the Plan or Restructuring Transactions, the formulation, preparation, dissemination, negotiation of any document in connection with the Plan, the Restructuring Documents, the Plan Supplement or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Plan Supplement, the pursuit of Consummation, the administration and implementation of the Plan, or the distribution of property pursuant to the Plan.

48. "<u>Executory Contract</u>" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

49. "<u>Existing Equity Interests</u>" means the existing Interests in the Debtors.

50.    "Exit Facility" means the new money senior capital expenditure facility which shall be used, among other things, to refinance the DIP Facility and for any extraordinary capital expenditures, including any amounts necessary for pavement remediation, as necessary or required.

51.    "Exit Facility Credit Agreement" means the credit agreement to be entered into with respect to the Exit Facility, as of the Effective Date, the form of which shall be included in the Plan Supplement and the terms of which shall be substantially in accordance with the terms set forth in the New Debt Term Sheet.

52.    "Exit Facility Documents" means the other documents and agreements ancillary to the Exit Facility Credit Agreement.

53.    "File" or "Filed" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

54.    "Final Order" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided however*, that the filing of a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, relating to such order shall not cause such order to not be a "Final Order."

55.    "First Lien Lenders" means the banks and other financial institutions from time to time party to the Senior Loan Agreement.

56.    "General Unsecured Trade Claims" means any Unsecured Claim for payment for goods and services provided in the ordinary course of business, but excluding payment for any amounts incidental thereto, including payment for indemnification, contribution or reimbursement.  General Unsecured Trade Claims shall not include: (a) intercompany obligations among the Debtors; (b) Administrative Claims; (c) Accrued Professional Compensation Claims; (d) Priority Tax Claims; (e) Other Priority Claims; or (f) Other General Unsecured Claims.

57.    "Governance Term Sheet" means that term sheet describing the material terms of the New Holdco LLC Agreement, the form of which is attached hereto as **Exhibit 1**.

58.    "Governmental Unit" means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

59.    "Hedging Agreements" means those certain ISDA Master Agreements and respective Schedules and Confirmations, between the Concessionaire and the hedge counterparties thereto, described in the Collateral Agency Agreement, pursuant to which, among other things, the Concessionaire hedged certain interest rate payment obligations under the Senior Loans, as amended, modified, or supplemented from time to time.

60.    "Hedging Banks" means the banks and other financial institutions from time to time parties to the Hedging Agreements.

61.    "Hedging Early Termination Date" means March 9, 2016, which is the date on which the Hedging Banks exercised their early termination rights under their respective Hedging Agreements.

62.    "Hedging Obligations" means, collectively, (a) all scheduled amounts payable to the Hedging Banks by the Concessionaire under the Hedging Agreements (including interest accruing after the Petition Date), net of all scheduled amounts payable to the Concessionaire by such Hedging Banks, and (b) all other indebtedness, fees,

indemnities and other amounts payable by the Concessionaire to the Hedging Banks under such Hedging Agreements net of all other indebtedness, fees, indemnities and other amounts payable by the Hedging Banks to the Concessionaire under such Hedging Agreements; *provided*, that Hedging Obligations shall not include Hedging Termination Obligations.

63.     "Hedging Termination Obligations" means the aggregate amount payable to the Hedging Banks by the Concessionaire upon the early unwind of the Hedging Agreements on the Hedging Early Termination Date, net of all amounts payable to the Concessionaire by such Hedging Banks upon the early unwind of such Hedging Agreements on the Hedging Early Termination Date.

64.     "Holder" means an Entity holding a Claim or an Interest, as applicable.

65.     "Impaired" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

66.     "Implementation Memorandum" means the memorandum describing the restructurings, transfers, and other corporate transactions that the Debtors determine to be necessary or appropriate to effectuate the Restructuring Transactions in compliance with the Bankruptcy Code and other applicable United States law and, to the maximum extent possible, in a tax efficient manner.  A non-final form of the Implementation Memorandum is attached to the Disclosure Statement as **Exhibit E**.  The Plan Supplement will include a substantially final form of the Implementation Memorandum.

67.     "Insider" has the meaning set forth in section 101(31) of the Bankruptcy Code.

68.     "Interest" means any: (a) Equity Security; or (b) issued, unissued, authorized, or outstanding shares of capital stock, partnership and limited liability company interests, or similar interests in the Debtors together with any warrants, options, or contractual rights to purchase or acquire such capital stock or interests at any time, and all rights arising with respect thereto.

69.     "Judicial Code" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

70.     "Key Employee Incentive Plan" means the Debtors' incentive plan for key employees, substantially in the form filed in the Plan Supplement.

71.     "Key Employee Retention Plan" means the Debtors' retention plan for key employees, substantially in the form filed in the Plan Supplement.

72.     "Lien" means a "lien" as defined in section 101(37) of the Bankruptcy Code.

73.     ["New Collaboration Agreement" means, collectively, the agreement or agreements pursuant to which the applicable Cintra affiliate shall provide the services of certain secondees to the Reorganized Concessionaire, the form of which shall be acceptable to the applicable Cintra affiliate and shall be included in the Plan Supplement.]

74.     "New Concessionaire LLC Agreement" means the amended and restated limited liability company agreement for Reorganized Concessionaire that will become effective as of the Effective Date, the form of which shall be included in Plan Supplement and the terms of which shall be reasonably acceptable to the Debtors and the Required Consenting Senior Lenders**.**

75.     "New Debt Documents" means the Exit Facility Credit Agreement, the New Senior Credit Agreement, the New PIK Notes, the New Security Documents and the other documents and agreements ancillary to such agreements.

76.     "New Debt Term Sheet" means the term sheet attached hereto as **Exhibit 2**.

77. "New Equity Interests" means the limited liability membership interests in New Holdco to be issued pursuant to the Plan and in accordance with the New Holdco LLC Agreement, and if the New Equity Interests will be distributed in certificated form, the form of such certificate shall be included in the Plan Supplement.

78. "New Holdco" means [SH130 Holdings, LLC], a new Delaware limited liability company that (a) will be formed on or prior to the Effective Date pursuant to the filing of the New Holdco Certificate with the Secretary of State of the State of Delaware and (b) will hold, as of the Effective Date, 100% of the membership interests in Reorganized Concessionaire.

79. "New Holdco Board" means the board of directors of New Holdco, from and after the Effective Date.

80. "New Holdco Certificate" means the certificate of formation of New Holdco that will be filed with the Secretary of State of the State of Delaware on or after the Confirmation Date and on or prior to the Effective Date, the form of which shall be included in the Plan Supplement.

81. "New Holdco LLC Agreement" means the limited liability company agreement for New Holdco that will become effective as of the Effective Date, the form of which shall be included the Plan Supplement and the terms of which shall be substantially in accordance with the terms set forth in the Governance Term Sheet.

82. "New Operator" means the entity (and any personnel thereof) selected (or which may be selected following the Effective Date) by the Required Consenting Senior Lenders to provide services under the New Operator Agreement and to operate the Toll Road on behalf of Reorganized Concessionaire in accordance with the terms of the New Operator Agreement.

83. "New Operator Agreement" means, collectively, the agreement or agreements pursuant to which the New Operator shall operate the Toll Road on behalf of Reorganized Concessionaire, the form of which may be included in the Plan Supplement, and the form and substance of which shall be acceptable to the New Operator and the Required Consenting Senior Lenders.

84. "New Organizational Documents" means, collectively, the following documents, the forms of which agreements shall be included in the Plan Supplement: (a) the New Holdco LLC Agreement; (b) the New Holdco Certificate; (c) the New Concessionaire LLC Agreement; and (d) the certificates or articles of incorporation, by-laws, or such other applicable formation documents of Reorganized Concessionaire.

85. "New PIK Notes" means the subordinated PIK Notes due [December 2061], to be issued by Reorganized Concessionaire as of the Effective Date, in the initial principal amount of $[_____],[1] with an interest rate of [Adjusted LIBOR + 1.75%], which shall be subordinated in right of payment to the Exit Facility and the New Senior Debt, the form of which shall be included in the Plan Supplement and the terms of which shall be substantially in accordance with the terms set forth in the New Debt Term Sheet.

86. "New Security Documents" means the collateral agency and accounts agreement, intercreditor agreement, security agreements and other related documents required by the Required Consenting Senior Lenders or TIFIA, as applicable, to grant, perfect and/or implement the Liens provided by the Reorganized Concessionaire pursuant to the New Debt Documents, the forms of which shall be included in the Plan Supplement.

87. "New Senior Credit Agreement" means the credit agreement to be entered into by Reorganized Concessionaire and the Holders of Allowed Senior Secured Claims on the Effective Date, the form of which shall be included in the Plan Supplement and the terms of which shall be substantially in accordance with the terms set forth in the New Debt Term Sheet.

---

[1] Amount to equal $[1,682,398,000] (the respective total Claim amount) minus the aggregate principal amount of New Senior Debt.

88.     "New Senior Debt" means the indebtedness to be issued by Reorganized Concessionaire under the New Senior Credit Agreement as of the Effective Date, with an initial principal amount of $[_____] and an interest rate of [Adjusted LIBOR plus __%].[2]

89.     ["New Services Agreement" means the agreement pursuant to which the applicable Cintra affiliate shall provide general administrative services to the Reorganized Concessionaire, the form of which shall be acceptable to the applicable Cintra affiliate and shall be included in the Plan Supplement.]

90.     "Operator" means the applicable Cintra affiliate that has provided the Operator Services.

91.     "Operator Services" means the pre-petition, post-petition, and/or post-Effective Date operation and maintenance services provided by Cintra to the Concessionaire or Reorganized Concessionaire, as applicable, including: (a) back office tolling services, (b) disaster recovery services, (c) general administrative services (post-Effective Date general administrative services to be provided pursuant to the New Services Agreement), and (d) employee secondment services (post-Effective Date employee secondment services to be provided pursuant to the New Collaboration Agreement).

92.     "Other General Unsecured Claim" means any Unsecured Claim that is not (i) an Accrued Professional Compensation Claim; (ii) an Administrative Claim; (iii) a General Unsecured Trade Claim; (iv) an intercompany obligation; (v) an Other Priority Claim; or (vi) a Priority Tax Claim.

93.     "Other Priority Claims" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

94.     "Other Secured Claims" means any Claim that is Secured, other than the Pre-Petition Secured Claims.

95.     "Petition Date" means March 2, 2016, the date on which the Debtors commenced the Chapter 11 Cases.

96.     "PIK Note Agreement" means the Note Agreement to be entered into between the Reorganized Concessionaire and the Holders of the Senior Secured Claims.

97.     "Plan" means this *Joint Plan of Reorganization of SH 130 Concession Company, LLC, et al., Pursuant to Chapter 11 of the Bankruptcy Code*, including the Plan Supplement, which is incorporated herein by reference.

98.     "Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits, each of which shall be reasonably acceptable to Debtors and the Required Consenting Senior Lenders, except as provided herein, to be Filed by the Debtors, no later than five (5) Business Days prior to the Confirmation Hearing, including the following:  (a) the forms of the New Organizational Documents; (b) to the extent identified, a list of retained Causes of Action; (c) the forms of the New Debt Documents; (d) to the extent known, the names of the directors, managers, and executive officers for each of the Reorganized Debtors; (e) to the extent available, the form of the New Operator Agreement; (f) form of New Services Agreement (which also shall be acceptable in form and substance to the applicable Cintra affiliate); (g) form of New Collaboration Agreement (which also shall be acceptable in form and substance to the applicable Cintra affiliate); (h) the form of the New Equity Interests; (i) the New Security Documents; (j) the Assumed Executory Contract and Unexpired Lease List; (k) the Confirmation Order Findings of Fact and Conclusions of Law; and (l) the Implementation Memorandum.  Any reference to the Plan Supplement in the Plan shall include each of the documents identified above.  The Debtors shall have the right to amend the documents contained in the Plan Supplement through and including the Effective Date in accordance with Article XI of the Plan.

---

[2] Subject to further modeling upon finalization of the Exit Facility.

99.     "Plan Support Agreement" means any plan support agreement entered into by and among the Debtors, the Administrative Agent, the Senior Lenders, and/or TIFIA.

100.    "Pre-Petition Secured Claims" means, collectively: (a) the Senior Lender Secured Claims; and (b) the TIFIA Claims.

101.    "Priority Lender Claims" means, collectively:  (a) all fees due and payable to the First Lien Lenders, the Hedging Banks, and TIFIA, other than the Secured Party Fees, (b) all accrued and unpaid interest due and payable in respect of the Senior Loans and the TIFIA Loans, and (c) all Hedging Obligations due and payable to the Hedging Banks.

102.    "Priority Tax Claim" means the Claims of Governmental Units of the type specified in section 507(a)(8) of the Bankruptcy Code.

103.    "Pro Rata" means the proportion that a Claim or Interest in a particular Class bears to the aggregate amount of the Claims or Interests in that Class, or to the aggregate amount of the Claims or Interests in a particular Class and other Classes entitled to share in the same recovery as such Claim or Interest, under the Plan.

