| | § | |
|---|---|---|
| IN RE: | § | CASE NO. 16-10262 |
| | § | CASE NO. 16-10263 |
| SH 130 CONCESSION COMPANY, LLC, | § | CASE NO. 16-10264 |
| ZACHRY TOLL ROAD - 56 LP, | § | |
| CINTRA TX 56 LLC, | § | CHAPTER 11 |
| | § | |
| DEBTORS. | § | JOINTLY ADMINISTERED UNDER |
| | § | CASE NO. 16-10262-TMD |

## FERROVIAL AGROMAN US CORP.'S OBJECTIONS TO—AND MOTION TO QUASH OR, ALTERNATIVELY, TO MODIFY AND LIMIT—RULE 2004 SUBPOENA TO PRODUCE DOCUMENTS

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUPTCY JUDGE:

Pursuant to FED. R. BANKR. P. 2004 ("Rule 2004"), LOCAL BANKR. RULE 2004 ("Local Rule 2004"), FED. R. CIV. P. 26 ("Federal Rule 26"), and FED. R. CIV. P. 45 ("Federal Rule 45"), made applicable to bankruptcy cases by FED. R. BANKR. P. 9016 ("Rule 9016"), Ferrovial Agroman US Corp. ("FAUS") files its Objections to—and Motion to Quash or, Alternatively, to Modify and Limit—Rule 2004 Subpoena to Produce Documents ("Motion"), respectfully showing the Court:

### I. JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334(b).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b), and the Court may enter a final order.

### II. INTRODUCTION AND RELIEF SOUGHT

2.      The Rule 2004 subpoena served by Debtor SH 130 Concession Company, LLC ("SH 130") upon FAUS on February 9, 2017 ("Subpoena") is not part of any proper Rule 2004 investigatory process, and the representations to the contrary made by SH 130's Special Counsel

("Bracewell Counsel") are, at best, suspect.[1]  The record of this bankruptcy case shows that Bracewell Counsel have, for months, claimed to be "investigating" alleged potential claims against CTHC regarding the design and construction of State Highway 130 Segments 5 and 6 ("Facility"). Bracewell Counsel's fee applications show that, over a period of many months, they have charged the bankruptcy estate millions of dollars for "investigating" SH 130's alleged potential claims against CTHC.

3.      Based on information provided to the undersigned counsel and to CTHC's litigation counsel, Bracewell Counsel estimates that they have compiled about three (3) million unique documents—and many more than three (3) million pages of documents—during their purported "investigatory" process.  Bracewell Counsel claim to have roughly 2.5 terabytes[2] of electronic data, in addition to substantial numbers of documents in non-digital format.  Rarely do litigants gather three (3) million documents—or 2.5 terabytes of electronic data—during the entire discovery process, much less just to "investigate" and decide whether there is a claim upon which suit could be filed.  Bracewell Counsel have had more than ***ample opportunity to obtain the information*** needed to decide whether SH 130 has any sort of claim against CTHC.  *See* Argument § IV(B), *infra* (citing *inter alia* FED. R. CIV. P. 26(b)(2)(C)(ii)).

4.      Bracewell Counsel's conclusory statements in prior hearings about the requested documents' being necessary to SH 130's ongoing efforts to work on a remedial plan with TxDOT are also suspect.  SH 130 has already developed a remedial plan and presented it to TxDOT.  While TxDOT might not be satisfied with the proposed remedial plan, clearly SH 130 was able to create

---

[1] On February 9, 2017, Bracewell Counsel also served virtually identical subpoenas upon CTHC and ZCC, and those subpoenas are the subject of separate motions to quash being filed contemporaneously herewith.  The FAUS Subpoena, the CTHC Subpoena, and the ZCC Subpoena are collectively referred to herein as "the  Subpoenas."

[2] A terabyte is roughly a trillion bytes, or about 1000 gigabytes, of data.

such a plan without the production of millions more documents pursuant to the Subpoenas. Bracewell Counsel, moreover, have represented to CTHC's litigation counsel and to the undersigned bankruptcy counsel that only about 20-25% of the estimated three (3) million unique documents collected to date have even been processed, and that keyword searches of that small percentage of processed documents would be unlikely to identify many—and certainly not all—of the documents in SH 130's possession, custody, and control that would be responsive to any given keyword search. Since Bracewell Counsel have not yet processed some 2,250,000 of the 3,000,000 digital documents—not to mention the non-digital documents—that they have already collected, they almost certainly are not using those documents to work with TxDOT on a remedial plan, and they do not and cannot know whether they need more documents for that effort—and if so, from whom.

5.      For these reasons and those additional reasons established below, FAUS respectfully asks this Court to quash the Subpoena in its entirety because: **(a)** the Subpoena exceeds the proper scope of Rule 2004; **(b)** violates newly amended FED. R. CIV. P. 26, made applicable to Rule 2004 subpoenas by FED. R. CIV. P. 45; **(c)** is overly broad and unduly burdensome and does not allow reasonable time to comply; **(d)** is an improper end run around the dispute resolution provisions that SH 130 itself contracted for in the design and construction contract ("D&C Contract"); and **(e)** is duplicative. Further, SH 130 has not met, and cannot meet, its burden to establish good cause for the Subpoena, and the Certificate of Conference in the "Notice of Subpoena Duces Tecum Requesting the Production of Documents of Ferrovial Agroman U.S. Corp." ("Notice") sent to FAUS on February 7, 2017, is untrue.