104.    "Professional" means an Entity:  (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered on or prior to the Effective Date, pursuant to sections 327, 328, 329, 330, and 331 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

105.    "Proof of Claim" means a proof of Claim Filed by a Holder on account of such Claim; *provided* that Holders of Pre-Petition Secured Claims and Entities to which all or a portion of the Secured Party Fees are owed shall not be required to file a proof of any such Claims.

106.    "Reinstated" or "Reinstatement" means:  notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:  (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than a Debtor or an Insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder such that the applicable Claim or Interest is Unimpaired.

107.    "Released Party" means each of the following in its respective capacity as such: (a) the Administrative Agent; (b) the Collateral Agent; (c) the DIP Parties; (d) the Senior Lenders; (e) TIFIA; (f) the Steering Committee and the members thereof; (g) with respect to each of the Entities in clauses (a) through (f), each such Entity's current and former Affiliates and subsidiaries and each such Entity's, Affiliate's, and subsidiary's respective current and former officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; and (h) with respect to the Debtors and Reorganized Entities, their respective current and former officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

108.    "Reorganized Concessionaire" means the Concessionaire, as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

109.     "Reorganized Debtors" means, collectively:  (a) the Reorganized Concessionaire; (b) New Holdco, from and after the Effective Date; and (c) any Affiliates of the Debtors or any of the foregoing entities, as applicable, existing or formed to effectuate the Restructuring Transactions.

110.     "Reorganized Entities" means the Reorganized Debtors and each of Cintra TX and Zachry Toll Road, as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

111.     "Required Consenting Senior Lenders" means the Senior Lenders representing at least a majority of the outstanding principal amount of Senior Lender Secured Claims held by all Senior Lenders.

112.     "Restructuring Documents" means the Plan, Disclosure Statement, Plan Supplement, New Organizational Documents, New Debt Documents, the Implementation Memorandum and the other agreements and documentation effectuating the Plan.

113.     "Restructuring Transactions" means, collectively, (a) the formation of New Holdco, (b) the issuance to New Holdco of 100% of the membership interests in Reorganized Concessionaire, (c) the issuance of the New Equity Interests, (d) the issuance of the New Senior Debt and the New PIK Notes pursuant to the New Debt Documents, (e) the other transactions described in Article III.B (Treatment of Claims and Interests) of the Plan, (f) the entry into the Exit Facility, (g) to the extent applicable, the execution of the New Operator Agreement, (h) the execution of the New Organizational Documents, (i) the vesting of the assets of the Debtors and their respective Estates in the Reorganized Debtors, in each case in accordance with the Plan; and (j) any other arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or similar transactions that either (x) the Debtors and the Required Consenting Senior Lenders, or (y) the Reorganized Debtors, as applicable, determine are necessary or appropriate to implement the foregoing, in each case in accordance with the Plan, including, for the avoidance of doubt, all steps set forth in the Implementation Memorandum.

114.     "Secured" means when referring to a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed as such pursuant to the Plan.

115.     "Secured Party Fees" means, as of the Effective Date, collectively, all accrued and unpaid reasonable, actual, and documented fees and out-of-pocket expenses of each of:  (a) the Administrative Agent; (b) the Collateral Agent (including fees and expenses of its counsel, Drinker Biddle & Reath LLP); (c) the Fronting Bank; (d) TIFIA (including fees and expenses of its counsel, Shearman & Sterling LLP); and (e) the professionals retained by the Administrative Agent and/or the Steering Committee (Munsch Hardt Kopf & Harr, P.C., Milbank, Tweed, Hadley & McCloy LLP, RPA Advisors, LLC and Louis Berger Group (Domestic), Inc.).

116.     "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder.

117.     "Security" means a "security" as defined in section 2(a)(1) of the Securities Act.

118.     "Senior Lender Secured Claims" means, collectively:  (a) any Claims on account of the Senior Loans or other obligations owed to the First Lien Lenders under the Senior Loan Agreement and any related documents; and (b) any Claim on account of the Hedging Agreements (including any Claim on account of Hedging Obligations and Hedging Termination Obligations) which shall be deemed Allowed or other obligations owed to the Hedging Banks under the Hedging Agreements.

119.     "Senior Lenders" means, collectively, the First Lien Lenders and the Hedging Banks.

120.     "Senior Loan Agreement" means that certain Initial Senior Loan Agreement, dated as of March 7, 2008, among the Concessionaire, the Administrative Agent, and the First Lien Lenders, as amended, modified, or supplemented from time to time.

121.     "Senior Loans" means the loans in the outstanding aggregate principal amount, as of the Petition Date, of $[720,750,000.00] (exclusive of unpaid interest, whether or not such interest was accrued but unpaid as of the Petition Date), arising under the Senior Loan Agreement.  For the avoidance of doubt, the Senior Loans shall not include any amounts due under the Hedging Agreements.

122.     "Senior Secured Claims" means the Allowed Claims of the Senior Secured Parties, except for any Priority Lender Claims.

123.     "Senior Secured Parties" means, collectively: (a) the First Lien Lenders; (b) the Hedging Banks; (c) TIFIA; (d) the Collateral Agent; and (e) the Administrative Agent.

124.     "Steering Committee" means the group of certain Holders of Senior Lender Secured Claims.

125.     "TIFIA" means the United States Department of Transportation, acting by and through the Federal Highway Administrator.

126.     "TIFIA Agreement" means that certain TIFIA Loan Agreement, dated as of March 7, 2008, between the Concessionaire and TIFIA.

127.     "TIFIA Claims" means, as of the Effective Date, any Claims on account of the TIFIA Loans, except for any Priority Lender Claims.

128.     "TIFIA Loans" means the loans in the outstanding aggregate principal amount, as of the Petition Date, of $[550,875,000] (exclusive of unpaid interest, whether or not such interest was accrued but unpaid as of the Petition Date), arising under the TIFIA Agreement.

129.     "Toll Road" means segments five and six of Texas State Highway 130, which the Concessionaire was formed to finance, develop, design, construct, operate and maintain.

130.     "Toll Road Lease" means that certain Facility Lease, dated as of March 22, 2007, by and between TxDOT and the Concessionaire, as amended, modified, or supplemented from time to time.

131.      "TxDOT" means the Texas Department of Transportation.

132.     "Unexpired Lease" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

133.     "Unimpaired" means, solely with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

134.     "Unsecured Claim" means any Claim that is not a Senior Secured Claim or an Other Secured Claim.

135.     "U.S. Trustee" means the Office of the United States Trustee for the Western District of Texas.

136.     "Zachry Toll Road" means Zachry Toll Road–56 LP, a Delaware limited partnership and a Debtor in the Chapter 11 Cases.

B.    *Rules of Interpretation.*

For purposes of the Plan:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented from time to time; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, by-law, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code (other than section 102(5) of the Bankruptcy Code) shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's Case Management and Electronic Case Filing system; (13) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended, modified, or supplemented from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (14) any immaterial effectuating provisions may be interpreted by the Debtors or Reorganized Debtors, as applicable, in such a manner that is consistent with the overall purpose and intent of the Plan, subject to the approval of the Required Consenting Senior Lenders, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (15) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation."

C.    *Computation of Time.*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.    *Governing Law.*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.    *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.  *Administrative Claims.*

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment of its Allowed Claim, each Holder of an Allowed Administrative Claim will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (1) on the Effective Date, or as soon as practicable thereafter, (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Administrative Claim is Allowed by a Final Order, or as soon as reasonably practicable thereafter, or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims, without any further action by the Holders of such Allowed Administrative Claims.

B.  *Professional Compensation.*

1.  Final Fee Applications and Payment of Accrued Professional Compensation Claims.

All final requests for the allowance and payment of Accrued Professional Compensation Claims incurred during the period from the Petition Date through the Effective Date, shall be Filed no later than 30 days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Accrued Professional Compensation Claims shall be determined by the Bankruptcy Court.  The amount of each Accrued Professional Compensation Claim that is Allowed and owing to a Professional shall be paid in Cash to such Professional from funds held by the Debtors' Estates or the Reorganized Debtors, as applicable, when such Claim is Allowed by a Final Order.

2.  Post-Effective Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking compensation for services rendered after such date shall terminate, and the Reorganized Debtors may pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.  *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, the Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.  *Claims in Connection with Debtor-in-Possession Financing.*

On the Effective Date, all advances, fees and expenses in connection with the DIP Facility provided to the Debtors and approved by the Bankruptcy Court shall be paid in Cash and any remaining Claims arising in connection with such debtor-in-possession financing shall be paid with the proceeds of the Exit Facility pursuant to the terms of the Exit Facility Credit Agreement.

E.      *Secured Party Fees.*

On the Effective Date, the Reorganized Debtors shall pay in Cash in full the Secured Party Fees to the extent not already paid.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests.*

Claims and Interests, except for Administrative Claims, Priority Tax Claims, and Accrued Professional Compensation Claims, are classified in the Classes set forth in this Article III of the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.  Class Identification.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Priority Lender Claims | Impaired | Entitled to Vote |
| Class 4 | Senior Secured Claims | Impaired | Entitled to Vote |
| Class 5 | General Unsecured Trade Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 6 | Other General Unsecured Claims | Impaired | Not Entitled to Vote (Presumed to Reject) |
| Class 7 | Existing Equity Interests | Impaired | Not Entitled to Vote (Presumed to Reject) |

B.      *Treatment of Claims and Interests.*

1.  Class 1—Other Priority Claims.

(a)     *Classification*:  Class 1 consists of all Other Priority Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment of its Allowed Other Priority Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive payment in full in Cash of the amount of such Holder's Allowed Other Priority Claim either: (i) on the Effective Date, or as soon as reasonably practicable thereafter, or (ii) if the Other Priority Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which such Other Priority Claim is Allowed by Final Order, or as soon as reasonably practicable thereafter.

(c)     *Voting*:  Class 1 is Unimpaired under the Plan. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.  Class 2—Other Secured Claims.

    (a)  *Classification*: Class 2 consists of all Other Secured Claims.

    (b)  *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment of its Allowed Other Secured Claim, on the Effective Date or as soon as reasonably practicable thereafter, each Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the Reorganized Debtors: (i) such Allowed Other Secured Claim shall be Reinstated; (ii) payment in full (in Cash) of such Allowed Other Secured Claim; (iii) satisfaction of such Allowed Other Secured Claim by delivering the collateral securing such Allowed Other Secured Claim and paying any interest required to be paid under section 506(b) of the Bankruptcy Code; or (iv) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

    (c)  *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.  Class 3—Priority Lender Claims.

    (a)  *Classification*:  Class 3 consists of the Priority Lender Claims.

    (b)  *Allowance*:  The Priority Lender Claims shall be Allowed in the aggregate amount of $[94,799,000].  For the avoidance of doubt, the Holders of the Priority Lender Claims shall not be required to File Proofs of Claim to assert or otherwise evidence their respective Priority Lender Claims.

    (c)  *Treatment*:  Except to the extent that a Holder of an Allowed Priority Lender Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Lender Claim, each such Holder shall receive, on the Effective Date or as soon as reasonably practicable thereafter, subject to the provisions of Article IV below, New Senior Debt in the face amount equal to the Allowed amount of such Holders' Priority Lender Claim.

    (d)  *Voting:*  Class 3 is Impaired under the Plan.  Therefore, Holders of Allowed Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.  Class 4—Senior Secured Claims.

    (a)  *Classification*:  Class 4 consists of all Senior Secured Claims.

    (b)  *Allowance*:  The Senior Secured Claims shall be Allowed in the aggregate principal amount of $[1,587,599,000].  For the avoidance of doubt, the Holders of the Senior Secured Claims shall not be required to File Proofs of Claim to assert or otherwise evidence their respective Senior Secured Claims.

    (c)  *Treatment*:  Except to the extent that a Holder of an Allowed Senior Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Senior Secured Claim, each such Holder thereof shall receive, on the Effective Date or as soon as reasonably practicable thereafter, subject to the provisions of Article IV below, its Pro Rata share (based on the

face amount of the Allowed amount of such Holder's Senior Secured Claim) of the following:

(i)     The New Senior Debt (remaining after the amounts allocated to the Holders of the Priority Lender Claims, as described in Class 3 above);

(ii)    100% of the New PIK Notes; and

(iii)   100% of the New Equity Interests.

(d)     *Voting*:  Class 4 is Impaired under the Plan.  Therefore, Holders of Allowed Claims in Class 4 are entitled to vote to accept or reject the Plan.

5.   Class 5—General Unsecured Trade Claims.

(a)     *Classification*:  Class 5 consists of all General Unsecured Trade Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Trade Claim agrees to a less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Trade Claim, each such Holder shall receive, at the option of the Reorganized Debtors:

(i)     payment in full in Cash of the Allowed amount of such Allowed General Unsecured Trade Claim;

(ii)    Reinstatement of such Allowed General Unsecured Trade Claim; or

(iii)   such other treatment rendering such Allowed General Unsecured Trade Claim Unimpaired.

(c)     *Voting*:  Class 5 is Unimpaired under the Plan.  Holders of Claims in Class 5 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

6.   Class 6—Other General Unsecured Claims.

(a)     *Classification*:  Class 6 consists of all Other General Unsecured Claims.