6.      Alternatively, FAUS respectfully asks the Court to modify and limit the Subpoena in at least all of the following ways: **(a)** the scope of the Subpoena shall be limited to those non-

privileged, non-confidential documents, if any, produced by FAUS in the *Lexington* Litigation[3] that are relevant to SH 130's work with TxDOT on a remedial plan; **(b)** the time for producing such documents shall be extended to 5:00 pm on June 30, 2017; **(c)** all documents produced by FAUS pursuant to the Subpoena shall be used solely for the purpose of SH 130's work with TxDOT on a remedial plan; **(d)** no documents produced by FAUS pursuant to the Subpoena shall be used against CTHC, FAUS, or ZCC by SH 130, or by any other person or entity, in any proceeding or forum—including without limitation any arbitration—unless the parties to such proceeding or in such forum agree otherwise, or the arbitration panel or court in such other proceeding or forum orders otherwise; and **(e)** all documents produced by FAUS shall be produced pursuant to an agreed protective and confidentiality order in substantially the same form and under substantially the same terms as the Agreed Protective and Confidentiality Order entered in the *Lexington* Litigation.[4]

### III. PROCEDURAL AND FACTUAL BACKGROUND

7.     Movant FAUS is not: **(a)** a creditor or a party in interest in this jointly administered bankruptcy case; **(b)** a party to any litigation with SH 130; or **(c)** a party to the D&C Contract upon which SH 130's alleged potential claims against Central Texas Highway Constructors, LLC ("CTHC"), if any, might be based.

8.     ***The February 7th Notice***.  On February 7, 2017, the undersigned counsel for FAUS received a document captioned "Notice of Subpoena Duces Tecum Requesting the Production of Documents of Ferrovial Agroman U.S. Corp." ("Notice").  A true and correct copy of the Notice is attached hereto as **Ex. 1** and is incorporated by reference herein.

9.     The Notice is signed by Stephen B. Crain ("Crain"), an attorney at Bracewell LLP

---

[3] *See* definition of "*Lexington* Litigation" in ¶ 22, *infra*.
[4] *See* Argument § IV(A), *infra*, and **Ex. 5** hereto.

("Bracewell") in Houston, acting in his capacity as Special Counsel for SH 130. *See* **Ex. 1** at 1-2.

10.     Exhibit A to the Notice is an unsigned Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Bankruptcy Case (or Adversary Proceeding) (B2570) ("Exhibit A"), addressed to FAUS c/o Mario Menendez, 9303 New Trails Dr. #200, The Woodlands, TX 77381. *See* **Ex. 1** at Exhibit A.

11.     The Notice and the Attachment to Exhibit A refer to Rule 2004 and ask FAUS to produce ten broad categories of documents at Bracewell's Austin office by 10:00 am on February 22, 2017, fifteen (15) days after service of the Notice. *See* **Ex. 1** and Exhibit A Attachment.

12.     ***The February 9th Subpoena***.   On February 9, 2017, FAUS was served, by and through its counsel Mario Menendez, with a signed version of the subpoena ("Subpoena"), a true and correct copy of which is attached hereto as **Ex. 2** and is incorporated by reference herein.

13.     Like the unsigned subpoena attached to the Notice, the Subpoena has an Attachment that refers to Rule 2004, and the Subpoena requires FAUS to produce at Bracewell's Austin office ten broad categories of documents by 10:00 am on February 22, 2017, which was thirteen (13) days after service of the Subpoena.  See **Ex. 2**.

14.     Since December 2016, and even after the February 9th Subpoena was served, CTHC's litigation counsel, Jeff Ford, and the undersigned bankruptcy counsel for FAUS, CTHC, and Zachry Construction Company ("ZCC") have engaged in discussions with Bracewell Counsel, including Crain, in an effort to reach an agreement to exchange documents. *See* Argument § IV(G), *infra*.

15.     Each proposed version of such an agreement involved CTHC's producing the non-privileged, non-confidential *Lexington* Litigation documents requested by SH 130 (*See*, *e.g.*, **Ex. 2** at Attachment, Item 1), in exchange for SH 130's producing to CTHC documents that would be reasonably equivalent to the *Lexington* Litigation documents in both number and substance.

16.     The parties ***were not*** able to reach an agreement to exchange documents, primarily for two reasons.  First, according to Bracewell Counsel, only about 20-25% of the estimated three (3) million unique documents that SH 130 has collected have been processed.  As a result, keyword searches of those three (3) million documents would be unlikely to identify many—and certainly not all—of the documents in SH 130's possession, custody, and control that are responsive to any particular keyword search or document request.  Second, emboldened by this Court's recent orders denying the motions to quash filed by Rodriguez Engineering Laboratories, LLC ("REL") [**Doc. 550**] and AECOM Technical Services, Inc. [**Doc. 549**],[5] Bracewell Counsel believe they can demand any documents they want from non-parties without having to produce any documents in return.[6]

17.     The parties ***were*** able to reach an agreement, however, to extend the performance date stated in the Subpoena to February 27, 2017, and the date for filing objections and/or motions to quash to February 20, 2017.  *See* February 10, 2017, email from S. Crain to J. Ford, a true and correct copy of which is attached hereto as **Ex. 3** and incorporated by reference herein.

18.     For all of the reasons stated more fully below, FAUS timely objects to and moves to quash—or, alternatively, to modify and limit—the Subpoena.

### IV. OBJECTIONS TO THE SUBPOENA AND NOTICE

19.     FAUS reiterates, adopts, and incorporates the foregoing paragraphs by reference, as if they were set forth verbatim herein, and objects to the Subpoena and Notice as follows:

**A.     The Subpoena Exceeds the Proper Scope of Rule 2004**.

20.     The Subpoena exceeds the proper scope of a Rule 2004 examination because it is not

---

[5]Pursuant to FED. R. EVID. 201, FAUS respectfully asks the Court to take judicial notice of all publicly filed documents cited in or attached to this Motion.  *See* FED. R. EVID. 201; *see also Aloe Creme Labs., Inc. v. Francine Co.*, 425 F.2d 1295, 1296 (5th Cir. 1970) (court may take notice "of its own files and records").