(b)     *Treatment*:  On the Effective Date, all Other General Unsecured Claims shall be cancelled and extinguished.  Holders of Other General Unsecured Claims shall not receive any distribution pursuant to the Plan.

(c)     *Voting*:  Class 6 is Impaired under the Plan.  Each Holder of a Claim in Class 6 is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

7.   Class 7—Existing Equity Interests.

(a)     *Classification*:  Class 7 consists of all Existing Equity Interests.

(b)     *Treatment*:  On the Effective Date, subject to the provisions of Article IV below, all Existing Equity Interests shall be cancelled and extinguished.  Holders of Existing Equity Interests shall not receive any distribution or retain any property pursuant to the Plan.

     (c)    *Voting*: Class 7 is Impaired under the Plan. Each Holder of an Allowed Interest in Class 7 is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, is not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.    *Acceptance or Rejection of the Plan.*

1.    Voting Classes.

Classes 3 and 4 are Impaired under the Plan. The Holders of Claims in such Classes are entitled to vote to accept or reject the Plan.

2.    Presumed Acceptance of the Plan.

Classes 1, 2, and 5 are Unimpaired under the Plan. The Holders of Claims in such Classes are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

3.    Presumed Rejection of the Plan.

Classes 6 and 7 are Impaired under the Plan. The Holders of Claims and Interests in such Classes are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

E.    *Elimination of Vacant Classes.*

Any Class of Claims that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

F.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Provided Classes 3 and/or 4 votes to accept the Plan, the Debtors request Confirmation pursuant to section 1129(b) of the Bankruptcy Code.

G.    *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy at or before the hearing conducted by the Bankruptcy Court to consider confirmation of the Plan. Any dispute with respect to Impairment that is not raised in sufficient time to enable the Bankruptcy Court to determine such dispute on or prior to the Confirmation Date shall be deemed waived.

H.    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable

17

subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors and Reorganized Debtors, as applicable, reserve the right to reclassify any Allowed Claim or Allowed Interest, other than the Pre-Petition Secured Claims, in accordance with any contractual, legal, or equitable subordination relating thereto; *provided*, *however*, that any such reclassification must be approved by the Required Consenting Senior Lenders.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

*A.      No Substantive Consolidation.*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

*B.      Formation of New Holdco; Issuance of New Equity Interests*

On or after the Confirmation Date and on or prior to the Effective Date, New Holdco will be formed as a new Delaware limited liability company, by filing the New Holdco Certificate with the Secretary of State of the State of Delaware. As of the Effective Date, among other things, (a) the Concessionaire shall be converted, merged or otherwise reorganized into Reorganized Concessionaire, (b) 100% of the membership interests in Reorganized Concessionaire will be issued to New Holdco, and (c) the New Equity Interests will be issued and distributed to Holders of Senior Secured Claims in Class 4, pursuant to and in accordance with the Plan, in each case, as provided in the Implementation Memorandum. Each such issuance and distribution of New Equity Interests shall be authorized without the need for any further limited liability company action and without the need for any further consent, approval or action by any Holders of Claims or Interests or any other Entity.

Each issuance and distribution of the New Equity Interests under the Plan shall be governed by the applicable terms and conditions set forth in the Plan and the Implementation Memorandum and by the terms and conditions of the New Holdco LLC Agreement, which terms and conditions shall bind each such recipient of New Equity Interests.

On the Effective Date, New Holdco and Reorganized Concessionaire will be authorized to and shall issue or execute and deliver, as applicable, in accordance with the Implementation Memorandum, the New Equity Interests and the New Concessionaire LLC Agreement, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

*C.      Continued Organizational Existence and Vesting of Assets in the Reorganized Debtors; Continued Operations*

1.      Continued Organizational Existence and Vesting of Assets in the Reorganized Debtors

Except as otherwise provided herein: (1) as of the Effective Date, New Holdco shall exist as a separate legal entity, with all powers in accordance with the laws of the state of Delaware and the New Holdco LLC Agreement; (2) as of the Effective Date, Reorganized Concessionaire shall exist as a separate legal entity, with all powers in accordance with the laws of the state of Delaware and the New Concessionaire LLC Agreement; and (3) on the Effective Date, all property of the Estate of a Debtor, and any property acquired by a Debtor or Reorganized Debtor under the Plan, shall vest, subject to the Restructuring Transactions, in Reorganized Concessionaire, free and clear of all Claims, Liens, charges, other encumbrances, Interests and other interests. On and after the Effective Date, Reorganized Concessionaire may operate its business and may use, acquire and dispose of property and compromise or settle any claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each of New Holdco and Reorganized Concessionaire

18

may pay the respective charges that it incurs on or after the Effective Date for appropriate Professionals' fees, disbursements, expenses or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Bankruptcy Court.

2. Continued Operations

If a New Operator Agreement has not been entered into prior to the Effective Date, the Operator shall continue to perform its roles operating and maintaining the Toll Road after the Effective Date, under the contractual arrangements in effect as of the Confirmation Date; *provided, however*, that the Operator shall only continue to perform the Operator Services for a maximum of 18 months following the Effective Date, unless otherwise agreed to among the applicable parties. Notwithstanding anything to the contrary in the Plan, to the extent the Required Consenting Senior Lenders seek to enter into a New Operator Agreement prior to the Effective Date, such agreement will be subject to any rights of TxDOT under the Concession Agreement.

3. [Survival of Certain Indemnification Obligations

The obligations of the Debtors, pursuant to the Debtors' operating agreements, certificates of incorporation or formation, articles of association, by-laws, or equivalent corporate governance documents, applicable statutes, or employment agreements to indemnify their respective current and former directors, officers, managers, agents, employees, representatives, and professionals, in respect of all present and future actions, suits, and proceedings against any of such officers, directors, managers, agents, employees, representatives, and professionals, based upon any act or omission related to service with, for, or on behalf of the Debtors on or before the Effective Date, as such obligations were in effect at the time of any such act or omission, shall not be discharged or impaired by confirmation or consummation of the Plan but shall survive unaffected by the reorganization contemplated by the Plan and shall be performed and honored by the Reorganized Entities regardless of such confirmation, consummation, and reorganization.]

D. *Restructuring Transactions.*

On or after the Confirmation Date and on or prior to the Effective Date, New Holdco will be formed as a new Delaware limited liability company by filing the New Holdco Certificate with the Secretary of State of the State of Delaware, absent an alternative structure determined by the Debtors and the Required Consenting Senior Lenders. On the Effective Date, among other things, (a) 100% of the membership interests in Reorganized Concessionaire will be issued to New Holdco, (b) the New Equity Interests, the New PIK Notes, and New Senior Debt will be issued and distributed to Holders of Claims in Classes 3 and 4 as provided in the Implementation Memorandum and (c) Reorganized Concessionaire will enter into the Exit Facility and repay the DIP Facility pursuant to and in accordance with the Plan and the Implementation Memorandum. Certain other Restructuring Transactions may be undertaken as necessary or appropriate to effect, in accordance with applicable non-bankruptcy law, a corporate restructuring of the Debtors' or the Reorganized Debtors' respective businesses or simplify the overall corporate structure of the Reorganized Debtors, all to the extent not inconsistent with any other terms of the Plan and in accordance with the Implementation Memorandum, including the dissolution of CINTRA TX and Zachry Toll Road. Notwithstanding anything to the contrary in the Plan, the means and timing for implementation of the Plan, including the formation of New Holdco, will be subject, in all respects, to the provisions of the Implementation Memorandum. The Implementation Memorandum will specify the sequence and timing of steps undertaken to effectuate the Plan, and will supersede any timing of events and structuring aspects noted in this Plan.

Without limiting the foregoing, unless otherwise provided by the terms of a Restructuring Transaction or the Implementation Memorandum, all such Restructuring Transactions will be deemed to occur on the Effective Date and may include one or more mergers, conversions, consolidations, restructurings, dispositions, liquidations or dissolutions, as may be determined by the Debtors or the Reorganized Debtors and the Required Consenting Senior Lenders to be necessary or appropriate. Subject to the immediately preceding sentence, the actions to effect these transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, conversion, consolidation, restructuring, disposition, liquidation or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable state law and such other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment,

19

assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable Entities may agree; (c) the filing of appropriate certificates or articles of merger, conversion, consolidation, dissolution or change in corporate form pursuant to applicable state law; and (d) the taking of all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with such transactions.  Any such transactions may be effected on or subsequent to the Effective Date without any further action by the members, partners, stockholders, directors or managers of any of the Debtors or the Reorganized Debtors.  All documents, agreements, and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan shall become and shall remain effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity (other than as expressly required by such applicable agreement).

E.      *New Debt Documents.*

On the Effective Date, Reorganized Concessionaire shall be authorized to incur or issue, as applicable, the indebtedness under the Exit Facility, the New Senior Debt, and the New PIK Notes, and to execute, deliver and enter into the New Debt Documents, and any related agreements or filings without the need for any further corporate, limited liability company or partnership action and without further action by or approval of the Bankruptcy Court, and the New Debt Documents and any related agreements or filings shall be executed and delivered and the applicable Reorganized Debtors may incur or issue the indebtedness available thereunder in accordance with the Implementation Memorandum.

F.      *Sources of Cash for Plan Distributions.*

The Debtors or Reorganized Debtors, as applicable, are authorized to execute and deliver any documents necessary or appropriate to obtain Cash for funding the Plan, including pursuant and subject to the Exit Facility Credit Agreement.  All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained through a combination of one or more of the following:  (a) Cash on hand of the Debtors and their Estates, including Cash from business operations; (b) proceeds of the Exit Facility; (c) the proceeds of any tax refunds; (d) the proceeds of any Causes of Action; and (e) any other means of financing or funding that the Debtors or the Reorganized Debtors determine is necessary or appropriate, subject to the terms of the New Debt Documents.

G.      *Governance, Directors and Officers; Employment-Related Agreements and Compensation Programs; Other Agreements.*

1.      The New Holdco LLC Agreement and Other New Organizational Documents

Forms of the New Holdco LLC Agreement, the New Concessionaire LLC Agreement and the other New Organizational Documents will be included in the Plan Supplement and shall be in form and substance consistent in all material respects with the Governance Term Sheet.  The New Holdco LLC Agreement, the New Concessionaire LLC Agreement and the certificate of incorporation and bylaws, limited liability company agreement or comparable constituent documents of the other Reorganized Debtors shall, among other things, prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  On the Effective Date, the limited liability company agreement of Concessionaire will be amended and restated as the New Concessionaire LLC Agreement of Reorganized Concessionaire, and the New Holdco LLC Agreement will be executed by New Holdco and become effective as the limited liability company agreement of New Holdco.  As of the Effective Date, New Holdco and all recipients of New Equity Interests issued pursuant to the Plan shall be deemed to be parties to and bound by the New Holdco LLC Agreement, without the need for execution by any such Entity other than New Holdco.  In addition, the New Holdco LLC Agreement shall be binding on all transferees and other holders of New Equity Interests, regardless of whether they execute the New Holdco LLC Agreement.  Notwithstanding the foregoing, a Holder of an Allowed Senior Secured Claim will not be entitled to receive their respective distribution of New Equity Interests pursuant to the Plan unless and until such Holder delivers to New Holdco a duly executed counterpart signature page to the New Holdco LLC Agreement.

At any time after the Effective Date, any one or more of the Reorganized Debtors may amend its respective certificate of formation, limited liability company agreement, certificate of incorporation, bylaws or comparable constituent documents, as applicable, to the extent permitted by applicable non-bankruptcy law and subject to the terms and conditions set forth in the applicable constituent documents.  On the Effective Date, or as soon thereafter as is practicable, each Reorganized Debtor shall file any such certificate of formation or certificate of incorporation (or comparable constituent documents) with the secretary of state or jurisdiction or similar office of the state or jurisdiction in which such Reorganized Debtor is incorporated or organized, to the extent required by and in accordance with the applicable corporate, limited liability company or partnership law, as applicable, of such state or jurisdiction.

2. Directors and Officers of the Reorganized Debtors

In accordance with section 1129(a)(5) of the Bankruptcy Code, to the extent known, the initial members of the New Holdco Board and the other directors, managers, and officers of the Reorganized Debtors, as of the Effective Date and subject to the rights of TxDOT under the Concession Agreement, shall be identified in a disclosure to be included in the Plan Supplement.

3. Employment-Related Agreements and Compensation Programs

Except as otherwise provided herein, as of the Effective Date, the Reorganized Debtors shall have authority to:  (i) maintain, Reinstate, amend or revise existing employment, retirement, welfare, incentive, severance, indemnification and other agreements with its active and retired directors, officers and employees, subject to the terms and conditions of any such agreement and applicable non-bankruptcy law; and (ii) enter into new employment, retirement, welfare, incentive, severance, indemnification and other agreements for active and retired employees, including the Key Employee Incentive Plan and the Key Employee Retention Plan; *provided, however,* that any amendments or revisions to employment or related agreements of any employees seconded to the Debtors by Cintra, whether such employment or related agreements were entered into prior to or after the Effective Date, shall be subject to the consent of the applicable Cintra affiliate.