[6]"Emboldened" is the word Bracewell Counsel used to describe their present attitude regarding their perceived power to demand production of any documents they want pursuant to Rule 2004.

limited to documents that "relate *only* to the acts, conduct, or property or to the liabilities and financial condition of [SH 130], or to any matter which may affect the administration of [SH 130's] estate, or to [SH 130's] right to a discharge."[7] FED. R. BANKR. P. 2004(b). In addition, the Subpoena is not limited to documents regarding "the operation of any business and the desirability of its continuance, the source of any money or property acquired or to be acquired by [SH 130] for purposes of consummating a plan and the consideration given or offered therefor, [or] any other matter relevant to the case or to the formulation of the plan." *Id.*

21.     The timing of the Subpoena confirms that it does not seek information necessary to the administration of the Debtors' estate, to the preparation of the disclosure statement, or to either development of, or voting on, the Plan. In fact, the Subpoena was sent on the eve of Confirmation, long *after* the disclosure statement was approved, and even *after* votes on the Debtors' Second Amended Plan of Reorganization had been cast and tabulated.

22.     The Attachment to the Subpoena demands production of ten broad categories of documents, far in excess of the proper scope of Rule 2004. Item 1 of the Attachment, for instance, requests "*[a]ll documents*, if any, that Ferrovial Agroman U.S. Corp. produced in *Central Texas Highway Constructors, LLC v. Lexington Insurance Company*, Cause No. D-1-GN-13-001691, 53rd Judicial District Court of Travis County, Texas," an insurance coverage dispute to which SH 130 was not a party ("*Lexington* Litigation"). *See* **Ex. 2** Attachment at 1.

23.     In the *Lexington* Litigation, CTHC moved to quash twenty-six (26) non-party subpoenas, including one to FAUS, as being *inter alia* extraordinarily burdensome and expensive.[8]

---

[7]Unless otherwise indicated, all emphasis in quoted passages throughout this Motion has been supplied and did not appear in the originals, and all internal citations have been omitted.

[8]A true and correct copy of Plaintiff's Motion to Quash, for Protective Order and for Sanctions Regarding Non-Party Subpoenas Issued by Lexington Insurance Company, filed on November 11, 2013, in the *Lexington* Litigation is attached hereto as **Ex. 4** and is incorporated by reference herein.

In the face of that motion, Lexington withdrew all of its subpoenas and issued narrower ones. Even with those narrower subpoenas, though, FAUS still had to produce a total of 3429 documents, which included TIFF files and native files. The total page count of 18,849 accounts for all TIFF images and one count for each native file. As discussed in Argument §§ IV(B),(C), *infra*, having to produce even that many documents in response to the Subpoena in this case would be unduly burdensome and costly for FAUS.

24.     In addition, the *Lexington* Litigation documents were produced pursuant to an Agreed Protective and Confidentiality Order ("*Lexington* Protective Order"), a true and correct copy of which is attached hereto as **Ex. 5** and is incorporated by reference herein. Although the *Lexington* Litigation has concluded, the *Lexington* Protective Order remains binding upon the Parties (CTHC and Lexington), non-parties (including, but not limited to, SH 130), experts, and other Qualified Persons to whom the Order applies. *See* **Ex. 5** ¶ 21 at 10. The *Lexington* Protective Order also provides that with "respect to Confidential Material disclosed to CTHC or Lexington, the receiving party shall use any such Confidential Material ***solely in connection with*** [the *Lexington*] lawsuit, which is limited to trial preparation, trial, appeal, and potential settlement of the lawsuit; as well as the insurance claim made the basis of [the *Lexington*] lawsuit." *See* **Ex. 5** ¶ 4 at 3. The *Lexington* Protective Order is probative of the fact that the document production in the *Lexington* Litigation included many privileged and confidential documents.

25.     If the Subpoena only demanded production of the Item 1 *Lexington* documents, it would be too broad, but the Attachment also has an even-broader Item 2, which has nine (9) parts and multiple subparts—many of which are duplicative of one another and/or other Subpoenas— and requests ***all*** non-*Lexington* Litigation documents "that fall into one of the following categories":

a.     [all] documents pertaining to the work and services performed by Ferrovial

Agroman U.S. Corp. [sic] State Highway 130 Segments 5 & 6 (the "Facility");

b.    [all] documents pertaining to the Facility, including anything relating to the pavement design, construction, settlement analysis, causation of the pavement cracking and/or heaving, and repairs to the pavement cracking and/or heaving;

c.    [all] communications (including emails) sent or received by Ferrovial Agroman U.S. Corp.'s employees that discuss the Facility, its design, soil conditions, weather conditions, cracking of the roadway, repairs of cracking in the roadway, causes of cracking in the roadway, settlement analysis, and geotechnical consulting for the Facility;

d.    [all] executed contracts, including all exhibits, amendments and endorsements, to which Ferrovial Agroman U.S. Corp. is a party, that relate to the Facility, including contracts between Ferrovial Agroman U.S. Corp. and Central Texas Highway Constructors, LLC, SH 130 Concession Company, and/or any subcontractor;

e.    [all] records that pertain to the design and/or geotechnical consulting done in regards to the Facility, including all design drafts, proposals, sketches, notes, data reports, testing reports, or similar documents;

f.    [all] documents pertaining to the investigation of the cracking in the Facility, including any reports or data generated as a result of the investigation;

g.    [all] documents pertaining to the repair of the Facility, including recorded data, summary reports, investigative reports, photographs of any cracks, repair design reports, or similar documents;

h.    [all] documents submitted to the Texas Department of Transportation relating to the Facility, including bids, design and construction proposals, reports, and repair proposals; and

i.    [all] job logs and/or periodic reports (e.g., daily or monthly) regarding work done on the Facility.

*See* **Ex. 2** Attachment at 1-2.

26.    The scope of the ten categories in Items 1 and 2 is further broadened by the definition of "document":

For the purposes of these requests, the term "document" is used in the broadest sense

possible and includes anything subject to production under the Federal Rules of Civil Procedure, Federal Rules of Bankruptcy Procedure or the Local Rules of the United States District Court for the Western District of Texas including ***any written, printed, or published material or tangible thing***, and including ***any electronically stored information***, ***any information stored in machine readable form***, and the ***metadata associated with an electronic file***.