4. Other Matters

Notwithstanding anything to the contrary in the Plan, no provision in any contract, agreement or other document with the Debtors that is rendered unenforceable against the Debtors or the Reorganized Debtors pursuant to sections 541(c), 363(*l*) or 365(e)(1) of the Bankruptcy Code, or any analogous decisional law, shall be enforceable against the Debtors or Reorganized Debtors as a result of the Plan.

5. Transactions Effective as of the Effective Date

Pursuant to section 1142 of the Bankruptcy Code and section 303 of the Delaware General Corporation Law and any comparable provisions of the business corporation law of any other applicable jurisdiction, the following shall occur and be effective as of the Effective Date, if no such other date is specified in such other documents, including the Implementation Memorandum, and shall be authorized and approved in all respects and for all purposes without any requirement of further action by the stockholders, members, managers or directors of the Debtors or any of the Reorganized Debtors:  (a) the Restructuring Transactions; (b) the adoption of the New Organizational Documents; (c) the election or appointment, as applicable, of the initial members of the New Holdco Board and the other directors, managers, and officers of the Reorganized Debtors as of the Effective Date; (d) the distribution of Cash and other property pursuant to the Plan, subject to Article VI; (e) the authorization and issuance of the Exit Facility, the New Senior Debt and the New PIK Notes pursuant to the Plan; (f) the authorization and issuance of New Equity Interests pursuant to the Plan; (g) the entry into and performance under the New Debt Documents; (h) the adoption, execution, delivery and implementation of all contracts, leases, instruments, releases and other agreements or documents related to any of the foregoing; (i) the adoption, execution and implementation of employment, retirement and indemnification agreements, incentive compensation programs, including the Key Employee Incentive Plan and the Key Employee Retention Plan, retirement income plans, welfare benefit plans and other employee plans and related agreements; and (j) any other matters provided for under the Plan involving the corporate structure of the Debtors or Reorganized Debtors or any corporate, limited liability company or partnership action to be taken by or required of a Debtor or Reorganized Debtor.

H.      *Section 1145 Exemption.*

To the maximum extent provided by section 1145(a) of the Bankruptcy Code, the offering, issuance and distribution under the Plan of the New Equity Interests and the New PIK Notes (collectively, the "New Securities") shall be exempt from the registration requirements of Section 5 of the Securities Act and any other applicable federal, state or local law requiring the registration of any offering, issuance, distribution or sale of securities.  The exemptions provided for in section 1145 of the Bankruptcy Code do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code. To the extent that such exemption under section 1145(a) is not available with respect to the offering, issuance and distribution of any of the New Securities, the offering, issuance and/or distribution, as applicable, of such New Securities will be made pursuant to the exemption set forth in section 4(a)(2) of the Securities Act or another exemption thereunder.  The New Securities issued and distributed under the Plan shall be authorized without the need for further limited liability company action with respect to New Holdco or any of the Reorganized Debtors or without any further action by any Entity, and once issued, all such New Securities shall be duly authorized and validly issued.

Resales of the New Securities issued and distributed under the Plan will be subject to (i) the contractual restrictions on transfer contained in the New Holdco LLC Agreement (with respect to the New Equity Interests) and the New Debt Documents (with respect to the New PIK Notes); and (iii) applicable regulatory approval, if any.  In addition, to the extent that any New Securities distributed under the Plan are not covered by section 1145(a), such New Securities will be "restricted securities" as defined in Rule 144(a)(3) under the Securities Act and may not be transferred or resold except as permitted under the Securities Act and other applicable securities laws, pursuant to registration or exemption therefrom.

I.      *General Settlement of Claims and Interests.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies resolved pursuant to the Plan.

J.      *Cancellation of Existing Securities and Agreements.*

On the Effective Date, except to the extent otherwise provided in the Plan or the Implementation Memorandum, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including the Pre-Petition Secured Claims and the Existing Equity Interests, shall be deemed cancelled and surrendered without any need for a Holder to take further action with respect thereto and the obligations of the Debtors or Reorganized Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and discharged; *provided*, *however*, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan; *provided further*, *however*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable.  Notwithstanding anything to the contrary in the Plan, including this paragraph, the Liens of the Senior Secured Parties shall be deemed to become Liens under the New Security Documents and New Debt Documents, and shall not be discharged hereby.

K.      *Corporate, Limited Liability Company and Partnership Action.*

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (1) selection of the members of the New Holdco Board and the other directors, managers, and officers of the Reorganized Debtors; (2) implementation of the Restructuring Transactions; (3) the entry by the applicable Reorganized Debtors into the New Debt Documents, and, to the extent applicable, the New Operator Agreement; (4) the issuance of the New Equity Interests, the New PIK Notes and the New Senior Debt and the incurrence of the Exit Facility; (5) the dissolution of CINTRA TX and Zachry Toll Road, as necessary and in the discretion of the Debtors and the Senior Secured Parties; (6) with respect to all intercompany obligations among the Debtors, the Debtors, with the consent of the Required Consenting Senior Lenders, shall either (a) extinguish, (b)

compromise by distribution, contribution or otherwise, or (c) Reinstate such intercompany obligations; and (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date), without the need for any further corporate, limited liability company or partnership action and without the need for any further consent, approval or action by any Holders of Claims or Interests or any other Entity. All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate, limited liability company or partnership action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Debt Documents and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.K of the Plan shall be effective notwithstanding any requirements that would otherwise apply under applicable nonbankruptcy law.

L.      *Effectuating Documents; Further Transactions.*

From and after the Effective Date, the Debtors and the Reorganized Debtors and the officers and members of the boards of managers thereof, as applicable, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan in the name of and on behalf of the Debtors and the Reorganized Debtors, as applicable, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

M.      *Section 1146 Exemption.*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or interests pursuant to the Plan, including the recording of any amendments to such transfers, or any new mortgages or liens placed on the property in connection with such transfers, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

N.      *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII of the Plan, the Debtors and the Reorganized Debtors, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement and any actions related to claims in connection with the design, construction, operation, maintenance, reconstruction or remediation of the Toll Road (including, for the avoidance of doubt, any actions against the Contractor), and the rights of the Debtors and Reorganized Debtors, as applicable, to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date[, other than the following Causes of Action, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date: all Causes of Action that arise under (a) sections 544, 547, and 548 of the Bankruptcy Code and (b) state fraudulent conveyance law, in each case, solely related to payments made in the 90 days prior to the Petition Date]. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as**

**otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled pursuant to the Plan or a Final Order, the Debtors and Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Debtors and the Reorganized Debtors, as applicable, reserve and shall retain the Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3)(B) of the Bankruptcy Code, any Causes of Action that a Debtor or its Estate may hold against any Entity shall vest in the Debtors or the Reorganized Debtors, as applicable. The applicable Debtors or the Reorganized Debtors through their respective authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. On or after the Effective Date, the Debtors and the Reorganized Debtors, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

O.      *Payment of Certain Fees and Expenses.*

On the Effective Date, the Reorganized Debtors shall pay in Cash in full the Secured Party Fees to the extent not already paid.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption, Assumption and Assignment, and Rejection of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein, each of the Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code except any Executory Contract or Unexpired Lease (1) identified on the Assumed Executory Contract and Unexpired Lease List (which shall be included in the Plan Supplement) as an Executory Contract or Unexpired Lease designated for assumption, (2) which is the subject of a separate motion or notice to assume or reject Filed by the Debtors and pending as of the Confirmation Hearing, (3) that previously expired or terminated pursuant to its own terms or (4) that was previously assumed by any of the Debtors. Any objection to the assumption, assumption and assignment, or rejection of an Executory Contract or Unexpired Lease, as applicable, must be Filed, served, and actually received by the counsel to the Debtors, counsel to the Steering Committee, the clerk of the Bankruptcy Court, and the United States Trustee on or before the later of (i) the commencement of the Confirmation Hearing and (ii) ten (10) Business Days following receipt of notice of such proposed assumption, assumption and assignment, or rejection. Any such objection will be scheduled to be heard by the Bankruptcy Court as soon as reasonably practicable after such objection is Filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption, assumption and assignment, or rejection will be deemed to have assented to such assumption, assumption and assignment, or rejection, as applicable.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumption of Executory Contracts identified on the Assumed Executory Contract and Unexpired Lease List and rejection of all other Executory Contracts and Unexpired Leases, subject to the exceptions noted above, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party on or prior to the Effective Date, shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court. To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision

shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Assumed Executory Contract and Unexpired Lease List prior to the Confirmation Date on no less than three (3) days' notice to any counterparty to an Executory Contract or Unexpired Lease affected thereby.

B.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases.*

Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of the Executory Contracts and Unexpired Leases pursuant to the Plan or otherwise must be Filed with the Claims and Balloting Agent no later than the later of 30 days after the Effective Date or the effective date of rejection.  Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be classified as a General Unsecured Trade Claim and shall be treated in accordance with Article III, as applicable.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned, as applicable, pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the cure amount in Cash on the Effective Date or in the ordinary course of business, subject to the limitation described below, or on such other terms as the parties to such Executory Contract or Unexpired Lease may otherwise agree.

No later than twenty (20) Business Days prior to the Confirmation Hearing, the Debtors shall serve notices of proposed assumption or (if applicable) assumption and assignment and the proposed cure amounts to the applicable counterparties to Executory Contracts and Unexpired Leases, and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection to a proposed cure amount by a counterparty to an Executory Contract or Unexpired Lease must be Filed, served, and actually received by the counsel to the Debtors, counsel to the Steering Committee, the clerk of the Bankruptcy Court, and the U.S. Trustee on or before the later of (1) the commencement of the Confirmation Hearing and (2) ten (10) Business Days following receipt of notice of such proposed assumption or assumption and assignment and the proposed cure amounts.  Any such objection will be scheduled to be heard by the Bankruptcy Court as soon as reasonably practicable after such objection is Filed.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed cure amount applicable to an Executory Contract or Unexpired Lease to be assumed or assumed and assigned will be deemed to have assented to such cure amount.  **Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

In the event of a dispute regarding:  (1) the amount of any payments to cure a default in connection with a proposed assumption or assumption and assignment of an Executory Contract or Unexpired Lease; (2) the ability of the Debtors, the Reorganized Debtors, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or to be assumed and assigned; or (3) any other matter pertaining to assumption or assumption and assignment, as applicable, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or Final Orders resolving the dispute and approving the assumption or assumption and assignment, as applicable.

Assumption, rejection, or assumption and assignment, as applicable, of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assumed and assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

D.      *Insurance Policies.*

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan, on the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

E.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned, as applicable, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to pre-petition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the pre-petition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      *Reservation of Rights.*

Nothing contained in the Plan, including identification in the Assumed Executory Contract and Unexpired Lease List, shall constitute an admission by the Debtors that any contract or lease is in fact an Executory Contract or Unexpired Lease subject to assumption or rejection pursuant to section 365(a) of the Bankruptcy Code, or that any of the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, if necessary.

G.      *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

H.      *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor shall be assumed or assumed and assigned by such Debtor in accordance with the Plan.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on or after the Effective Date, except as otherwise provided in the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

B.      *Rights and Powers of Disbursing Agent.*

      1.    Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary or appropriate to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

      2.    Expenses Incurred On or After the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

C.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

      1.    Delivery of Distributions in General.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims as of the Distribution Record Date at the address for each such Holder as indicated on such Holder's Proof of Claim, or if no Proof of Claim has been filed, as reflected in the Debtors' books and records as of the date of any such distribution; *provided* that the manner of such distributions shall be determined at the sole discretion of the Reorganized Debtors.

      2.    Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

D.      *Compliance with Tax Requirements.*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary or appropriate to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.

E.      *Allocations.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

*F.      No Post-Petition Interest on Claims.*

Post-petition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

*G.      Setoffs and Recoupment.*

The Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the Holder of any such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors, as applicable, of any such Claim it may have against the Holder of such Claim.

*H.      Applicability of Insurance Policies.*

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors, their Estates or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

*A.      Disputed Claims.*

Holders of Allowed Claims, Interests, and Administrative Claims need not file a Proof of Claim with the Bankruptcy Court.  On and after the Effective Date, except as otherwise provided in the Plan, all Allowed Claims shall be paid in accordance with the terms of the Plan and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced.  Nothing in this paragraph shall in any way limit the Debtors' or Reorganized Debtors' rights to contest the validity, amount or enforceability of any Claim regardless of whether a Proof of Claim is required for such Claim.

*B.      Objections to Claims and Interests.*

Unless a different time is set by an order of the Bankruptcy Court or otherwise established pursuant to the Plan, all objections to Claims and Interests must be Filed within six months of the Effective Date; *provided*, that no such objection may be Filed with respect to any Claim or Interest after a Final Order has been entered Allowing such Claim or Interest.

*C.      Compromises and Settlements.*

From and after the Effective Date, and without any further approval by the Bankruptcy Court, the Reorganized Debtors, as applicable, may compromise and settle all Claims and Causes of Action, without the necessity of Bankruptcy Court approval or any further notice.