*See* **Ex. 2** Attachment at 2.

27.     While FAUS understands that the permissible scope of Rule 2004 is broad, it is not unlimited, and the rule itself limits the scope of a Rule 2004 examination to "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the bankruptcy estate." *In re Enron Corp.*, 281 B.R. 836, 840 (Bankr. S.D. N.Y. 2002) (citing Fed. R. Bankr. P. 2004(b)); *see also Snyder v. Society Bank*, 181 B.R. 40, 42 (S.D. Tex. 1994) (use of Rule 2004 to further its case in another forum was an abuse of Rule 2004), *aff'd sub nom. Snyder v. Society Bank* (*In re Snyder*), 53 F.3d 1067 (5th Cir. 1995); *Matter of Wilcher*, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985). The rule's primary purpose is to reveal the nature and extent of the bankruptcy estate, to discover assets, examine transactions, and determine whether wrongdoing has occurred. *See, e.g.*, *In re Enron Corp.*, 281 B.R. at 840. Once confirmation occurs, moreover, the bankruptcy estate no longer exists, so with few exceptions not relevant here, the broad inquiry permitted by Rule 2004 is no longer necessary or appropriate. *See, e.g.*, *Bank of Louisiana v. Craig's Stores of Tex., Inc.*, 266 F.3d 388, 390 (5th Cir. 2001) (debtor's estate ceases to exist after confirmation, except for matters pertaining to the plan's implementation or execution); *Colvin v. Amegy Mortgage Co., LLC*, 507 B.R. 169, 177 (W.D. Tex. 2014) (same).

28.     FAUS also understands that Rule 2004 can properly be used to investigate whether a debtor might have a claim against some person or entity. *See, e.g.*, *In re J & R Trucking, Inc.*, 431 B.R. 818, 822 (Bankr. N.D. Ind. 2010) (one purpose for a Rule 2004 examination is to gather

information needed to determine whether litigation should be filed). However, the Subpoena is not part of any proper Rule 2004 investigatory process, and Bracewell Counsel's representations to the contrary are, at best, suspect. The record of this bankruptcy case shows that Bracewell Counsel have, for months, claimed to be "investigating" alleged potential claims against CTHC regarding the design and construction of State Highway 130 Segments 5 and 6 ("Facility"). Bracewell Counsel's fee applications show that, over a period of many months, they have charged the bankruptcy estate millions of dollars for "investigating" SH 130's alleged potential claims against CTHC.

29. Based on information provided to the undersigned counsel and to CTHC's litigation counsel, Bracewell Counsel estimates that they have compiled about three (3) million unique documents—and many more than three (3) million pages of documents—during their purported "investigatory" process. Bracewell Counsel claim to have roughly 2.5 terabytes of electronic data, in addition to substantial numbers of documents in non-digital format. Rarely do litigants gather three (3) million documents—or 2.5 terabytes of electronic data—during the entire discovery process, much less just to "investigate" and decide whether there is a claim upon which suit could be filed. Bracewell Counsel have had more than **ample opportunity to obtain the information** needed to decide whether SH 130 has any sort of claim against CTHC. *See* Argument § IV(B), *infra* (citing *inter alia* FED. R. CIV. P. 26(b)(2)(C)(ii)).

30. Bracewell Counsel's conclusory statements in prior hearings about the requested documents' being necessary to SH 130's ongoing efforts to work on a remedial plan with TxDOT are also suspect. SH 130 has already developed a remedial plan and presented it to TxDOT. While TxDOT might not be satisfied with the proposed remedial plan, clearly SH 130 was able to create such a plan without the production of millions more documents pursuant to the Subpoenas. Bracewell Counsel, moreover, have represented to CTHC's litigation counsel and to the undersigned

bankruptcy counsel that only about 20-25% of the estimated three (3) million unique documents collected to date have even been processed, and that keyword searches of that small percentage of processed documents would be unlikely to identify many—and certainly not all—of the documents in SH 130's possession, custody, and control that would be responsive to any given keyword search. Since Bracewell Counsel have not yet processed some 2,250,000 of the 3,000,000 digital documents—not to mention the non-digital documents—that they have already collected, they almost certainly are not using those documents to work with TxDOT on a remedial plan, and they do not and cannot know whether they need more documents for that effort—and if so, from whom.

### B. The Subpoena Violates Newly Amended FED. R. CIV. P. 26, Made Applicable to Rule 2004 Subpoenas by FED. R. CIV. P. 45.

31. FAUS reiterates, adopts, and incorporates the foregoing paragraphs by reference, as if they were set forth verbatim herein, and continues to object to the Subpoena and Notice as follows:

32. For decades, virtually every Rule 2004 opinion has mechanically recited the "fishing expedition" metaphor. *See*, *e.g.*, *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711 (Bankr. S.D. N.Y. 1991) (Rule 2004 examination "can be legitimately compared to a fishing expedition."). As the *Drexel Burnham* court observed, the shift toward an increasingly expansive reading of Rule 2004 can be tracked back to the 1978 Code and its focus on reorganizations. *Id.* The "fishing expedition" idea, though, is usually attributed to *In re Foerst*, in which the court described the examination of the bankrupt as a "fishing examination." 93 F. 190, 190 (S.D. N.Y. 1899).

33. Recently, however, the propriety of continuing to rely upon the "fishing expedition" metaphor in the Rule 2004 context has been called into question because the cost of compliance with discovery requests has increased substantially since the 1978 Code or 1991, when *Drexel Burnham* was decided. *See*, *e.g.*, *In re SunEdison, Inc.*, 562 B.R. 243, 249-50 (Bankr. S.D. N.Y. 2017). The

"era of paper discovery in relatively small cases has given way to the discovery not only of paper but also of vast amounts of electronically stored information ('ESI'), possibly stored on outdated systems, on numerous personal computers and servers located throughout the world." *Id.* at 250 (citing Shira A. Scheindlin, MOORE'S FEDERAL PRACTICE, E–Discovery: The Newly Amended Federal Rules of Civil Procedure 3 (2006)).