*D.      No Distributions Pending Allowance.*

If a Claim or Interest, or any portion of a Claim or Interest, is Disputed, no payment or distribution provided hereunder shall be made on account of such Disputed Claim or Interest, unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest.

E.        *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.        *Discharge of Claims and Termination of Interests.*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims and Interests of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, or whether asserted or unasserted, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.  Notwithstanding anything to the contrary in the Plan, including this paragraph, (a) the Liens of the Senior Secured Lenders and TIFIA shall be retained and supplemented by Liens granted by Reorganized Concessionaire under the New Security Documents and the New Debt Documents, and such retained and granted Liens shall not be discharged under the Plan, and (b) the terms of the Plan shall not discharge, release or otherwise adversely affect the New Equity Interests, or the membership interests in Reorganized Concessionaire that are issued to New Holdco.

B.        *Releases.*

    1.    Releases by the Debtors

**As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors in their individual capacities and as debtors in possession will be deemed to release and forever waive and discharge the Released Parties from and against all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Entities, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, including, without limitation, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or any other act, omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Debtors or their Estates at any time on or prior to the Effective Date against the Released Parties, except that the Debtors will not be deemed to release, waive, or discharge the Released**

Parties from and against any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Executory Contract or Unexpired Lease assumed during the Chapter 11 Cases or under the Plan.

2.    Releases by Certain Third Parties

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Senior Secured Parties in their individual capacities will be deemed to have released and forever waived and discharged each Debtor, each Reorganized Entity, each Estate, and each Released Party from and against all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date (including prior to the Petition Date) in any way relating to the Debtors, the Chapter 11 Cases, the Plan, or the Disclosure Statement, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Entities, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor, the Reorganized Entities, and any Released Party, including, without limitation, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan, the Plan Supplement, the Disclosure Statement, or related agreements, instruments, or other documents, or any other act, omission, transaction, agreement, event, or other occurrence taking place before the Effective Date and that could have been asserted by or on behalf of the Senior Secured Parties at any time on or prior to the Effective Date against each Debtor, each Estate, or each Released Party, except that the Senior Secured Parties will not be deemed to release, waive, or discharge a Debtor, a Reorganized Entity, an Estate, or a Released Party, as applicable, from and against any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, or liabilities arising out of or relating to any act or omission of a Debtor, a Reorganized Entity, an Estate, or a Released Party, as applicable, that constitutes willful misconduct or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Executory Contract or Unexpired Lease assumed during the Chapter 11 Cases or under the Plan.

3.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Reorganized Debtors and their Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns in accordance with the Plan.

C.    *Exculpation.*

Except as otherwise specifically provided in the Plan, each Debtor, each Reorganized Entity, each Estate, and each Released Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any Exculpated Claim, except to the extent such claim, obligation, Cause of Action, or liability arises from willful misconduct or gross negligence or the breach of the Plan Support Agreement, but in all respects (other than with respect to any breach of the Plan Support Agreement) such released Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors, the Reorganized Entities, the Estates, and the Released Parties have, and

upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with applicable law with regard to the restructuring and treatment of Claims and Interests in the Chapter 11 Cases and in connection with the Restructuring Transactions, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments, or other documents (including the New Debt Documents and documents and instruments related thereto, and any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Entity on the Plan or the Confirmation Order in lieu of such legal opinion) in connection with the Plan, and the distribution of and the solicitation of votes on the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Without limiting the generality of the foregoing, each Debtor, each Reorganized Entity, each Estate, and each Released Party shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.  Notwithstanding anything to the contrary in the foregoing, the releases and exculpations set forth above do not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or any Executory Contract or Unexpired Lease assumed during the Chapter 11 Cases or under the Plan.

D.     Injunction.

       Except as otherwise expressly provided in the Plan, the Confirmation Order, or for obligations issued or required to be paid pursuant to the Plan (including any obligations under the Plan, the New Debt Documents and documents and instruments related thereto), all Entities who have held, hold, or may hold any claims, Causes of Action or interests that have been discharged pursuant to Article VIII.A of the Plan or are subject to exculpation pursuant to Article VIII.C of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Entities or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Causes of Action or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtors, the Reorganized Entities or the Released Parties on account of or in connection with or with respect to any such claims, Causes of Action or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against the Debtors, the Reorganized Entities, the Released Parties, or their respective property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Debtors, the Reorganized Entities or the Released Parties or against their respective property or estates on account of or in connection with or with respect to any such claims, Causes of Action or interests unless such Entity has timely asserted such setoff right in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim, Cause of Action or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims, Causes of Action or interests released or settled pursuant to the Plan.

E.     Protections Against Discriminatory Treatment.

       Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

F.      *Setoffs.*

Except as otherwise expressly provided for in the Plan, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided, however,* that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor or Reorganized Debtor of any such claims, rights, and Causes of Action that such Debtor or Reorganized Debtor may possess against such Holder.

G.      *Recoupment.*

In no event shall any Holder of a Claim be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless (1) such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date or (2) such Claim is Reinstated under the Plan.

H.      *Subordination Rights.*

The classification and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and, subject to the provisions of Article III.H. of the Plan, any such subordination rights shall be settled, compromised, and released pursuant to the Plan.

I.      *Document Retention.*

On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

## ARTICLE IX.
## EFFECT OF CONFIRMATION OF THE PLAN

Upon entry of the Confirmation Order, the Bankruptcy Court shall be deemed to have made and issued pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014, the Confirmation Order Findings of Fact and Conclusions of Law.  Upon entry of the Confirmation Order, the Confirmation Order Findings of Fact and Conclusions of Law shall constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law in the Plan shall constitute conclusions of law even if they are stated as findings of fact.

## ARTICLE X.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Confirmation Date.*

It shall be a condition to the Confirmation Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan:

1.   The Disclosure Statement Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and the Required Consenting Senior Lenders;

2. All documents to be provided in the Plan Supplement are in form and substance reasonably acceptable to the Debtors and the Required Consenting Senior Lenders and have been filed with the Bankruptcy Court;

3. The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and the Required Consenting Senior Lenders and must provide for the confirmation of the Plan with respect to each Debtor; and

4. The Debtors shall have received a binding commitment for the Exit Facility, in form and substance reasonably acceptable to the Debtors and the Required Consenting Senior Lenders, in an amount sufficient to satisfy (i) all Effective Date Cash requirements, including, without limitation, satisfaction of all Allowed Cure Claims and (ii) feasibility requirements as required pursuant to section 1129 of the Bankruptcy Code.

B.     *Conditions Precedent to the Effective Date.*

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.C of the Plan:

1. all Restructuring Documents shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Senior Lenders;

2. the Confirmation Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors and the Required Consenting Senior Lenders, in full force and effect, and not be subject to any stay or injunction;

3. all actions, documents, Certificates, and agreements necessary or appropriate to implement the Plan, including documents contained in the Plan Supplement, shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, Filed with the applicable Governmental Units in accordance with applicable laws;

4. all authorizations, consents, regulatory approvals (including approvals and consents from TxDOT), rulings, or documents that are necessary or appropriate to implement and effectuate the Plan shall have been received;

5. the Concession Agreement, Toll Road Lease and all operation and maintenance contracts and services contracts, as agreed to by the Required Consenting Senior Lenders, shall have been assumed by the Debtors;

6. the Exit Facility shall have been consummated; and

7. all Secured Party Fees shall have been paid.

C.     *Waiver of Conditions.*

The conditions set forth in Article X.A. and X.B of the Plan may be waived only by written consent of the Debtors and the Required Consenting Senior Lenders. Such waiver may be effectuated without notice to or entry of an order of the Bankruptcy Court and without notice to any other parties in interest.

D.     *Effect of Failure of Conditions.*

If Consummation does not occur on or prior to [December 31, 2016], the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any claims by the Debtors, Holders of Claims, or Holders of Interests or any Causes of Action; (2) prejudice in any manner the rights of the Debtors, any Holders, the Required Consenting Senior Lenders, TIFIA or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, the Required Consenting Senior Lenders, TIFIA or any other Entity in any respect, including with respect to substantive consolidation and similar arguments.

## ARTICLE XI.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments.*

Except as otherwise provided in the Plan and subject to the consent of the Required Consenting Senior Lenders, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.  Such modification may be material or immaterial, and may include material modifications to the economic terms of the Plan, provided, however, that any such material modification to the economic terms of the Plan may only be made subject to the consent of the Required Consenting Senior Lenders.  Further, subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to exercise its reasonable discretion to revoke or withdraw, or to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary or appropriate may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary or appropriate to carry out the purposes and intent of the Plan.  Any such revocation, withdrawal, alteration, amendment, modification, or supplement contemplated by this paragraph shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Senior Lenders.  Additionally, any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article XI of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof made in accordance with Article XI of the Plan are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims, Interests or Causes of Action; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity, including with respect to substantive consolidation and similar arguments.

## ARTICLE XII.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code to the extent provided under applicable law, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.    decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.    resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.    ensure that distributions to Holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5.    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

6.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

7.    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

8.    enter an order or Final Decree concluding or closing the Chapter 11 Cases;

9.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

10.  determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

11.  hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

12.  hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions and releases granted in the Plan, including under Article VIII of the Plan, regardless of whether such termination occurred prior to or after the Effective Date;

13.  enforce all orders previously entered by the Bankruptcy Court; and

14.  hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XIII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect.*

Subject to Article X.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, as of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether the Holders of such Claims or Interests, as applicable, have, or are deemed to have, accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases,

discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.       *Additional Documents.*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents, which agreements and other documents shall be in form and substance reasonably acceptable to the Debtors and the Required Consenting Senior Lenders, as may be necessary to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.       *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) on the Effective Date, and following the Effective Date, the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) shall pay such fees as they are assessed and come due for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

D.       *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

E.       *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.       *Disallowed Claims.*

No distribution shall be made under this Plan on account of or in relation to Disallowed Claims.

G.       *Notices.*

All notices, requests, and demands to or upon the Debtors, the Administrative Agent, or the Steering Committee to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

1.    if to the Debtors, to:

SH 130 Concession Company, LLC
10800 N US 183 Highway NB, Buda, TX 78610
Attn: Alfonso Orol, Steven J. Thoreson, and Paul Harris
Email:    aorol@sh130cc.com, sthoreson@sh130cc.com, and pharris@SH130cc.com

with copies to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attn: David M. Feldman, Matthew K. Kelsey, and Alan Moskowitz
Email: DFeldman@gibsondunn.com, MKelsey@gibsondunn.com, and
AMoskowitz@gibsondunn.com

2.    if to the Administrative Agent, to:

BNP Paribas
787 Seventh Avenue
New York, NY 10019
Attn: Barbara Eppolito
Email: Barbara.eppolito@us.bnpparibas.com

with copies to:

Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, TX 75201-6659
Attn: E. Lee Morris and Kevin M. Lippman
Email: lmorris@munsch.com and klippman@munsch.com

and:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
Facsimile: (212) 530-5219
Attn.: Gerard Uzzi and Mary Doheny
Email:  guzzi@milbank.com and mdoheny@milbank.com

3.    if to TIFIA, to:

Build America Bureau Credit Office
United States Department of Transportation
Room W12-447
1200 New Jersey Avenue, SE
Washington, DC  20590
Attn:  Duane Callender
Email:  BureauOversight@dot.gov

with copies to:

U.S. Department of Justice
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, DC 20044
Attn: Rodney A. Morris
Email: Rodney.Morris2@usdoj.gov

and:

Shearman & Sterling LLP
599 Lexington Ave # 16
New York, NY 10022
Attn: Douglas P. Bartner and Cynthia Urda Kassis
Email: dbartner@shearman.com and curdakassis@shearman.com

After the Effective Date, the Reorganized Debtors shall have authority to send a notice to Entities providing that, in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

H.      *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement.*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan and Plan Supplement.

J.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://cases.primeclerk.com/sh130/ or the Bankruptcy Court's website at http://www.txwb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

L.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith

38

and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

M.      *Closing of Chapter 11 Cases.*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

N.      *Waiver or Estoppel.*

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

O.      *Conflicts.*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of a conflict between the terms of the Plan, Disclosure Statement, Plan Supplement and, in each case, all documents, attachments, and exhibits thereto, on the one hand, and the terms of the Confirmation Order, on the other hand, the terms of the Confirmation Order shall control.