34.     "Discovery has become an increasingly expensive aspect of civil litigation," and the "proliferation of information and . . . costs associated with retrieving, reviewing, and producing discovery in civil litigation" prompted the 2015 amendments to the Federal Rules of Civil Procedure and their emphasis upon proportionality.  *Id.*

35.     Federal Rule 26 now defines the scope of discovery as "any nonprivileged matter that is relevant to any party's claim or defense and *proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.*" FED. R. CIV. P. 26(b)(1); *see also In re SunEdison, Inc.*, 562 B.R. at 250.  Also, subject to certain exceptions, a party need not provide discovery of ESI from sources "that the party identifies as not reasonably accessible because of undue burden or cost."  FED. R. CIV. P. 26(b)(2)(B).

36.     Although Rule 2004 has not been similarly amended, the "spirit of proportionality is consistent with the historic concerns in Rule 2004 jurisprudence regarding the burden on the producing party and is relevant to the determination of" whether the party requesting the Rule 2004 exam or issuing the Rule 2004 subpoena has satisfied its burden of showing good cause.  *In re SunEdison, Inc.*, 562 B.R. at 250; *see also* Argument §§ IV(C), (E), (F), *infra*.

37.     More importantly, Rule 2004(c), Local Rule 2004(c), Rule 9016, Federal Rule

45(e)(1)(D), and Federal Rule 26(b)(2)(C)—working together—have made the proportionality limitations imposed by Federal Rule 26(b)(1) and the other limitations set out in Federal Rule 26(b)(2)(C) applicable to Rule 2004 subpoenas in general, and to the Subpoena in particular.

38.     Both Rule 2004(c) and Local Rule 2004(c) expressly invoke Rule 9016, which in turn makes Federal Rule 45 applicable to bankruptcy cases.  Federal Rule 45(e)(1)(D), in turn, expressly invokes the "limitations of [Federal] Rule 26(b)(2)(C)," which provides:

> (C)     *When Required*.  On motion or on its own, ***the court must limit the frequency or extent of discovery*** otherwise allowed by these rules or by local rule if it determines that:
>
> > (i)     the discovery sought is ***unreasonably cumulative or duplicative***, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
> >
> > (ii)     the party seeking discovery ***has had ample opportunity to obtain the information by discovery in the action***; or
> >
> > (iii)     ***the proposed discovery is outside the scope permitted by Rule 26(b)(1)***.

FED. R. CIV. P. 26(b)(2)(C).

39.     As established by the facts and law presented throughout in this motion (especially, Argument § IV(C), *infra*), all three subsections of Federal Rule 26(b)(2)(C) apply to the Subpoena and require the Court to quash, or at least to modify and limit the extent of, the Subpoena since: **(a)** it is "unreasonably cumulative or duplicative"; **(b)** SH 130 has had more than "ample opportunity to obtain the information" it claims to need; and **(c)** the information sought is "outside the scope permitted by [Federal] Rule 26(b)(1)," including its requirement that discovery be "*proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the*

14

*proposed discovery outweighs its likely benefit.*"

C.  **The Subpoena Is Overly Broad and Unduly Burdensome and Does Not Allow Reasonable Time to Comply**.

40.  FAUS reiterates, adopts, and incorporates the foregoing paragraphs by reference, as if they were set forth verbatim herein, and continues to object to the Subpoena and Notice as follows:

41.  The Court must quash the Subpoena because it is overly broad and unduly burdensome and costly, making compliance by February 27, 2017, unreasonable. *See*, *e.g.*, FED. R. CIV. P. 45(d)(3)(A).  Although, at present, there is no way to know exactly how much information CTHC, FAUS, and ZCC have that would be responsive to the Subpoenas issued to them on February 9, 2017, third-party vendors whom CTHC, FAUS, and ZCC have contacted about assisting with document production, should it become necessary, estimate that somewhere between 6-10 terabytes of information will have to be scanned, uploaded, and processed.

42.  The estimated costs associated with just scanning, uploading, and processing all of the documents requested by SH130 range from $703,800 to $913,027.  The estimated amount of time that would be necessary to scan, upload, and process all of the documents requested by SH 130 is at least three months.  An estimated two to three months would also be needed to review all of the data/documents as the information is processed.  While the reviewing process might perhaps overlap some with the scanning, uploading, and processing of the documents, the review process could not realistically be completed until late May or June 2017, and certainly could not be completed by February 27, 2017, as required by the Subpoenas.

43.  To put the unduly burdensome nature of the Subpoena into some context, it took almost a month and a half for CTHC, FAUS, and ZCC's third-party vendor to transfer and load just the *Lexington* Litigation database—which was all digital, had nothing in hard copy, and was largely

located in San Antonio—and that vendor is still processing the data. Even several years ago, when the *Lexington* Litigation was pending, the burdens and costs of producing the documents subpoenaed by Lexington were excessive. *See* **Ex. 4**.

44.     The foregoing estimates are subject to change, of course, as the vendors further assess the nature and amount of data to be scanned, uploaded, and processed, and as the reviewing process begins. Since the Subpoena was just served on Mr. Menendez on February 9th, FAUS cannot yet predict exactly how many pages of documents might be responsive to the Subpoena. However, consistent with the above information, FAUS can confidently say that: **(a)** it would take months to respond to all ten categories of documents listed in the Attachment to the Subpoena; and **(b)** such process would be highly disruptive and expensive to FAUS. In the event that the Court determines that the Subpoena should not be quashed as requested herein, FAUS should be compensated for any reasonable and necessary fees and expenses incurred in having to respond to the Subpoena, particularly since FAUS: **(a)** is not a party in interest in the bankruptcy case; **(b)** is not a party to any litigation involving SH 130; and **(c)** is not a party to the D&C Contract.