Dated:  August 12, 2016

Respectfully submitted,

**SH 130 CONCESSION COMPANY, LLC**

By: _/s/ Alfonso Orol_____
Name:  Alfonso Orol
Title:  Authorized Signatory

**ZACHRY TOLL ROAD – 56 LP**

By: _/s/ Timothy A. Watt_____
Name:  Timothy A. Watt
Title:  Authorized Signatory

**CINTRA TX 56 LLC**

By: _/s/ Antonio Resines_____
Name:  Antonio Resines
Title:  Authorized Signatory

Prepared by:

David M. Feldman
Matthew K. Kelsey
Alan Moskowitz
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Patricia B. Tomasco
Jennifer F. Wertz
**JACKSON WALKER L.L.P.**
100 Congress Ave., Suite 1100
Austin, Texas 78701
(512) 236-2000
(512) 236-2002 - FAX

*Counsel to the Debtors and
Debtors in Possession*

**Exhibit 1**

**Governance Term Sheet**

## SH 130 CONCESSION COMPANY, LLC
### TERM SHEET FOR POST-RESTRUCTURING EQUITY AND GOVERNANCE

This term sheet (this "Governance Term Sheet") sets forth the principal terms of (a) the common equity interests (the "New Equity Interests") to be issued by the Company (as defined below) in the Restructuring (as defined below) of SH 130 Concession Company, LLC ("SH130"), and (b) the post-Restructuring governance of the Company. As used herein, "Restructuring" means the financial restructuring of SH130 pursuant to the Chapter 11 Plan of Reorganization of SH130 (the "Plan") described in the Disclosure Statement to which this Governance Term Sheet is attached (the "Disclosure Statement"). This Governance Term Sheet does not constitute (nor shall it be construed as) an offer to sell or buy, nor the solicitation of an offer to sell or buy, any securities of the Company or of SH130 or any of its subsidiaries, it being understood that any such offer or solicitation will only be made in compliance with applicable provisions of securities, bankruptcy and/or other applicable laws. The transactions described herein will be subject to the completion of definitive documents incorporating the terms set forth herein and the closing of any transaction shall be subject to the terms and conditions set forth in such definitive documents. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

| | |
|---|---|
| **The Company** | The New Equity Interests will be issued by a newly-formed Delaware limited liability company (the "Company") that upon consummation of the Plan (the "Effective Date"), will be the sole owner of 100% of the equity interests in reorganized SH 130. The Company will [elect to be treated as a corporation] / [be treated as a partnership][1] for U.S. federal, state and local income tax purposes. |
| **Operating Agreement; Units** | The Company will be governed, from and after the Effective Date, by a limited liability company agreement to be entered into in the form to be filed with the Plan Supplement (as amended, the "Operating Agreement"). Each Person that receives a distribution of New Equity Interests under the Plan will be required, as a condition to receiving such distribution, to become a party to the Operating Agreement by executing a counterpart signature page thereto. The New Equity Interests will be issued in the form of common membership interest units in the Company ("Units"). The Operating Agreement will provide for only one class of Units at the Effective Date. It shall be a condition precedent to the effectiveness of any issuance or Transfer (to be defined in the Operating Agreement) of Units that the recipient thereof execute and deliver a joinder, in the form attached to the Operating Agreement (a "Joinder"), pursuant to which the recipient agrees to become a member of the Company (a "Member") and a party to the Operating Agreement. The New Equity Interests issued to any particular Person under the Plan may, if requested by such Person, be issued subject to percentage ownership and voting restrictions and restrictions on certain business arrangements with the Company, to the extent necessary for |

---

[1] Note to Draft: To be revised accordingly, to reflect whether the Company will be taxed as a corporation or treated as a partnership / disregarded entity for tax purposes.

compliance with regulatory requirements applicable to such Person.

| | |
|---|---|
| **Board of Directors** | <u>Board Composition</u>:  The Company shall be managed by a Board of Directors (the "<u>Board</u>") consisting of three (3) directors (collectively, the "<u>Directors</u>").  The names of the three (3) initial Directors, to be seated as of the Effective Date, shall be set forth in the Plan Supplement.  The initial term of each of the initial Directors shall expire on the first anniversary of the Effective Date, and thereafter all Directors shall be subject to election each year and shall be elected for a term expiring one year after the date of his or her election.  Each Director shall hold office until his or her successor is duly elected and qualified or until the Director's earlier death, resignation, disqualification or removal. |

<u>Vacancies; Removal</u>: Any Director may be removed at any time, with or without cause, by any Member or group of Members holding, in the aggregate, a majority of the total number of Units then outstanding.  Board vacancies may be filled by the affirmative vote (whether by written consent or at a meeting of the Members called for such purpose) of Members holding a majority of the total number of Units then outstanding.

<u>Chairman</u>:  The initial Chairman of the Board shall be selected at the initial Board meeting by a majority vote of the Directors.

<u>Meetings</u>:  The Board shall meet no less frequently than once per calendar quarter.  Board meetings may be called by the Chairman of the Board, the Chief Executive Officer of the Company, or by any two (2) Directors with the lesser of one Business Day or forty-eight (48) hours' prior notice in writing or by email.

<u>Board Action /Quorum</u>:  Board action shall require the affirmative vote of a majority of the Directors present at a duly called meeting at which a quorum is present, or the written consent of all of the Directors.  A quorum shall consist of a majority of the total Directors then in office.

| | |
|---|---|
| **Member Consent Rights** | The Company shall not, and shall not permit any of its subsidiaries to, take any of the following actions without the prior written consent of Members holding at least 66-2/3% of the total number of Units then outstanding: |

- Any dissolution, winding-up or liquidation of the Company or any of its subsidiaries;

- Removing, replacing or filling a vacancy with respect to the operator of the toll road project owned by SH130;

- Any election to terminate the Facility Concession Agreement, dated as of March 22, 2007, by and between the Texas Department of Transportation and SH130 (the "Concession Agreement") in

2

accordance with its terms;

- Any material amendment, modification or waiver of any of the terms of the Concession Agreement;
- Any change in the tax status of the Company;
- Any material amendments to the Operating Agreement; and
- Approval of any affiliate transactions.

The Company shall not, and shall not permit any of its subsidiaries to, take any of the following actions without the prior written consent of Members holding at least a majority of the total number of Units then outstanding:

- Any sale by the Company of its membership interests in SH130 or any authorization to SH130 to sell all or substantially all of its assets in connection with a Sale of the Company (as defined below);
- Any issuance of preferred interests or other securities other than Units;
- Any incurrence of indebtedness in excess of an amount to be specified; and
- Any authorization to SH130 to engage in any business other than as currently conducted and activities reasonably related thereto.

| | |
|---|---|
| **Affiliate Transactions** | The entry by the Company or any of its subsidiaries into, or material modification of, any agreement or transaction with any Member or any affiliate of any Member, or any portfolio company of any Member or affiliate thereof, shall require the written consent of Members holding 66-2/3% of the total number of Units then outstanding held by all Members other than such interested Member and its affiliates. |
| **Pre-emptive Rights** | If the Company or any of its subsidiaries proposes to issue Units or other equity interests or securities convertible into or exercisable or exchangeable therefor, the Company shall (or shall cause such subsidiary to) first offer to each Member the right to purchase, for cash, at a price equal to the price at which the Company (or such subsidiary) proposes to issue such Units or other interests or securities, such Member's pro rata portion based on its respective ownership of the Units outstanding immediately prior to such issuance (or, as applicable, its indirect ownership in such subsidiary) of such Units or other securities, subject to customary exceptions for Unit dividends, issuances under employee incentive plans, and issuances in connection with acquisition transactions. |
| **Transfers of Units** | The ability of any Member to directly or indirectly Transfer (to be defined in the Operating Agreement) all or any portion of its Units shall be subject to the conditions and restrictions set forth below; <u>provided</u>, <u>however</u>, that a bona-fide sale, transfer, assignment, exchange, |

conveyance or other disposition of equity interests in any entity that directly or indirectly owns Units shall not constitute a Transfer of such Units (and accordingly shall not be subject to the restrictions set forth below) if the aggregate number of Units directly or indirectly owned by such entity represents 25% or less of such entity's total assets:

- The transferee shall have executed a Joinder.

- All Transfers shall be made in compliance with all applicable federal and state securities laws.

- All Transfers shall, to the extent applicable, be subject to the Right of First Offer and Tag-Along provisions described below.

- No Transfer of Units will be permitted if, as a result of such Transfer, any class of equity securities of the Company would be held of record by a number of holders that exceeds the applicable threshold for registration under the Securities Exchange Act of 1934, as amended (the "Exchange Act") or if the Board otherwise determines that such Transfer could result in the Company's being required to file reports under the Exchange Act.

- In the event that the Company does not elect to be treated as a corporation for tax purposes, all Transfers may be subject to customary restrictions to avoid causing the Company to (i) be a "publicly traded partnership" within the meaning of Section 7704(d) of the Internal Revenue Code of 1986, as amended (the "Code"), (ii) lose its status as a partnership for federal or state income tax purposes, or (iii) be terminated pursuant to Section 708 of the Code.

The foregoing requirements shall not apply to any Transfer of Units by any Member, together with a proportionate amount of the New PIK Notes held by such Member, (a) pursuant to any Drag-Along Sale, or (b) pursuant to the exercise of tag-along rights with respect to any Tag-Along Sale, and shall be subject to customary exceptions for Transfers to affiliates and other permitted transferees.

All New PIK Notes distributed to any Person under the Plan (including any additional New PIK Notes issued to reflect the accrual of interest thereon) shall be deemed to be permanently "stapled" to the Units distributed to such Person under the Plan (including in the case of any Drag-Along Sale or Tag-Along Sale), such that (a) no such Units may be Transferred to any Person unless a proportionate amount of such New PIK Notes are included in such Transfer and (b) no such New PIK Notes may be Transferred to any Person unless a proportionate number of such Units are included in such Transfer. As used herein, "Stapled PIK Notes" shall mean, with respect to any Unit(s), the amount of New PIK Notes that are deemed stapled to such Unit(s) pursuant to the immediately preceding sentence.

Any purported transfer of Units or New PIK Notes that does not comply with the foregoing requirements shall be void *ab initio* and shall not be

given any force or effect.

| | |
|---|---|
| **Right of First Offer** | In the event that any Member proposes to Transfer all or any of its Units (the "<u>Offered Units</u>"), and the Stapled PIK Notes corresponding to such Units, in one or more transactions pursuant to the Operating Agreement's right of first offer provisions, then such Member (a "<u>ROFO Seller</u>") shall deliver to each of the other Members holding at least 5.0% of the total number of Units then outstanding (each, a "<u>ROFO Offeree</u>") written notice thereof, which notice (an "<u>Offer Notice</u>") shall specify the number of Offered Units, the price per Offered Unit, and any other material terms of such Transfer. |

- Each ROFO Offeree may elect to purchase, by written notice given to the ROFO Seller at any time during the 10 Business Days following its receipt of the Offer Notice (the "<u>Offer Period</u>"), its *pro rata* share (based on its respective ownership of the Units held by all ROFO Offerees as of the date of the Offer Notice) of the Offered Units at the price and on the terms specified in the Offer Notice.

- Any Offered Units that ROFO Offerees do not elect to purchase will be re-offered *pro rata* to each ROFO Offeree who elected to purchase Offered Units.

- Any remaining Offered Units may be Transferred by the ROFO Seller, at any time during the 75 days following expiration of the Offer Period, to any one or more parties (each a "<u>ROFO Transferee</u>") on terms that in each case are no more favorable, in the aggregate, to the applicable ROFO Transferee than the terms specified in the Offer Notice (including a cash purchase price that, net of commissions or similar expenses, is no lower than the price specified therein); <u>provided</u>, <u>however</u>, that with respect to any such Transfer that constitutes a Tag-Along Sale, the consummation of such Transfer shall be deemed timely notwithstanding that it occurs after such 75-day period, if (a) the Tag-Along Notice for such Transfer is given within such 75-day period and (b) within 30 days after such notice is given, the Transfer is consummated in accordance with the Operating Agreement's tag-along provisions.

| | |
|---|---|
| **Tag-along Rights** | In the event that any one or more Members proposes to Transfer to any unaffiliated Person or "group" of unaffiliated Persons (the "<u>Tag-Along Buyer</u>") Units that constitute more than 30% of the total number of Units then outstanding and the Stapled PIK Notes corresponding to such Units (a "<u>Tag-Along Sale</u>"), such Member (the "<u>Selling Member</u>") shall provide notice of the Tag-Along Sale to each of the other Members (the "<u>Tag-Along Offerees</u>") no later than 30 days prior to the proposed closing of such Tag-Along Sale (the "<u>Tag Along Notice</u>"). Each Tag-Along Offeree shall have "tag-along" rights to participate, on a *pro rata* basis (based on its respective ownership of the Units held by all Tag-Along Offerees as of the date of the Tag-Along Notice), in the Tag- |

Along Sale, on the same terms, and subject to the same conditions as the Selling Member, with a corresponding reduction (except to the extent the Tag-Along Buyer agrees to purchase additional Units and the Stapled PIK Notes corresponding to such Units) in the number of Units and Stapled PIK Notes being sold by the Tag-Along Seller to reflect the number of Units (and the Stapled PIK Notes corresponding to such Units) that Tag-Along Offerees elect to sell in the Tag-Along Sale.  It shall be a condition precedent to the effectiveness of any Tag-Along Sale that the Tag-Along Buyer concurrently purchase, pursuant to the terms hereof, all of the Units (and the Stapled PIK Notes corresponding to such Units) with respect to which Tag-Along Offerees timely elect to exercise tag-along rights in connection with such Tag-Along Sale.