45.     Moreover, many of the documents covered by the Subpoena are subject to one or more privileges or a subsisting confidentiality agreement, including the previously discussed *Lexington* Protective Order. *See* **Ex. 5**. Without reasonable time to search for, gather, and review the requested documents after they have been scanned, uploaded, and processed, however, FAUS cannot adequately identify and protect such privileged and confidential documents, or prepare and provide a privilege log regarding such documents. *See*, *e.g.*, FED. R. CIV. P. 45(e)(2). Although, by this Motion, FAUS objects to, and seeks to quash, the Subpoena in its entirety, FAUS also hereby reserves all of its rights to assert any and all applicable privileges and protections regarding the documents demanded by the Subpoena.

**D.** **The Subpoena Is an Improper End Run Around the Dispute Resolution Provisions that SH 130 Itself Contracted for in the D&C Contract**.

46. FAUS reiterates, adopts, and incorporates the foregoing paragraphs by reference, as if they were set forth verbatim herein, and continues to object to the Subpoena and Notice as follows:

47. The Subpoena it is part of Bracewell Counsel's litigation strategy, pursuant to which they are not really using Rule 2004 to investigate a possible claim, but rather to build a case against CTHC, thereby circumventing the dispute resolution provisions (Article 17) of the D&C Contract and the discovery rules of the very arbitration for which SH 130 itself contracted.

48. Bracewell Counsel are doing this even though the Debtors and CTHC have agreed *inter alia* that the D&C Contract shall be preserved and shall be passed through the Chapter 11 Cases, and that any and all claims and defenses based upon, or related to, the D&C Contract—including without limitation CTHC's unsecured trade debt claim for $1,049,011.53—shall be preserved and be passed through the Chapter 11 Cases and be preserved for future adjudication in a single forum pursuant to the terms of the dispute resolution provisions of the D&C Contract.

49. Article 17 of the D&C Contract memorializes the following agreement that SH 130 made with CTHC: "Any dispute, claim, or controversy arising out of or relating to this D&C Contract, or the formation, existence, performance, breach, validity, interpretation, application, or termination thereof (the "Dispute"), shall be resolved in accordance with the procedures specified in this Section 17.1, which shall be the sole and exclusive procedures for the resolution of any such Disputes." For the Court's reference, a true and correct copy of Article 17 of the D&C Contract is attached hereto as **Ex. 6** and is incorporated by reference herein.

50. Article 17 requires the parties to use their best efforts to settle any Dispute "arising

out of or relating to" the D&C Contract. **Ex. 6** at Art. 17.1(b). If the Dispute is not resolved by negotiation within a period of thirty (30) days following written notice, then that Dispute "shall be finally resolved by arbitration administered by the International Chamber of Commerce International Court of Arbitration ("ICC") under its then current Rules of Arbitration ("ICC Rules"), as modified by the D&C Contract." **Ex. 6** at Art. 17.1(c).

51.     Each subcontract also has a similar provision, and for the Court's reference, a true and correct copy of Section 17 of the Earth Tech, Inc. n/k/a AECOM Technical Services, Inc.'s subcontract is attached here to as **Ex. 7** and is incorporated by reference herein.

52.     While SH 130 has not commenced an arbitration, it certainly has raised disputes, claims, or controversies sufficient to trigger the provisions of Article 17. On October 16, 2015—months before the March 2, 2016, Petition Date—SH 130 sent CTHC a written Notice of Potential Arbitration & Document Retention Obligations ("Dispute Notice"). A true and correct copy of the Dispute Notice is attached hereto as **Ex. 8** and is incorporated by reference for the purposes for which it is cited herein. Among other things, the Dispute Notice references "recent slope and pavement failures" and says, "Developer [SH 130] is considering its options, but it appears that we will have to invoke the dispute resolution provisions of the D&C Contract. This letter is to put Contractor on notice that this matter may proceed to arbitration." **Ex. 8** at 1. The Dispute Notice also made various "litigation hold" demands upon CTHC. **Ex. 8** at 2-3.

53.     In addition to the Dispute Notice, both SH 130's Disclosure Statement and its soon-to-be-confirmed Plan describe SH 130's alleged disputes, claims, and controversies with CTHC.

54.     On February 14, 2017, moreover, SH 130 sent CTHC a letter and the results of a 2016 Pavement Survey, further delineating the disputes, claims, and controversies between SH 130 and CTHC. A true and correct copy of the February 14, 2017, letter is attached hereto as **Ex. 9** and is

incorporated by reference for the purposes for which it is cited herein.

55.     SH 130 and CTHC contracted for ICC arbitration—as the means of resolving their disputes, claims, and controversies—because discovery in such arbitrations is limited and because SH 130 and CTHC believed arbitration would be more efficient and economical than litigation.

56.     SH 130 and Bracewell Counsel have decided to pre-empt and violate both the letter and the spirit of the parties' agreement, however, and to misuse Rule 2004 in an effort to get a head start on building their alleged case against CTHC.  Worse yet, Bracewell Counsel are unfairly trying to gather documents pursuant to Rule 2004 from entities like FAUS and ZCC, which: **(a)** are not parties to the D&C Contract; and **(b)** cannot send reciprocal discovery requests to SH 130 pursuant to Rule 2004.