**Drag-along Rights**  In the event that any one or more Members holding, in the aggregate, a majority of the total number of Units then outstanding proposes a Sale of the Company to one or more third parties (collectively, the "Drag-Along Buyer"), then such Member(s) (collectively, the "Drag-Along Seller") shall have the right to require all of the other Members to participate in such transaction (including, if applicable, by Transferring all of their Units and the Stapled PIK Notes corresponding to such Units to the Drag-Along Buyer), on the same terms, and subject to the same conditions as the Drag-Along Seller. In connection with any such Sale of the Company, each Member shall, if applicable, (i) vote in favor of the transaction pursuant to which the Transfer is effected, (ii) not exercise any appraisal or similar rights with respect to such transaction (iii) provide customary representations and warranties to the Drag-Along Buyer regarding its legal status and authority, and its ownership of the Units and New PIK Notes being transferred, and, to the extent permitted by applicable law, customary (several but not joint) indemnities regarding the same, (iv) to the extent permitted by applicable law, participate *pro rata* in any indemnification of the Drag-Along Buyer with respect to matters other than the representations and warranties described in clause (iii), provided, that each Member's liability shall be several and not joint and several, and (v) take all other actions reasonably requested in order to consummate such transaction. In no event shall any such Member be required to indemnify or contribute any amount in excess of the net cash amount received by such Member in any such Transfer. A Sale of the Company will not trigger any change of control provision under any applicable financing document.

"Sale of the Company" means a sale of the Company in a sale, merger or reorganization transaction pursuant to which the acquiring party or parties acquire (a) 100% of the outstanding New PIK Notes and (b) (i) 100% of the outstanding equity interests in SH130, (ii) 100% of the outstanding Units (whether by merger, consolidation, recapitalization or reorganization of the Company, or the sale or other Transfer of Units) or (iii) all or substantially all of the Company's or SH130's assets

6

determined on a consolidated basis.

**Information Rights**

The Company shall provide the following to each Member:

- audited annual consolidated financial statements within [120] days after the end of each fiscal year;

- unaudited quarterly consolidated financial statement within 45 days from the end of each quarter;

- unaudited monthly reports and consolidated financial statements within 30 days after the end of each month; and

- not less than 45 days prior to the beginning of each fiscal year, a budget and a business plan.

The Company shall provide the foregoing information in an electronic data room to which access is given to each Member and any potential transferee that enters into a customary confidentiality agreement in form and substance reasonably acceptable to the Company; <u>provided</u>, that access to the budgets and business plans may be restricted to Members entitled to receive such information and potential transferees of such Members.

In addition, each Member of the Company holding (including any Units held by its affiliates) at least 5% of the total number of Units then outstanding shall have the right, upon reasonable notice and at reasonable times, to meet with the officers of the Company and its subsidiaries and to have access to the officers of the Company and its subsidiaries.

In addition, upon reasonable notice from any Member of the Company holding (including any Units held by its affiliates) at least 5% of the total number of Units then outstanding, the Company shall, and shall cause its officers and employees to, afford such Member and its representatives reasonable access during normal business hours to the corporate, financial and similar records, reports and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management letters and communications with Members or Managers, and to permit such Member and its representatives to examine such documents and make copies thereof.

The Company's obligation to provide the foregoing information to any particular Member shall be subject to customary exceptions regarding attorney-client privileged information.

**Capital**

No Member shall be required to make any capital contributions to the

| | |
|---|---|
| **Contributions** | Company without the prior consent of such Member. |
| **Fiduciary Duties** | The Operating Agreement shall expressly provide that any duties (including fiduciary duties) of any Member in its capacity as such (but not the duties of any officer of the Company, in his or her capacity as such) that would otherwise apply at law or in equity (including the duty of loyalty and the duty of care) shall be waived and eliminated to the fullest extent permitted under Delaware law and any other applicable law; provided, however that the foregoing shall not eliminate (a) the obligation of each Member or any other Person to act in compliance with the express terms of this Agreement or (b) the implied contractual covenant of good faith and fair dealing.  In furtherance of the foregoing (but subject to the foregoing provisos), when any Member (but not the officers of the Company, in their capacity as such) takes any action under the Operating Agreement to give or withhold its consent or approval, such Member shall have no duty (fiduciary or otherwise) to consider the interests of the Company, its subsidiaries or the other Members, and may act exclusively in its own interest. |
| **Indemnity and Exculpation** | The Operating Agreement shall contain customary indemnification, to the extent permitted by applicable law, and exculpation provisions consistent with the foregoing and applicable Delaware law. The Directors shall have the benefit of customary Indemnification Agreements with the Company and the Company shall maintain customary D&O insurance. |
| **Confidentiality** | Customary confidentiality restrictions for a privately held company (including with respect to all information and documents described under "Information Rights" above), with carve-outs (i) allowing Members to share confidential information with any potential transferee that enters into a customary confidentiality agreement in form and substance reasonably acceptable to the Company and (ii) allowing TIFIA to comply with its statutory obligations. |
| **Amendments** | Any material amendment to the Operating Agreement shall require approval of Members holding 66-2/3% of the total number of Units then outstanding; provided, that any amendment that would reasonably be expected to materially adversely affect any Member's interest in the Company in a manner that is disproportionate to the effect on each other Member's interest in the Company shall require the consent of such Member. |

**Exhibit 2**

**New Debt Term Sheet**

**Summary Term Sheet**

**SH130 Concession Company, LLC**

**Exit Financing Documentation**

This term sheet (this "Financing Term Sheet") sets forth the principal terms of the debt financing facilities (the "Financing Facilities") to be incurred or issued in the Restructuring (as defined below) of SH 130 Concession Company, LLC ("SH130"). As used herein, "Restructuring" means the financial restructuring of SH130 pursuant to the Chapter 11 Plan of Reorganization of SH130 (the "Plan") described in the Disclosure Statement to which this Financing Term Sheet is attached (the "Disclosure Statement"). This Financing Term Sheet does not constitute (nor shall it be construed as) an offer to extend credit to SH130 or to restructure the SH130 indebtedness or to sell or buy, nor the solicitation of an offer to sell or buy, any securities of SH130 or any of its subsidiaries. The transactions described herein will be subject to the completion of definitive documents incorporating the terms set forth herein and the closing of any transaction shall be subject to the terms and conditions set forth in such definitive documents. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

The Financing Facilities shall comprise (a) a senior secured "first out" Exit Facility, (b) a senior secured Senior Debt Facility, and (c) a PIK Note Facility, as further described herein.

SH-130 Summary Term Sheet:
Exit Facility

| Borrower | SH130 |
|---|---|
| Lenders | To be determined. |
| Administrative Agent | A financial institution to be selected by the Lenders under the Exit Facility. |
| Finance Documents | • Credit Agreement among the Borrower, the Lenders and the Administrative Agent (the "Exit Facility Credit Agreement").<br><br>• The Common Security Documents (as defined under "Intercreditor and Accounts Agreement" below)<br><br>• All ancillary financing documents referred to in the Exit Facility Credit Agreement. |
| Initial Principal Amount | $[___] million |
| Use of Proceeds / Availability | The proceeds of the Exit Facility will be used solely (a) for any extraordinary capital expenditures, including any amounts necessary for pavement remediation, as necessary or required (the "Extraordinary CapEx") and (b) to satisfy on the Effective Date referred to below all outstanding obligations under any DIP facility incurred by SH130.<br><br>The Exit Facility shall be available to the Borrower in one or more drawings during the period from the effective date of consummation of the Plan (the "Effective Date") until the earlier of completion of the Extraordinary CapEx or [December 31, 2017] (the "Availability Period"). If fully disbursed prior to incurrence of the Extraordinary CapEx, proceeds of the Exit Facility will be held in a designated collateral account.<br><br>During the Availability Period, the Borrower may draw on the proceeds of the Exit Facility no more than once per calendar month, subject to customary conditions for this type of facility, including:<br><br>(a) No default or event of default;<br>(b) Representations and warranties true and correct in all material respects;<br>(c) Except with respect to amounts drawn to repay outstanding obligations under the DIP Facility, evidence of payment of pavement remediation costs then due or anticipated to be due and payable during the next 30 days, together with confirmation |

|  | thereof by the Lenders' technical advisor;<br>(d) Any required TxDOT approvals. |
|---|---|
| Interest Rate | Adjusted LIBOR + [____]%. |
| Maturity Date | [9] years from the Effective Date. |
| Interest Payments | Interest will be payable quarterly in arrears, in [March/June/September/December] of each year (each a "Quarterly Date"), beginning with the [first Quarterly Date] following the Effective Date. |
| Interest Rate Protection | Subject to market conditions, the Company will enter into interest rate hedges in a notional amount equal to the Exit Facility. |
| Mandatory Amortization | [Bullet maturity on the Maturity Date.] |
| Collateral | Subject to market conditions, the Exit Facility shall be secured on a pari passu basis with the Senior Debt Facility, as further described under "Intercreditor and Accounts Agreement" below. |
| Mandatory Prepayments | Mandatory prepayment of the Exit Facility with the proceeds of any claims against or settlement by the Contractor or any other party relating to the pavement remediation required to comply with the Concession Agreement.<br><br>Mandatory prepayments, on a ratable basis with the Senior Debt Facility, with respect to:<br><br>• casualty or condemnation or insurance proceeds; and<br>• any Concession Agreement refund.<br><br>Additional mandatory prepayment from Excess Cash Flow Sweep as provided under the "Waterfall" provisions under "Intercreditor and Accounts Agreement" below. |
| Representations and Warranties | As set forth below in the Summary Terms for the Senior Debt Facility below. |
| Affirmative Covenants | As set forth below in the Summary Terms for the Senior Debt Facility below. |
| Negative Covenants | As set forth below in the Summary Terms for the Senior Debt Facility below. |
| Informational Covenants | As set forth below in the Summary Terms for the Senior Debt Facility below. |

3

| | |
|---|---|
| Events of Default | As set forth below in the Summary Terms for the Senior Debt Facility below. |
| Required Lenders | Lenders holding more than 50% of total commitments or exposure under the Exit Facility, subject to usual and customary exceptions for unanimous or affected lenders.  The voting rights of defaulting Lenders will be subject to certain limitations to be specified in the Exit Facility Credit Agreement. |
| Assignments and Participations; Funding Protection; Indemnity and Expenses; Taxes; Sanctions: | The Exit Facility Credit Agreement will include provisions relating to assignments and participations, funding protection, indemnity, expense reimbursement and related matters, EU Bail-in and taxes that are usual and customary provisions for financings of this kind. The Exit Facility Credit Agreement will contain conditions, representations, and covenants relating to the Borrower's compliance with US and EU sanctions regimes and anti-money laundering and anti-corruption laws. |
| Governing Law and Jurisdiction: | The laws of the State of New York (except for certain Common Security Documents), provided that, with respect to the rights and obligations of TIFIA (if a Lender), the federal laws of the United States, if and to the extent such federal laws are applicable, shall apply and the laws of the State of New York, if and to the extent such federal laws are not applicable, shall apply. The Finance Documents will provide that the Borrower will submit to the jurisdiction and venue of the federal and state courts of the State of New York and shall waive any right to trial by jury. |

SH-130 Summary Term Sheet:
Senior Debt Facility

| Borrower | SH130 |
|---|---|
| Lenders | (a)  Those lenders under that certain Initial Senior Loan Agreement, dated as of March 7, 2008 (as amended, supplemented, or otherwise modified from time to time, the "ISLA"), among SH 130, as borrower, the Senior Lenders party thereto from time to time, BNP Paribas (as successor to Fortis Bank S.A./N.V., UK Branch), as Administrative Agent, Banco Santander, S.A., New York Branch, as Fronting Bank, and the mandated lead arrangers party thereto.<br><br>(b)  The United States Department of Transportation, acting by and through the Federal Highway Administrator ("TIFIA"), as the lender under that certain TIFIA Loan Agreement, dated as of March 7, 2008 (as amended, the "TIFIA Loan Agreement") between SH 130, as borrower, and TIFIA.<br><br>(c) (i) Caixa – Banco de Investimento, S.A., (ii) Espírito Santo, plc, as successor to Banco Espírito Santo, S.A., New York Branch, (iii) Bank of America, N.A., as successor by way of assignment to Bankia S.A., as successor to Caja de Ahorros y Monte de Piedad de Madrid Miami Agency, (iv) BNP Paribas, as successor to Fortis Bank S.A./N.V., and (v) Banco Santander, S.A., which are parties to certain hedging agreements with SH 130. |
| Administrative Agent | [BNP Paribas] |
| Finance Documents | • Credit Agreement among the Borrower, the Lenders and the Administrative Agent (the "Senior Debt Facility Credit Agreement").<br><br>• The Common Security Documents.<br><br>• All ancillary financing documents referred to in the Senior Debt Facility Credit Agreement. |
| Initial Principal Amount | $[___] million |
| Interest Rate | Adjusted LIBOR + [___]% |
| Maturity Date | [9] years from the Effective Date |
| Interest Payment | Interest will be payable quarterly in arrears, on each Quarterly Date, beginning with the [first Quarterly Date] following the Effective Date. |

| | |
|---|---|
| Interest Rate Protection | Subject to market conditions, the Company will enter into interest rate hedges in a notional amount equal to the Senior Debt Facility. |
| Mandatory Amortization | The Senior Debt Facility will amortize in equal quarterly principal installments, on each Quarterly Date, in an amount equal to 0.5% annually, commencing on the [first Quarterly Date] following the Effective Date, with the remaining outstanding principal amount of the Senior Debt Facility payable in full on the Maturity Date. |
| Collateral | Subject to market conditions, the Senior Debt Facility shall be secured on a pari passu basis with the Exit Facility, as further described under "Intercreditor and Accounts Agreement" below. |
| Mandatory Prepayments | After prepayment in full of the Exit Facility, mandatory prepayment with the proceeds of any claims against or settlement by the Contractor or any other party relating to the pavement remediation required to comply with the Concession Agreement.<br><br>Mandatory prepayments, on a ratable basis with the Exit Facility, with respect to:<br><br>• casualty or condemnation or insurance proceeds;<br>• any Concession Agreement refund.<br><br>Additional mandatory prepayment from Excess Cash Flow Sweep as provided under the "Waterfall" provisions under "Intercreditor and Accounts Agreement" below. |
| Representations and Warranties | Similar representations and warranties as contained in the ISLA (together with any other usual and customary representations and warranties for a facility of this type), including, without limitation, with respect to:<br><br>• organization, power and authority of the Borrower;<br>• due authorization of all Finance Documents;<br>• compliance with laws and contractual obligations;<br>• no existence of adverse legal actions or proceedings;<br>• good and valid title to collateral package;<br>• no environmental claims against Borrower;<br>• all required governmental approvals granted;<br>• validity of all material project contracts (to be defined);<br>• customary insurance matters;<br>• no material adverse effect;<br>• tax status of the Borrower;<br>• no default or event of default;<br>• customary ERISA matters;<br>• continuing validity of Common Security Documents;<br>• customary Investment Company Act matters;<br>• accuracy of annual operating budget (updated). |