57.     Bracewell Counsel should not be permitted to abuse Rule 2004 to try to obtain information for use in a case that will ultimately be pending, if ever, in another tribunal.  *See*, *e.g.*, *In re Enron Corp.*, 281 B.R. at 841-43; *see also Snyder*, 181 B.R. at 42 (using Rule 2004 to further a state court action was a abuse of the rule; bankruptcy court did not abuse its discretion by denying production under Rule 2004 subpoena, where appellant's primary motivation was to use those materials in a state court action against the examinee); *Ernst & Young, LLP v. Pritchard* (*In re Daisytek, Inc.*), 323 B.R. 180, 186-88 (N.D. Tex. 2005) (bankruptcy court abused its discretion by failing to "distinguish between the disparate types of proceedings" that "could flow from the information obtained through the Rule 2004 examination"; on remand, bankruptcy court must use the *National Gypsum* analysis to "determine the extent to which the proceedings" to be initiated "derive exclusively from the provisions of the Bankruptcy Code," and to the extent that a proceeding does not do so, bankruptcy court "must give effect to the terms of any applicable arbitration clauses"); *cf.* Local Bankr. Rule 2004(a) (Rule 2004 does not apply in adversary proceedings); *In re*

*Bennett Funding Group, Inc.*, 203 B.R. 24, 30 (Bankr. N.D. N.Y. 1996) (limiting trustee to Federal Rule discovery devices because *inter alia* the subject matter of the pending adversary proceeding was inseparable from the subject matter of the Rule 2004 examination, thereby creating an unavoidable back door through which the trustee could use Rule 2004 to avoid the Federal Rules).

58.     While Bracewell Counsel has tried to dress its strategy up in various sorts of Rule 2004 robes, nothing can disguise the fact that it is really nothing more than an improper end run around the very dispute resolution provisions that SH 130 itself contracted for, in part to limit discovery costs.  This Court should not countenance such conduct and misuse of Rule 2004.

59.     If—as Bracewell Counsel claim, but FAUS denies—the requested documents are necessary to SH 130's work on a remedial plan with TxDOT, then the Court should limit the Subpoena and SH 130's use of the documents to that purpose and forbid SH 130 or any other party from using the subpoenaed documents against  CTHC, ZCC, or FAUS in any other proceeding or forum—including any arbitration, if any—or for any other purpose, unless the parties to such proceeding or in such forum agree otherwise, or the arbitration panel or court in such other proceeding or forum orders otherwise.  *See*, *e.g.*, *In re Enron Corp.*, 281 B.R. at 841-43.

**E.      The Subpoena Is Duplicative**.

60.     FAUS reiterates, adopts, and incorporates the foregoing paragraphs by reference, as if they were set forth verbatim herein, and continues to object to the Subpoena and Notice as follows:

61.     At or about the same time that Bracewell Counsel sent the Subpoena to FAUS, Bracewell Counsel sent the virtually identical and equally defective Subpoenas to CTHC and ZCC, which Subpoenas are the subject of separate motions to quash being filed contemporaneously herewith.  As the Court is aware, Bracewell Counsel has also sent virtually identical subpoenas to some of CTHC's subcontractors, including REL and AECOM.  These virtually identical subpoenas

are highly likely to result in duplicative document productions—or in document productions that overlap significantly with one another, as well as with the multiple categories of documents that were made the subject of the litigation hold portions of the Dispute Notice that SH 130 sent to CTHC in October 2015 (**Ex. 8** at 2-3).

62.     That Bracewell Counsel have now **(a)** requested essentially the same documents from so many different sources—including without limitation REL and AECOM, in addition to CTHC, ZCC, and FAUS—and **(b)** do not even know what documents they already have strongly suggests that the Subpoenas are intended more for purposes of abuse and harassment than for investigation. Rule 2004 cannot be used for purposes of abuse and harassment. *See*, *e.g.*, *In re Enron Corp.*, 281 B.R. at 840.

**F.     SH 130 Has Not Met, and Cannot Meet, Its Burden to Show Good Cause**.

63.     FAUS reiterates, adopts, and incorporates the foregoing paragraphs by reference, as if they were set forth verbatim herein, and continues to object to the Subpoena and Notice as follows:

64.     Based on the facts and law set out above, SH 130 has not met, and cannot meet, its burden of establishing good cause for the unduly burdensome, expensive, excessive, and duplicative production of documents demanded by the Subpoena. *See*, *e.g.*, *Drexel Burnham*, 123 B.R. at 712.

65.     SH 130 has not shown, and cannot show, that the documents sought by the Subpoena—and the other Subpoenas—are either necessary for the purported investigatory and remedial purposes claimed by Bracewell Counsel, or that quashing the Subpoena—and the other Subpoenas—will cause SH 130 undue hardship or injustice. *See*, *e.g.*, *In re Wilcher*, 56 B.R. at 434-35 (good cause ordinarily shown if "requested documents are necessary to establish [the requesting party's] claim" or if "denial of production would cause undue hardship or injustice"; and the "burden of showing good cause is an affirmative one" that "is not satisfied merely by a showing that justice

would not be impeded by production of the requested documents").

66.     If anything, calling a halt to Bracewell Counsel's endless gathering and warehousing of more documents and more terabytes of data than they can reasonably process or use will save the Estate millions of dollars.  More streamlined discovery is what SH 130 contracted for in the D&C Contract, and that all subcontractors on the tollroad project agreed to as well.

67.      In evaluating whether SH 130 has shown good cause, the Court must "balance the competing interests of the parties, weighing the relevance of and the necessity of the information sought by the examination.  That documents meet the requirement of relevance does not alone demonstrate . . . good cause for requiring their production."  *Drexel Burnham*, 123 B.R. at 712.

68.     As demonstrated by the facts and law set out in this Motion, balancing those competing interests weighs in favor of quashing the Subpoena.

**G.     The Notice's Certificate of Conference Is Untrue**.

69.     As the Court may recall, in late November 2016, the undersigned counsel filed objections and motions to vacate, strike, or quash some Letter Document Requests sent by Bracewell Counsel to FAUS, ZCC, and Dr. Dallas Little, who is one of CTHC's consulting experts.  [**Docs. 456, 458, 461**].  While Bracewell Counsel calls those Letter Document Requests "informal requests for documents," there was nothing informal about them.  [*See* **Docs. 456** at Ex. 1, **458** at Ex. 1, **461** at Ex. 1].  In fact, when REL's counsel received the "informal request[ ] for documents" that was sent to REL, she began to comply precisely because the request made demand for such production by date, time, and place certain and invoked both Rule 2004 and the authority of this Court.  REL's counsel discontinued the production, though, as soon as she realized that the "informal request[ ] for documents" or "faux subpoena" could not really require the performance that it demanded.