6

| | |
|---|---|
| | <ul><li>accuracy of pavement remediation plan, schedule, budget and required funding; and</li><li>funding of required reserve accounts.</li></ul> |
| Affirmative Covenants | Similar affirmative covenants as contained in the ISLA (together with any other usual and customary affirmative covenants for a facility of this type), including, without limitation, with respect to:<br><ul><li>books and records and inspections of the Borrower;</li><li>conduct of business (including maintenance and operation of the Project);</li><li>maintenance of and compliance with material project contracts;</li><li>compliance with governmental rules and governmental approvals;</li><li>continued legal existence and good standing;</li><li>customary insurance matters;</li><li>customary tax matters;</li><li>existence of accounts;</li><li>ranking of claims;</li><li>validity of security, further assurances;</li><li>authorization to auditors;</li><li>Compensation Claims;</li><li>Technical Advisor Services Agreement;</li><li>payment of fees;</li><li>Remedial Plan;</li><li>funding of reserve accounts; approval and compliance with annual budget;</li><li>use of Exit Facility proceeds;</li><li>monthly progress reports with respect to pavement remediation; and</li><li>completion of pavement remediation in accordance with relevant budget and schedule.</li></ul> |
| Negative Covenants | Similar negative covenants as contained in the ISLA (together with any other usual and customary negative covenants for a facility of this type), including, without limitation, with respect to:<br><ul><li>liens/negative pledge;</li><li>no additional bank accounts;</li><li>restrictions on disposals;</li><li>conduct of business;</li><li>mergers, sales, or corporate reorganizations;</li><li>acquisition of assets;</li><li>no investments other than Permitted Investments;</li><li>termination, amendment, modification of the Concession Agreement or material project contracts;</li><li>entering into material project contracts;</li><li>restricted payments;</li></ul> |

| | |
|---|---|
| | • affiliate transactions;<br>• tax election;<br>• permitted indebtedness;<br>• release of hazardous materials;<br>• name and financial year;<br>• compensation events; and<br>• Financial Covenants. |
| Informational Covenants | Similar informational covenants as contained in the ISLA (together with any other usual and customary informational covenants for a facility of this type), including, without limitation, with respect to:<br><br>• financial statements;<br>• Borrower's compliance certificate;<br>• auditor's compliance certificate;<br>• notices relating to the Concession Agreement;<br>• default notices;<br>• casualty notices;<br>• material notices;<br>• traffic and operating reports;<br>• monthly progress reports;<br>• permitted pari passu financial indebtedness;<br>• "Know Your Customer" requests;<br>• pavement remediation updates;<br>• toll collection reports; and<br>• budgets. |
| Events of Default | Similar Events of Default as contained in the ISLA (together with any other usual and customary Events of Default for a facility of this type), including, without limitation, with respect to:<br><br>• non-payment of scheduled principal and interest or fees;<br>• failure to comply with covenants;<br>• misrepresentation of representations and warranties;<br>• bankruptcy of the Borrower;<br>• abandonment of the Project;<br>• judgments against the Borrower which are likely to have a material adverse effect;<br>• any security document ceasing to be effective in granting a perfected lien on the collateral,<br>• any financing document ceasing to be in full force and effect prior to satisfaction of obligations thereunder;<br>• the termination of any Material Project Contract;<br>• the occurrence of any ERISA event that is likely to have a material adverse effect;<br>• the occurrence of an event that would entitle TxDOT to terminate |

| | |
|---|---|
| | the FCA;<br>• the use of funds in the Project Accounts or Operating Account for purposes other than those expressly permitted in the financing documents;<br>• the occurrence of a casualty, loss or damage event;<br>• failure to maintain any required governmental approval;<br>• the occurrence of any prohibited transfer; and<br>• cross-default provisions as to failure to pay the Exit debt as required. |
| Required Lenders | Lenders holding more than 50% of total commitments or exposure under the Senior Debt Facility, subject to usual and customary exceptions for unanimous or affected lenders. |
| Assignments and Participations; Funding Protection; Indemnity and Expenses; Taxes; Sanctions | The Senior Debt Facility Credit Agreement will include provisions relating to assignments and participations, funding protection, indemnity, expense reimbursement and related matters, EU Bail-in and taxes that are usual and customary provisions for financings of this kind.<br><br>The Senior Debt Facility Credit Agreement will contain conditions, representations, and covenants relating to the Borrower's compliance with US and EU sanctions regimes and anti-money laundering and anti-corruption laws. |
| Governing Law and Jurisdiction | The laws of the State of New York (except for certain Common Security Documents), provided that, with respect to the rights and obligations of TIFIA, the federal laws of the United States, if and to the extent such federal laws are applicable, shall apply and the laws of the State of New York, if and to the extent such federal laws are not applicable, shall apply. The Finance Documents will provide that the Borrower will submit to the jurisdiction and venue of the federal and state courts of the State of New York and shall waive any right to trial by jury. |

SH-130 Summary Term Sheet:
PIK Notes Facility

| Issuer | SH130 |
|---|---|
| Holders | Lenders under the Senior Debt Facility |
| Administrative Agent or Trustee | To be determined. |
| Finance Documents | • Note Agreement between the Borrower and the Holders (the "PIK Note Agreement").<br><br>• All ancillary financing documents referred to in the PIK Note Agreement. |
| Tranche: | PIK Notes: |
| Initial Principal Amount | $[_____]¹ |
| Interest Rate | Adjusted Libor + 1.75% |
| Maturity Date | Dec '61 |
| Interest Payment | None.  Interest to be paid in kind. |
| Mandatory Amortization | None |
| Collateral | The PIK Notes will be secured on a subordinated basis to the Exit Facility and Senior Debt Facility. |
| Mandatory Prepayments | Mandatory prepayment from Excess Cash Flow Sweep as provided under the "Waterfall" provisions under "Intercreditor and Accounts Agreement" below (after payment in full of the Exit Facility and Senior Debt Facility). |
| Representations and Warranties | Usual and customary. |
| Covenants | Usual and customary. |
| Events of Default | Usual and customary. |
| Required Holders | Holders holding more than 50% of the outstanding PIK Notes, subject to usual and customary exceptions for unanimous or affected Holders. |
| Payment Subordination | The PIK Notes shall be expressly subordinate in right of payment to the Exit Facility and the Senior Debt Facility. |

---

¹ NTD: Amount to equal $1,682,398,000 (the respective total claim amount) minus the aggregate principal amount of Senior Debt.

10

| | |
|---|---|
| Transferability | The PIK Notes (including additional PIK Notes issued to reflect the accrual of interest thereon) will be permanently stapled to the equity Units referred to and  as described in the Post-Restructuring Equity and Governance Summary Term Sheet.<br><br>No PIK Notes may be transferred unless a proportionate number of such Units are included in such transfer.<br><br>The PIK Notes shall also be subject to the Right of First Offer, Tag-along Rights and Drag-Along Rights as provided in the Post-Restructuring Equity and Governance Summary Term Sheet. |
| Governing Law and Jurisdiction | The laws of the State of New York (except for certain Common Security Documents), provided that, with respect to the rights and obligations of TIFIA, the federal laws of the United States, if and to the extent such federal laws are applicable, shall apply and the laws of the State of New York, if and to the extent such federal laws are not applicable, shall apply. The Finance Documents will provide that the Borrower will submit to the jurisdiction and venue of the federal and state courts of the State of New York and shall waive any right to trial by jury. |

SH-130 Summary Term Sheet:
Intercreditor and Accounts Agreement

| | |
|---|---|
| Collateral Agent | [Deutsche Bank Trust Company Americas], for the benefit of the Lenders party to the Exit Facility, Senior Debt Facility and, acting in a separate capacity as second lien collateral agent, the PIK Notes. |
| Security Package | To include a first priority pledge (or, in the case of the PIK Notes, second priority) of 100% of the equity interest in SH130 and all property and assets of SH130, including its rights under the Concession Agreement. To be evidenced by customary mortgages, security agreements and pledge agreements (the "Common Security Documents"). |
| | The Exit Facility, the Senior Debt Facility and any related interest rate hedging agreements shall be secured by the collateral under the Common Security Documents on a pari passu basis, provided that subject to market conditions the Exit Facility [and any termination payments under such interest rate hedging agreements] shall be treated on a first out basis in respect of amounts received from the proceeds of such collateral (other than the Debt Service Reserve Accounts referred to below). |
| | The PIK Notes shall be secured by the collateral on a subordinated basis to the Exit Facility and Senior Debt Facility. |
| Intercreditor Agreement | The Lenders under the Exit Facility and Senior Debt Facility (or the respective Administrative Agents) and parties to interest rate hedging agreements shall enter into an intercreditor agreement setting forth the relative voting rights and other creditor's rights issues in respect of the Common Security Documents. |
| | The collateral agent under the Common Security Documents and PIK Note holders (or their representative) shall enter into an intercreditor agreement setting forth the subordination of the liens securing the PIK Notes and other related creditors' rights. |
| Debt Service Reserve Accounts | An amount equal to 6-months' projected debt service on the Exit Facility and Senior Debt Facility, available for such Facilities with drawings thereon to be shared ratably first among the Lenders under the Exit Facility and next among the Lenders under the Senior Debt Facility. |
| Major Maintenance Reserve Account | Funded based on next 36 months of scheduled capital expenditures (excluding capital expenditures related to the pavement remediation to the extent funded by the Exit Facility) based on the following: |
| | -Next 12 Months (Year 1) – 100% of scheduled capex |

| | |
|---|---|
| | -Additional 12 Months (Year 2) − 66.6% of scheduled capex<br>-Additional 12 months (Year 3) − 33.3% of scheduled capex<br><br>The MMRA may be drawn to pay for Major Maintenance Costs (including any costs related to pavement remediation to the extent the Exit Facility is not sufficient to complete the pavement remediation) to the lesser of (i) Major Maintenance Costs required to be paid for the succeeding 6 month period and (ii) total balance in the MMRA. |
| Waterfall | 1. The Projected TxDOT Revenue Share Amount, Operating Expenses, costs and expenses, Major Maintenance Costs and Required Capital Expenditures (consistent with current clauses FIRST through SEVENTH of the first paragraph applicable to Transfers from the Proceeds Account, with appropriate changes to be agreed);<br><br>2. [Tax distributions to PIK Note/equity holders, ratably, in respect of taxes on operating income;]<br><br>3. Payment in cash, pro rata, of accrued interest and any fees due and payable in respect of the Exit Facility and the Senior Debt and ordinary course payments under any interest rate hedging agreement;<br><br>4. Payment in cash, pro rata, of principal due and payable in respect of the Exit Facility and the Senior Debt and any termination payments under interest rate hedging agreements;<br><br>5. Funding of the Major Maintenance Reserve Account;<br><br>6. Funding of the Debt Service Reserve Account;<br><br>7. [100% Excess Cash Flow sweep, to be applied to the Exit Facility and the Senior Debt, in inverse order of maturity];<br><br>8. 100% Excess Cash Flow sweep (after payment in full of the Exit Facility and the Senior Debt Facility), to be applied pro rata to the PIK Notes;<br><br>9. Restricted Payments. |
| Governing Law | New York |