70.     In the face of FAUS, ZCC, and Dr. Little's objections and motions [**Docs. 456, 458,**

**461**], Bracewell Counsel—*not* the undersigned counsel for FAUS, ZCC, and Dr. Little—*withdrew* their "informal request[ ] for documents" on December 13, 2016 [**Doc. 482**].

71.     Since around mid-December, CTHC's counsel have been conferring with Bracewell's counsel via email and telephone, in an effort to come to some sort of agreement that would afford SH 130 certain documents that it wanted in exchange for SH 130's providing CTHC with certain documents that it wanted. *See* Procedural and Factual Background § III, *supra*. Even after the Subpoenas were served on February 9th, counsel for CTHC and Bracewell continued to confer about possible *quid pro quo* agreements that could dispose of the document requests to CTHC, ZCC, FAUS, and CTHC's subcontractors.

72.     Contrary to the representations made in the certificate of conference, at no time during those negotiations did CTHC "refuse" to produce documents, but CTHC was certainly not under any duty to voluntarily produce documents just because Bracewell Counsel wanted them, particularly since Bracewell Counsel rejected each and every *quid pro quo* proposal made by CTHC. Ultimately, the negotiations were terminated on February 16, 2017, by Crain, *not* by CTHC.

## V.  MOTION TO QUASH SUBPOENA

73.     FAUS hereby reiterates, adopts, and incorporates all of the foregoing paragraphs by reference, as if they were set forth in their entirety herein, and for all of the foregoing reasons hereby asks the Court to sustain FAUS's objections and quash the Subpoena in its entirety.

## VI.  ALTERNATIVE MOTION TO MODIFY AND LIMIT SUBPOENA

74.     Alternatively, FAUS hereby reiterates, adopts, and incorporates the foregoing paragraphs by reference, as if they were set forth in their entirety herein, and for all of the foregoing reasons hereby asks the Court to sustain FAUS's objections and modify and limit the Subpoena in at least all of the following ways:

**(a)**     the scope of the Subpoena shall be limited to those non-privileged, non-confidential documents, if any, produced by FAUS in the *Lexington* Litigation that are relevant to SH 130's work with TxDOT on a remedial plan

**(b)**     the time for producing such documents shall be extended to 5:00 pm on June 30, 2017;

**(c)**     all documents produced by FAUS pursuant to the Subpoena shall be used solely for the purpose of SH 130's work with TxDOT on a remedial plan;

**(d)**     no documents produced by FAUS pursuant to the Subpoena shall be used against CTHC, FAUS, or ZCC by SH 130, or by any other person or entity, in any proceeding or forum—including without limitation any arbitration—unless the parties to such proceeding or in such forum agree otherwise, or the arbitration panel or court in such other proceeding or forum orders otherwise; and

**(e)**     all documents produced by FAUS shall be produced pursuant to an agreed protective and confidentiality order in substantially the same form and under substantially the same terms as the Agreed Protective and Confidentiality Order entered in the *Lexington* Litigation.

## VII.  CONCLUSION AND PRAYER

75.     For the foregoing reasons, FAUS respectfully asks the Court to sustain FAUS's objections and quash the Subpoena in its entirety.  Alternatively, FAUS asks the Court to sustain FAUS's objections and enter an order modifying and limiting the Subpoena in at least all of the following ways: **(a)** the scope of the Subpoena shall be limited to those non-privileged, non-confidential documents, if any, produced by FAUS in the *Lexington* Litigation that are relevant to SH 130's work with TxDOT on a remedial plan; **(b)** the time for producing such documents shall

be extended to 5:00 pm on June 30, 2017;  (**c**) all documents produced by FAUS pursuant to the Subpoena shall be used solely for the purpose of SH 130's work with TxDOT on a remedial plan; (**d**) no documents produced by FAUS pursuant to the Subpoena shall be used against CTHC, FAUS, or ZCC by SH 130, or by any other person or entity, in any proceeding or forum—including without limitation any arbitration—unless the parties to such proceeding or in such forum agree otherwise, or the arbitration panel or court in such other proceeding or forum orders otherwise; and (**e**) all documents produced by FAUS shall be produced pursuant to an agreed protective and confidentiality order in substantially the same form and under substantially the same terms as the Agreed Protective and Confidentiality Order entered in the *Lexington* Litigation.  Further, FAUS asks the Court to grant it all other relief to which it may be justly entitled, at law or in equity.

Respectfully submitted,

LANGLEY & BANACK, INC.
745 E. Mulberry, Suite 900
San Antonio, Texas  78212
Telephone:  210-736-6600
Facsimile:  210-736-6889

By:  */s/ David S. Gragg*
      DAVID S. GRAGG
      dgragg@langleybanack.com
      State Bar No. 08253300
      SARA MURRAY
      smurray@langleybanack.com
      State Bar No. 14729400

**ATTORNEYS FOR FERROVIAL
AGROMAN US CORP.**

**CERTIFICATE OF SERVICE**

The undersigned attorney of record hereby certifies that on February 20, 2017, true and correct copies of the foregoing Ferrovial Agroman US Corp.'s Objections to—and Motion to Quash or, Alternatively, to Modify and Limit—Rule 2004 Subpoena to Produce Documents were (1) served electronically upon those registered to receive electronic notice via the Court's CM/ECF system in the above-captioned case; and (2) served either electronically or by First Class Mail upon those included on the attached Sixth Amended Master Service List [**Doc. 391**].

<u>/s/ David S. Gragg</u>

David S. Gragg

W:\lbclient\19427\0002\L1241995.WPD